UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOHN BOWMAN, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   No. 4:21-cv-01406-NAB |
| | ) |
| ROBERT L. CHAMBERS, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## BOWMAN PLAINTIFFS' TRIAL BRIEF

The Bowman Plaintiffs, by and through their undersigned counsel, and pursuant to the Amended Case Management Order in this matter, submit the following trial brief in support of their Complaint and their proposed Council District map.

## INTRODUCTION

The 2020 Census reflected significant population shifts in St. Louis County, which render the current County Council Districts unequal in population in violation of the "one person, one vote" requirement of the Equal Protection clause of the Fourteenth Amendment to the United States Constitution, as well as Article I, Section 2 of the Missouri Constitution. The St. Louis County Charter sets forth a mechanism for redistricting that requires significant bipartisan compromise in order to adopt a new map: a 14-member Bipartisan Reapportionment Commission with one Democrat and one Republican appointee for each of the seven County Council Districts. There is no provision made for redistricting should the Commission fail to adopt a map by its Charter-imposed deadline.

For the fifth consecutive decade, the Commission has failed to adopt or report out any map to redistrict the County Council seats. This Court must now adopt a new map that complies with the constitutions and laws of the United States, the State of Missouri and St. Louis County. Two

sets of Plaintiffs – the Bowman Plaintiffs and the Arps Plaintiffs – filed similar lawsuits seeking similar relief, and those actions have been consolidated. The Bowman Plaintiffs are the seven Democrat Commissioners. The Arps Plaintiffs are some of the seven Republican Commissioners, and a smattering of other Republican politicians, including the three incumbent Republican County Council members[1]. The Bowman Plaintiffs are proposing the map they presented to the Commission for a vote, which failed 7-to-7. The Arps Plaintiffs offer the map their Republican Commissioners presented to the Commission for a vote, which also failed 7-to-7. They also offer a second map, which their Republican Commissioners sought to present to the Commission as a "compromise map" but which the Commission declined even to consider.

The Bowman Plaintiffs will present opinion testimony from Dr. David Kimball, a professor of political science at the University of Missouri – St. Louis and an expert in voting behavior and elections in the U.S. In his opinion, the three maps being offered by the parties are, statistically speaking, essentially equal in terms of achieving population equality, compactness, contiguity and racial fairness. However, the Bowman Plaintiffs' proposed map is preferable among the three, because it does a materially better job of respecting municipal boundaries, a long-recognized traditional redistricting principle that is now required under the Missouri Constitution for state legislative redistricting pursuant to an overwhelmingly-approved ballot measure. Further, Dr. Kimball cites in his report and will testify to the fact that much recent scholarship produced since

---

[1] The Arps Plaintiffs are also joined by one of the incumbent Democrat Council members, Rita Heard Days. However, based on Ms. Days' own testimony, she joined the action to protect against the possibility of a map being proposed that would dilute the minority population in her district (the 1st District) in violation of the Voting Rights Act. No such map is being offered by any of the parties. Ms. Days testified that the Bowman Plaintiffs' map looks fine to her, and she is not contending it violates the VRA. Indeed, all of the maps being proposed comply with the VRA, and it is a safe presumption the Court will not adopt any map that would violate the VRA. The Arps Plaintiffs now have moved to dismiss voluntarily the VRA claim included in their First Amended Complaint. It is unclear what standing and interest plaintiff Days has to continue in this action in light of her testimony and the VRA claim being dismissed.

the last round of decennial redistricting shows that respecting political subdivision boundaries has significant positive benefits for the effectiveness of representative democracy[2].

Based on what the evidence will be, the Bowman Plaintiffs respectfully submit that the Court find that the Bowman Plaintiffs' proposed map meets the constitutional and legal requirements of equal population, compactness, contiguity and racial fairness, and also does a materially better job of respecting municipal boundaries, a recognized traditional redistricting principle with significant electoral benefits. For those reasons, the Court should adopt the Bowman Plaintiffs' proposed map of the St. Louis County Council Districts for the next ten years.

Much of the Arps Plaintiffs' litigation strategy up to this point has been to seek to relitigate grievances over what transpired during the Commission proceedings, and who is to blame for the Commission's failure to adopt a map. However, such matters are wholly irrelevant. It is undisputed that the Commission did not adopt a map. Accordingly, the sole focus of this case is that the Court must now adopt or draw a map to cure the constitutional violations that would occur if the 10-year-old districts – now of unequal population – were used going forward.

The issue is what is the most appropriate map. And, with respect to the Court's consideration of the maps proposed by the parties, the issue is their respective attributes, not their lineage.

**SUMMARY OF MATERIAL EVIDENCE CONCERNING PROPOSED MAPS**

The Bowman Plaintiffs incorporate by reference the facts set forth in their Proposed Findings of Fact and Conclusions of Law, as well as the parties' Joint Stipulation. With respect to

---

[2] Moreover – to the extent the Court deems this evidence relevant and desires to hear it – by keeping municipalities intact to the extent possible, the Democrat Commissioners did not achieve any measurable partisan political advantage; nor was that their intent.

the competing maps before the Court, the Bowman Plaintiffs submit the following to reflect the pertinent evidence of their attributes.

The Bowman Plaintiffs submit for the Court's consideration their proposed map, which was a map proposed by the Bowman Plaintiffs at the final meeting of the Bipartisan Reapportionment Commission, known variously as the "Democrat Version 3" map and "Map Submitted by Brian Wingbermuehle on 11/22/21" (hereinafter "Bowman Map"). The Bowman Map has a maximum population deviation of 0.63%, an average deviation of 0.196%. To support their proposed map, the Bowman Plaintiffs offer the report and testimony of Dr. David Kimball. Dr. Kimball reviewed the Bowman Map and concluded that it complies with the constitutional and legal requirements of equal population, compactness, contiguousness and racial fairness. Dr. Kimball further concludes that the differences between the three maps in terms of population equality and compactness are so small as to be insignificant, i.e. *de minimis*, but that the Dem v. 3 map does a materially better job of keeping political subdivisions (municipalities) together while also achieving the other constitutional and legal requirements.

The Arps Plaintiffs are presenting two maps for the Court's consideration. One map was proposed by the Republican members at the final meeting of the Bipartisan Reapportionment Commission, and has been labeled as "Republican Map Version 1" and "Map Submitted by Adam Bohn on 11/8/21." Republican Map Version 1 has a maximum population deviation of 0.34% and an average deviation of 0.124%. The Arps Plaintiffs' other map is a map that a Republican Commissioner moved to have the Commission consider during its last meeting, but which the Commission declined to consider. The Republican Commissioners and the Arps Plaintiffs have referred to this second map as the purported "Compromise Map," a label the Bowman Plaintiffs have disputed. It has also been referred to as "Map Submitted by Adam Bohn on 11/21/21." In his

report and testimony, Dr. Kimball refers to this map as the "Republican Alternative Map." That map has a maximum population deviation of 0.429% and an average deviation of 0.158%.

All three proposed maps before the Court maintain two majority-minority districts, the 1st and 4th Districts. There is no claim before the Court that any proposed map would violate the provisions of the federal Voting Rights Act ("VRA").

Arps Plaintiff Tim Fitch is the current Councilperson for the existing Third District. His term expires in January 2023, with his successor to be elected in this year's primary and general elections. Fitch fully intends to seek reelection. In October 2020, Fitch and his wife sold their long-time residence and signed a two-year lease on a condominium located in the far northwest corner of the existing Third District. The Republican/Arps Plaintiffs' proposed maps seek to keep Fitch within the Third District by extending an appendage, variously referred to as the Fitch "head" or "thumb," up out of the core of the new district to capture Fitch's rental condo. Given the dynamics of the population shifts in the County and the Third District specifically, *any* effort to keep Fitch in the Third District requires some form of appendage reaching out of the core of the new district, which renders that district materially less compact.

## ARGUMENT

### I. The Current Districts Violate Plaintiffs' Equal Protection Rights

In 1962, the Supreme Court held for the first time that election districting and apportionment claims present justiciable questions. *Baker v. Carr,* 369 U.S. 186 (1962). What has followed is an ongoing, six-decade deluge of redistricting and reapportionment cases in federal courts. In a series of cases the Supreme Court recognized the "one person, one vote" principle in the context of Congressional districting, state legislative redistricting, and local legislative redistricting. *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964) (Congressional); *Reynolds v. Sims*, 377

5

U.S. 533, 568 (1964) (state legislatures); *Avery v. Midland Cty., Tex.*, 390 U.S. 474, 88 S. Ct. 1114 (1968) (local legislative bodies).

From the inception of the "one person, one vote" principle, the Supreme Court has been clear that it is not literally a mathematical requirement of 1 to 1, and perfect population equality is not required (or possible): "We realize that it is a practical impossibility to arrange legislative districts so that each one has an identical number of residents, or citizens, or voters. Mathematical exactness or precision is hardly a workable constitutional requirement." *Reynolds*, 377 U.S. at 577. In the ensuing decades, numerous cases have shaped "one person, one vote" jurisprudence to define how much population deviation is constitutionally acceptable, and for what reasons:

> [T]he Court has several times elaborated on the scope of the one-person, one-vote rule. States must draw congressional districts with populations as close to perfect equality as possible. See *Kirkpatrick v. Preisler,* 394 U.S. 526, 530–531, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). But, when drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness. See *Brown v. Thomson,* 462 U.S. 835, 842–843, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983). Where the maximum population deviation between the largest and smallest district is less than 10%, the Court has held, a state or local legislative map presumptively complies with the one-person, one-vote rule. Maximum deviations above 10% are presumptively impermissible.

*Evenwel v. Abbott*, 578 U.S. 54, 59–60, 136 S. Ct. 1120, 1124, 194 L. Ed. 2d 291 (2016).

Here, the maximum population deviation of the existing districts, adopted based on the 2010 Census, is over 15%. All parties before the Court agree that the existing Council District map is unconstitutional due to that population variance. The dispute before the Court is not *whether* a remedy is appropriate, but *what* remedy is most appropriate.

## II. Constitutional and Legal Standards Applicable To Redistricting

As stated above, as a rule of thumb, with respect to state and local redistricting maps, a maximum population deviation of 10% or less is presumed to comply with the "one person, one

6

vote" principle. When a court scrutinizes the population deviations of a proposed redistricting map, the inquiry is generally whether the deviations are of a *de minimis* or significant nature, and if significant, whether they are explained by good faith efforts to achieve traditional redistricting principles.

At the threshold, we recognize that *de minimis* or "relatively minor" population deviations are not of constitutional concern. "[R]elatively minor population deviations" are not considered "to substantially dilute the weight of individual votes in the larger districts so as to deprive individuals in these districts of fair and effective representation." *White v. Regester*, 412 U.S. 755, 764, 93 S. Ct. 2332, 2338–39 (1973). The principle of population equality "d[oes] not entirely preclude small deviations" in service of other traditionally recognized reapportionment principles. *Karcher v. Daggett*, 462 U.S. 725, 741 n. 11, 103 S. Ct. 2653, 2664, 77 L. Ed. 2d 133 (1983).

Again, for state and local redistricting, the Supreme Court has drawn the line for "minor deviations" at a total maximum deviation of ten percent (10%). *Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983). Moreover, the fact that "minor improvements" in population equality might be achieved does not foreclose a map from being found to be a "good faith effort" to achieve population equality. *Karcher*, 462 U.S. at 740 n. 10. Indeed, courts have often favored plans with higher population deviations and which reflect traditional redistricting principles, over plans that have slightly lower population deviation. *Id*. at 741 n. 11.

Moreover, the Supreme Court has also suggested that District Courts may consider maps *proposed* in the applicable legislative body, and the focus of inquiry still is on whether other criteria used in creating the map results in a substantial or *de minimis* deviation from the constitutionally-required population equality. When selecting or drawing a district map, federal courts "should follow the policies and preferences of the State, as expressed in statutory and

7

constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 795, 93 S. Ct. 2348, 2355 (1973).

Notably, keeping political subdivisions together was the first "traditional districting objective" mentioned by the *Evenwel* court as an historically-recognized justification for population deviations. *Evenwel*, 578 U.S. at 60. The history of "one person, one vote" jurisprudence reflects that keeping political subdivisions intact is highly-regarded as a legitimate and worthy redistricting objective that justifies population deviations. In the case of *Mahan v. Howell*, the Supreme Court upheld a state level redistricting map that had a maximum population deviation **over 16%**, because the evidence was that the deviations were the result of adhering to the legitimate interest in keeping political subdivisions intact. *Mahan v. Howell*, 410 U.S. 315, 329, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

In 2018, the voters of Missouri overwhelmingly approved amendments to their State Constitution, including new criteria and processes for redistricting the state legislature. The legislature is now required to preserve political subdivision boundaries to the maximum extent possible while still achieving population equality, contiguousness and compactness. Mo. Const. Art. III, § 3. Preserving subdivision boundaries is an especially important criteria, as it is the only criteria for which the maximum population deviation is allowed to exceed 1% - deviations in service of keeping political subdivisions together are permitted up to 3%. As recognized by this Court previously in *Fletcher v. Golden*, No. 91-2314C(7), 1992 WL 105910 at *8 (E.D. Mo. 1992) *aff'd* 959 F.2d 106 (8th Cir. 1992), the redistricting standards set forth in Article III, § 3 are applicable to St. Louis County Council redistricting[3].

---

[3] Prior to the 2018 amendments, the provision was found in Art. III, Section 2. The 2018 Amendments created a new Section 2 pertaining to lobbying and gift regulations, and moved the former Section 2 to now Section 3.

### III. "Political Considerations" Are An Irrelevant And Thorny Morass From Which The Court Should Steer Clear, But Ultimately That Evidence Supports The Bowman Plaintiffs' Proposed Map

The Court need not attempt to make its way through the briar patch of evidence regarding the political motivations behind the maps before it, but if it does, the Bowman Plaintiffs submit that emerging from that thicket, the Court will reach two inescapable conclusions: 1) that the Democrat effort to respect municipal boundaries was not a pretext for gaining partisan advantage (which it did not do) but a genuine effort to respect a traditional and beneficial redistricting principle while still complying with the constitutional and legal requirements of population equality, compactness, contiguity and racial fairness; and 2) that the Republican's proposed maps – which are nearly identical, especially in this regard – seek to alter the partisan lean of districts, particularly the Third District, to favor Republicans, and to render the Third District materially less compact in service of drawing in an incumbent whose term is expiring and moved to a rental property on the very north edge of the existing Third District.

The Arps Plaintiffs take the position that "political considerations" are relevant to attack the Bowman Plaintiffs' proposed map, but for no other purposes[4]. In support of that argument, the Arps Plaintiffs hold up Judge Perry's memorandum opinion in *Corbett v. Sullivan*, 202 F.Supp.2d 972 (E.D. Mo. 2002), where Judge Perry chose to consider evidence of political motivations behind the maps proposed by the Democrats and Republicans in that case, unsurprisingly found that there were at least some political considerations behind both proposed maps, and therefore

---

[4] In particular, the Arps Plaintiffs, while professing to propose a map "free of political considerations," seek to exclude as "prejudicial" various evidence that Republican Commissioners were strident partisans heavily embedded in conservative Missouri Republican politics. Such evidence includes, without limitation, admissions by Adam Bohn in his deposition that he believes "20 to 30 percent" of Democrats are "commies," and that mid-County Democrats are "blue crazies" who practice a "maskhole religion" that requires wearing "dehumanizing face diapers."

9

concluded she had to draw her own map. For the reasons that follow, the Arps Plaintiffs' argument is far off the mark.

First, Judge Perry failed to heed the ruling of the Eighth Circuit in *Fletcher v. Golden*, 959 F.2d 106 (8th Cir. 1992), and other binding federal precedent that political considerations behind maps are irrelevant when the court is either adopting or drawing its own map in the absence of legislative action, and that courts should avoid "the impossible task of extirpating politics from what are the essentially political processes of the sovereign states." *See, e.g., Fletcher*, 959 F.2d at 108, *citing Gaffney v. Cummings*, 412 U.S. 735, 752-54 (1973). It is naïve to assert that only some of the maps before the court took into account political considerations – they all did, as the process is inherently political (it is a "Bipartisan" commission composed of equal numbers of partisans, not a "non-partisan" commission). Second, on numerous material grounds, *Corbett* is distinguishable and does not compel a similar result here.

The Eighth Circuit was very clear in *Fletcher*. Where the Commission fails to adopt any map, this Court is "free to draw its own plan, or to adopt a plan that had been proposed to the Commission," and under either scenario, "evidence of partisan political motivation is irrelevant and need not be considered." *Fletcher*, 959 F.2d at 109. The wisdom and purpose of this view is self-apparent: admitting evidence of the political motivations behind maps proposed to the Commission will risk taking away the option of adopting a proposed map, lest the Court be seen as making a political choice. With political motivations – real or perceived – excluded from evidence, the Court can better maintain separation from politics. Once purported political motivations are allowed in the record, the Court risks becoming inextricably entangled in them.

In the underlying decision of Judge Jean Hamilton in *Fletcher*, she explained the rationale for excluding the evidence of political motivation as follows: "a court, where no legislative body

10

has adopted a plan, should base its decision on the Constitution and the laws rather than become embroiled in partisan political questions." *Fletcher*, 1992 WL 105910, at *9. The rationale was not confined to there being only three factors expressly mentioned in the St. Louis County Charter. Rather, Judge Hamilton referred broadly to "the Constitution and the laws."

In *Fletcher*, the Democrats sought to introduce evidence of "political considerations," to wit, "evidence concerning political competitiveness and evidence concerning the protection of incumbents," *Fletcher*, 1992 WL 105910 at *9. The Eighth Circuit shed more light on the specifics of that evidence, which was that the Republican-supported maps (including the map that Judge Hamilton ultimately adopted, which selection was upheld by the Eighth Circuit) shifted the Third District from a toss-up to a Republican-leaning district, and stuck two Democrat incumbents together in a single district. *Fletcher*, 959 F.2d 107-108.

In this regard, *Corbett* mis-cites *Fletcher*, and the Arps Plaintiffs here continue that game of jurisprudential "telephone." *Corbett* stated that *Fletcher* upheld the exclusion of political motivations behind the maps proposed at the Commission supposedly "because the County Charter only specified equality, compactness, and contiguity." *Corbett*, 202 F. Supp. 2d at 980. That is not quite accurate; nowhere in the Eighth Circuit's *Fletcher* opinion does the court cite the County Charter's three express factors as the rationale for upholding the exclusion of evidence of political motivations behind the maps (all of which had been proposed before the Commission in that case). *Fletcher* drew a clear distinction between reviewing a map that had been enacted by a legislature and then challenged in court, on the one hand, and the Court having to draw or adopt a map after a legislative failure to act, on the other. In the latter scenario, whether drawing its own map or adopting one that was proposed to the legislature (by one political side or the other), the Eighth

11

Circuit clearly stated that political motivations behind the maps are irrelevant. *Fletcher*, 959 F.2d at 109.

Furthermore, the laws applicable at the time of *Corbett* are now materially different. First, to the extent claims of "partisan political gerrymandering" have been used to argue for the relevance of political considerations in the past, such claims are now held non-justiciable by the Supreme Court. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 204 L. Ed. 2d 931 (2019). Second, the legal landscape of redistricting in Missouri has changed. In *Corbett*, the court rejected the Republican litigants' argument that the County Council map should respect political subdivision boundaries to the extent possible on grounds that it was not a "factor[] traditionally used in either St. Louis County or the State of Missouri." *Id*. at 987. When making that finding the *Corbett* court cited various cases in contrast, such as *Voinovich v. Quilter*, where Ohio's constitution favored respecting political subdivision boundaries[5]. *Corbett* was decided in 2002. In 2018, the Missouri electorate overwhelmingly approved changing the constitution to require redistricting of the Missouri legislative districts to respect political subdivision boundaries as much as possible[6]. Thus, the rationale underlying *Corbett* – that coterminosity is not a factor used in *either* the County or the State – is no longer applicable. In fact, in *Fletcher* Judge Hamilton expressly cited to the Missouri Constitution's provision regarding state legislative redistricting as being relevant and applicable to the factors to consider when redistricting the St. Louis County Council. *Fletcher*, 1992 WL 105910 at *8 (citing Mo. Const. Art. III, § 2 (now § 3) as a "State Consideration" relevant to the council district reapportionment process).

---

[5] *Corbett*, 202 F.Supp.2d at 984, *citing Voinovich v. Quilter*, 507 U.S. 146, 153 (1993).
[6] *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2507, 204 L. Ed. 2d 931 (2019). Subsequently, in 2020, the voters further amended the redistricting provisions of the state constitution to replace an independent state demographer with bipartisan redistricting commissions, but the requirement to maximize coterminosity with political subdivision boundaries, and the additional leeway to deviate from mathematical population equality in service of that objective, were retained.

The facts in this case are also materially different than those in *Corbett*. In *Corbett* the Court stated that "the Republicans' attempt to use [municipal boundaries] as an explanation for their ***extremely uncompact*** Third District looks suspiciously like a subterfuge for some other motive." *Id*. at 988 (emphasis added)[7]. Indeed, after examining all of the evidence, including of political motivations, Judge Perry noted that "[t]he Republican-proposed Third District, in particular, clearly has its unusual shape in order to include as many Republican-leaning municipalities and areas as possible, and to exclude the Democratic-leaning municipalities and areas." *Id*. at 979. The Court expressly found that "[b]ased on the records of voter behavior in past elections… the evidence reveals that the Republican plan attempts to give an advantage to Republicans that is out of proportion to their voting strength in past elections." *Id*. at 979. The Court held it was "undisputed that Republican plan will confer great political benefit on the Republican Party and was drawn with that intent in mind." *Id*. at 981.

These are material distinctions in this case. First, as explained by Dr. Kimball, the Bowman Plaintiffs' proposed map meets all other criteria very well, including compactness. Moreover, there is no evidence that any of the Bowman districts uses municipal boundaries as a pretext for partisan political gerrymandering, as was the case with the Republican map in *Corbett*. Indeed, better following municipal boundaries conferred no measurable partisan benefit for the Democrats here.

Dr. Kimball's analysis is that coterminosity is a long-recognized traditional redistricting principle with many benefits for the effectiveness of representative democracy, and that much scholarship empirically demonstrating those benefits has been undertaken and published recently,

---

[7] In the end, Judge Perry need not have reached the evidence of political motivations as the means of rejecting the Republican map. As she noted, that map was "**extremely** uncompact." *Id*. at 988. Whether or not that "uncompactness" was the result of political motivations or apolitical motivations, being extremely uncompact is enough, by itself and on its face, to compel a conclusion that the map should not be adopted.

since the last redistricting litigation. The three maps before the court are statistically equal in terms of meeting population equality, compactness, and racial fairness quite well, and that because the Bowman Plaintiffs' map is able to achieve those metrics while also achieving coterminosity substantially better than the other options, it is the best option for the Court to adopt.

### IV.    Of The Maps Before The Court, The Bowman Plaintiffs' Proposed Map Best Meets All Constitutional and Legal Requirements

The Bowman Plaintiffs' map meets all of the applicable constitutional and legal requirements. The seven districts are equal in population as may be, with a maximum deviation significantly below the error rate for the 2020 Census and indisputably within the margin the Supreme Court has referred to as "de minimis." The deviation from an "ideal" district population is so small as to be immaterial. The Bowman Map maintains two effective minority-majority districts; there is no dilution of minority voting power. Because the three maps before the Court are statistically equal in terms of the population, compactness, contiguity and racial fairness factors, but the Bowman Map is the one that is materially better in regard to respecting municipal boundaries, a traditional and beneficial redistricting principle reflected in the state constitution, the Court should select and adopt the Bowman Map to reapportion the St. Louis County Council Districts until the next decennial census requires further redistricting.

### CONCLUSION

For all of the reasons set forth herein, and based on the evidence and arguments to be presented at trial, the Bowman Plaintiffs respectfully request that the Court find the current St. Louis County Council Districts are unconstitutional, that the Bowman Map satisfies all constitutional and legal requirements for redistricting, and adopt the Bowman Map to reapportion the St. Louis County Council Districts until the next decennial census requires further redistricting.

Respectfully submitted,

/s/ *Thomas W. Hayde*
Gerald P. Greiman, #26668
Thomas W. Hayde, #57368
**SPENCER FANE LLP**
1 N. Brentwood Blvd., Suite 1000
St. Louis, MO 63105
Tel.: (314) 863–7733
Fax: (314) 862–4656
ggreiman@spencerfane.com
thayde@spencerfane.com

*Attorneys for Bowman Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January, 2022, I electronically filed the foregoing through the Court's CM/ECF system, to be served on counsel for all parties through the Court's electronic notification system

/s/ *Thomas W. Hayde*