**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN BOWMAN, ET AL., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|     v. | )  No. 4:21-CV-01406-NAB |
| | ) |
| ROBERT L. CHAMBERS, ET AL., | ) |
| | )  February 1, 2022 |
|     Defendants. | ) |

**NON-JURY TRIAL**
**BEFORE THE HONORABLE NANNETTE A. BAKER**
**UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

For Plaintiffs:         Thomas W. Hayde, Jr.
*Bowman Plaintiffs*     Gerald P. Greiman, Esq.
                        SPENCER FANE, LLP
                        1 N. Brentwood Blvd., Suite 1000
                        St. Louis, MO 63105

For Plaintiffs:         Jack B. Spooner, Esq.
*Arps Plaintiffs*       SPOONER LAW, LLC
                        34 North Brentwood Blvd., Suite 210
                        St. Louis, MO 63105

For Plaintiff:          Jane E. Dueker, Esq.
*Rita Days Heard*       JANE DUEKER, LLC
                        1100 Town and Country Commons Drive
                        St. Louis, MO 63006

For Defendants:         Edward J. Sluys, Esq.
                        CURTIS HEINZ, GARRETT & O'KEEFE, PC
                        130 S. Bemiston Ave., Suite 200
                        St. Louis, MO 63105-1951


REPORTED BY:   CARLA M. KLAUSTERMEIER, RMR, CRR, CSR, CRC, CCR
               Official Court Reporter
               United States District Court
               111 South Tenth Street
               St. Louis, MO 63102 | (314)244-7984

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

*Non-Jury Trial | 4:21-CV-01406-NAB*                                    2

1                                 INDEX

2   WITNESSES:                                              Page

3   DR. DAVID KIMBALL
         Direct Examination By Mr. Hayde              25
4        Cross-Examination By Mr. Spooner             77
         Cross-Examination By Ms. Dueker             111
5        Cross-Examination By Mr. Sluys              156
         Redirect Examination By Mr. Greiman         157
6
    BRIAN WINGBERMUEHLE
7        Direct Examination By Mr. Greiman           167
         Cross-Examination By Mr. Spooner            174
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **(The proceedings commenced at 9:02 a.m.)** |
| 2 | **THE COURT:** Good morning. We are on the record now |
| 3 | in the matter of Arps and Bowman v. Chambers, et al., |
| 4 | Case No. 4:21-CV-1406. And this is the bench trial of this |
| 5 | matter. |
| 6 | Before we begin, are there any preliminary matters |
| 7 | that we need to take care of before we begin with argument? |
| 8 | Yes. |
| 9 | **MR. SLUYS:** Your Honor, I just wanted to let the |
| 10 | Court know, I've let the parties know that one of the two |
| 11 | mapping people can't be here today because he is sick. But |
| 12 | I've advised the parties and I wanted to let the Court know. |
| 13 | **THE COURT:** Okay. All right. And we have some |
| 14 | observers coming in. |
| 15 | Is there anything else before we get started, |
| 16 | Mr. Greiman? |
| 17 | **MR. GREIMAN:** If I could just get the Wi-Fi |
| 18 | password. |
| 19 | **MS. DUEKER:** Oh, good question. |
| 20 | **THE COURT:** Are the parties ready to proceed? Have |
| 21 | you gotten your passwords in? Is everybody -- |
| 22 | **MR. GREIMAN:** Yes, Your Honor. |
| 23 | **THE COURT:** All right. You may proceed, |
| 24 | Mr. Greiman. |
| 25 | **MR. GREIMAN:** Thank you, Your Honor. Am I recalling |

1    correctly that I gave you a copy of our exhibit book --

2              **THE COURT:**  Yes.

3         **MR. GREIMAN:**  -- yesterday?

4              **THE COURT:**  Yes.

5         **MR. GREIMAN:**  Thank you, Your Honor.

6         May it please the Court.  This case is about the

7    Court having to adopt or draw a new County Council map because

8    the Reapportion Commission did not adopt a map, and using the

9    old districts would violate equal protection due to population

10   changes.

11        It's undisputed that the Commission did not adopt a

12   map and it's undisputed that population shifts in existing

13   districts have occurred making them unequal.  So there's no

14   dispute the Court needs to adopt or draw a new map.

15        There was a Commission that had proceedings leading

16   up to this.  What transpired at the Commission level, the

17   evidence will show, is largely irrelevant to the present case.

18   It doesn't matter why the Commission didn't adopt a map or

19   whose fault that was.  And as the Court looks at maps that the

20   Commission considered, the inquiry should be what the

21   attributes of those maps are, not their lineage.  Really, the

22   sole issue here is what is the most appropriate map this Court

23   should adopt or draw to define the County Council districts

24   for the next ten years?

25        The Court will hear a lot of argument and evidence

1  as to the factors the Court should consider in arriving at a

2  new map.  The Arps Plaintiffs will argue that the only factors

3  the Court should consider are population, compactness, and

4  contiguity.  But the evidence will show that this argument

5  doesn't hold water for a number of reasons.

6          For one thing, those three factors alone don't tell

7  you how to draw a map.  There's myriad ways to apply just

8  those three factors and, in part, it depends on where one

9  chooses to start.

10          Also, the Board of Election Commissioners, the

11  defendant in this case, it stipulated -- takes the strong

12  position that there are other factors that should be taken

13  into account such as the districts should not split census

14  blocks and the districts should not cross precinct boundary

15  lines.  That's in the stipulated facts.  And if those

16  principles are not honored, it makes election administration

17  by the Election Board much more complex.

18          The Arps Plaintiffs themselves have argued that

19  other factors should be taken into account in adopting or

20  drawing a map.  These include following the least change

21  approach and protecting incumbents by placing them in their

22  current districts.  Those aren't in the Charter.

23          So the evidence will show that when the Arps

24  Plaintiffs tell the Court that the Court should only consider

25  those three criteria and nothing else, they're really talking

1    out of both sides of their mouth.

2              There will be strong evidence in this case that it

3    is wholly appropriate to draw districts that, as much as

4    possible, respect municipal boundary lines as the Bowman

5    Plaintiffs have tried to do.  The Court will hear at length on

6    that score from Dr. Kimball, a highly-respected professor of

7    political science at UMSL.

8              Dr. Kimball will point to and discuss a body of

9    political science writings and teachings in that regard.  He

10   will also point to Missouri constitutional proceedings

11   supporting that point that have been in the Constitution since

12   2018 adopting public policy that political subdivision lines

13   should be honored as much as possible in drawing state

14   legislative house and senate districts.

15             Dr. Kimball also will point to a line of

16   U.S. Supreme Court cases recognizing political subdivision

17   boundaries as a traditional redistricting approach he will

18   also talk about how taking that approach leads to better

19   government and conserve to reduce the racial polarization that

20   has plagued this region for so long.

21             So what will the Arps Plaintiffs' evidence show?

22   They will try to tell you that using municipal boundary lines

23   is a pretext for political gerrymandering to gain partisan

24   advantage.  They will say that, but there will be no evidence.

25   No evidence to support that.

1    They will tell you that the Bowman Plaintiffs went

2 to great length to draw Tim Fitch out of the district that he

3 currently represents, the Third, but they'll ignore the fact

4 that Mr. Fitch moved his residence in October, 2020, as

5 reapportionment was approaching.  Mr. Fitch lived in Fenton

6 for many years.  But in October, 2020, he moved to the

7 northwest corner, the very northwest corner, of the

8 Third District.

9    The evidence will show that the Third District grew

10 in population over the last ten years and that population

11 growth was in the southwest area, not the northwest, so the

12 Third District, likely, was going to have to shift to the

13 southwest.  But Mr. Fitch moved to the northwest corner of the

14 district.

15    In light of all that, the evidence will show that to

16 draw the Third District so as to encompass Mr. Fitch's new

17 address, you have to draw pretty a non-compact district.  And

18 the evidence will show that the Bowman Plaintiffs didn't feel

19 compelled to do that and there's no reason why they should

20 have.

21    The Arps Plaintiffs will tell you, indeed, they've

22 already told the Court in signed and filed written pleadings,

23 that the Bowman Plaintiffs' map -- proposed map, is promised

24 on political considerations while theirs are not.  Theirs are

25 free from political motivation.  I quote and unquote.  If this

1    were not such a serious and important case, Your Honor, that

2    claim would be laughable.

3          The Commission was a bipartisan commission, not a

4    non-partisan commission.  Some degree of politics and the

5    commission process is inevitable.  The evidence will show that

6    at least two of the Republican commissioners, Ms. Arps and

7    Mr. Bohn, are as partisan as they come.  The Arps Plaintiffs

8    also include three incumbent Republicans on the St. Louis

9    County Council as well as the chair of the St. Louis County

10   Republican Central Committee, Rene Artman.

11         The best way to ensure that politics isn't driving

12   reapportionment is to focus not on the lineage of any proposed

13   maps, but on their attributes and on their impact on the

14   County.  If one map or another creates a partisan advantage,

15   you can tell that from the evidence.

16         The evidence will be that the software packages and

17   the data available can measure anything that anyone wants to

18   measure, including partisan lean, partisan advantage.  If the

19   Bowman Plaintiffs' map truly created unfair partisan

20   advantage, one would think that the Arps Plaintiffs would have

21   proffered expert testimony to make that point.  They haven't.

22   They don't have an expert.  They don't have any expert

23   testimony to support their position.

24         The most important evidence the Court will hear will

25   come from Dr. Kimball.  Dr. Kimball is an eminently

1  well-qualified expert witness.  He drew the county map

2  ten years ago.  He has no partisan axe to grind.  Dr. Kimball

3  will testify that all three proposed maps do fine on criteria

4  of equal population, compactness, and contiguousness, but that

5  the Bowman Map does best on the important criterion of

6  respecting municipal boundaries.

7          Dr. Kimball wouldn't say that if it weren't true and

8  the Arps Plaintiffs have not mustered any opposing expert

9  testimony to rebut that.  Thank you, Your Honor.

10          **THE COURT:**  Thank you.

11          Before you call -- so, yes.  Yes, Mr. Spooner.  And

12  so we'll have you do your opening and then we'll call the

13  witness.

14          I want to make an announcement.  As everyone knows,

15  we are all wearing masks because there is a pandemic.  The

16  mask should be worn over your nose and mouth.  It's not

17  comfortable.  I understand that.  I'm not comfortable wearing

18  it either.  But while you're in this courtroom, unless you are

19  speaking, you need to properly wear your mask over your nose

20  or mouth.  If you can't do that, you can step out of the

21  courtroom and take your mask off and get a breath.  Okay?

22  Just wanted to make sure everyone understands the rules.

23          Now, Mr. Spooner, you may proceed.

24          **MR. SPOONER:**  Thank you, Judge.

25          Ladies and gentlemen, opposing counsel.  I want to

1    thank the Court for helping us get this action to trial in

2    under 60 days.  There's been a lot of effort by the parties

3    and a lot of work has gone into it and I very much -- we all

4    very much appreciate the fact that we were able to get this

5    done under the deadline or within the deadline.

6                As the Court knows, my name is Jack Spooner and I

7    represent the citizens and voters of St. Louis County to help

8    ensure our elections comply with the County Charter, the

9    Constitution, and federal law.

10               Dr. Kimball will testify that using municipal

11   boundaries as a community of interest is a valid criteria for

12   redistricting.  Maybe it is.  Maybe it isn't.  But for

13   purposes of this action, the answer doesn't matter.

14               What matters is that there is no St. Louis County

15   legislative mandate to use municipal boundaries as a

16   redistricting criteria.  What matters -- or what the evidence

17   will show is that using municipal boundaries to redistrict is

18   a political partisan consideration and that, in this action,

19   the use of municipal boundaries is a cover for political

20   considerations.

21               Now, this Court has been here before and has

22   *Fletcher*, *Corbett*, and *Stenger* decisions for guidance, so I'll

23   be brief.  Charter mandates equality of population and

24   geographic compactness and federal law mandates protection of

25   minority voting rights.  The evidence will show, Dr. Kimball

1   will tell you, that all three maps satisfy these criteria.

2   And then you'll hear that the Democratic Version Map 3 applies

3   an additional criteria of municipal boundaries while the

4   Republican Version Map 1 applies the least change method.

5            Now, what the evidence will show is that the average

6   population deviations is lowest in Republican Map Version 1,

7   then the Proposed Compromise Map, and then Democratic Version

8   3.  The evidence will show the average population polygram,

9   that in Republican Version -- in Republican Map 1 and the

10  Proposed Compromise Map, they score better than the Democratic

11  Version 3, which means that the Democratic Version 3 Map

12  scores slightly less compact.  And, incidentally, that takes

13  out the thumb.

14           The evidence will show, as to minority voting, which

15  we are really talking about Districts 1 and 4, that Republican

16  Version Map 1 retains the highest percentage of black

17  population and voting age population voters followed by the

18  Proposed Compromise Map, then Democratic Version Map 3.  And

19  the evidence will show that the Bowman Plaintiffs want the

20  Court to apply the additional factor of municipal boundaries

21  not as a natural marker such as a river or a major roadway,

22  but as a community of interest.  The evidence will show that

23  there's two reasons why the Bowman Plaintiffs' position is

24  going to fail.

25           First, the evidence is going to show that factoring

1  municipal boundaries as a community of interest is a partisan

2  political question.  There will be no evidence of population

3  deviation in the maps so there's no justification to use any

4  factor outside of the County Charter.  The evidence will show

5  that the municipal boundaries are not a traditional factor

6  used when redistricting St. Louis County and the evidence will

7  show that municipal boundaries are not a historical factor

8  used when redistricting St. Louis County boundaries.  In fact,

9  the evidence will show that municipal boundaries have never

10  been used.  That in *Fletcher*, it wasn't considered, and that

11  in *Corbett*, it was considered and rejected, and that in

12  *Stenger*, it wasn't considered.

13        Second, the evidence will show that the use of

14  municipal boundaries is being used for a cover from political

15  considerations.  The evidence will be that before the first

16  map was presented, Dana Sandweiss and Sam Page had a

17  conversation about municipal boundaries and Tim Fitch's

18  position, his residence.  The evidence will show that

19  Democratic Version Map 1 attempted to use municipal boundaries

20  to draw out Fitch and the map violated the equal population

21  deviations and the Voting Rights Act.

22        The evidence will show that when Democratic Version

23  Map 2 was created, Mr. Fitch was put back in the Third

24  District.  That at this meeting on November 15th,

25  Ms. Sandweiss stated that the maps were incredibly similar and

1    moved for a bipartisan committee to see if they could reach an

2    agreed upon map.  The evidence is also going to show that

3    Brian Wingbermuehle reported on his social media on

4    November 15th that the Democratic and Republicans are close to

5    a historic deal on a bipartisan map.

6            The evidence will show that the by bipartisan

7    committee met and that a jointly-drawn map was created and

8    sent out that evening to the Commissioner members and to the

9    St. Louis County for posting on its website.  The next day, at

10   the November 22nd meeting, the Bowman Plaintiffs proposed

11   Democrat Version 3 which, again, drew Tim Fitch out of his

12   district.

13           The evidence that shows the use of the municipal

14   boundaries as a political consideration is further bolstered

15   by the facts that Dr. Kimball initially referred to the

16   Proposed Compromise Map as the Compromise Map.  And that in

17   his report, Dr. Kimball refers to the Compromise Map as the

18   Republican Alternative, thereby interjecting a political

19   consideration in his opinions.

20           The evidence will also show that Ms. Sandweiss

21   referred to the Proposed Compromise Map as the Compromise Map

22   and that she approved the November 22nd minutes in

23   mid December.  And in those minutes, it referred to the

24   Compromise Map and goes on and says in that meeting that the

25   consensus was that there was no confidence in further meeting

1  to work on a second Compromise Map would result in anything.

2          The evidence will show that Republican Version Map 1

3  was drawn based on the Charter factors and used the least

4  change approach.  And this least change approach was approved

5  by this Court in *Stenger*.  And when the Court looks at the

6  maps, and we'll show pictures of the maps, from the *Corbett*

7  case to the *Stenger* case to the maps that are presented today,

8  it'll become pretty evident that Republican Version Map 1 is

9  the best map.  It does not violate any constitutional -- any

10  cases, constitutional considerations, and that it's based on

11  the historic and traditional factors that this Court has used

12  in the past.

13          And at the close of evidence, again, we'll be asking

14  the Court to consider use of Republican Version Map 1, or

15  alternatively, the Proposed Compromise Map.

16          Thank you, Judge.

17          **THE COURT:**  Thank you, Mr. Spooner.

18          Ms. Dueker?

19          **MS. DUEKER:**  Good morning, Your Honor.

20          **THE COURT:**  Good morning.

21          **MS. DUEKER:**  As we discussed yesterday, the Bowman

22  Plaintiffs are asking you to just erase in your mind

23  everything that happened at the redistricting commission

24  level.  The problem with that is they're asking -- their

25  expert is asking this Court to adopt a map that was a result

1   of that process.  So it's not possible to ignore all of that.

2           And what the evidence is going to show is that their

3   maps are riddled with political gerrymandering.  Mr. Spooner

4   went into some of the evidence of that and you will hear that

5   through deposition testimony, primarily, and other

6   cross-examination.

7           So what the Bowman Plaintiffs are attempting to do

8   now is to try to cover up the political gerrymandering by

9   trying to get this Court to apply factors under the umbrella

10  of preserving communities of interest.  First, these

11  additional factors are not authorized by the County Charter

12  and no case law -- literally no case law supports adding these

13  factors to the Charter.

14          And also, the undisputed evidence shows that

15  communities of interest, it lacks any standardized definition

16  or application.  It makes, you know, drawing the boundaries

17  with that factor nothing more than an arbitrary and a roving

18  commission that can be used to justify any self-identified

19  goal or purpose.  And I think one of the challenges for the

20  Court is to have standards by which to draw this map.  You

21  don't -- you're not authorized to engage in the political back

22  and forth as Judge Perry found in *Corbett*.  And so you need

23  identifiable factors that can be applied in a non-political

24  way.

25          Well, the communities of interest, every person we

1   spoke to on deposition had a different definition of it.  And

2   so it can be used and morphed, you know, to cover up any

3   manner of sins.  And we don't believe that this Court has the

4   ability, you know, to set up an amorphous standard that can't

5   be -- that even a reviewing Court can't look at to determine

6   if the maps actually comply with that.

7          You hear them say that, somehow, the Missouri

8   Constitution allows this.  That's just blatantly false.  In

9   2020, the voters of the State of Missouri amended their

10  Constitution.  And in Article III, Section 3, they determined

11  that, quote, communities, as a fourth factor, fourth in

12  priority, communities shall be preserved.

13         In that provision, which is Article III,

14  Section 3(b)(4), just for Your Honor, it's defined what they

15  mean by communities and they also have a process by which it

16  is to be applied.  And that is sufficient to allow, you know,

17  a Court or the Commission to follow that.

18         This specifically applies only to the Missouri House

19  of Representatives and the State Senate.  In no way does this

20  apply to political subdivisions including St. Louis County.

21  In fact, the voters of St. Louis County, they enacted a new

22  Charter in 2020.  Went to the voters after a Charter

23  Commission that's required by the County Charter.  They did

24  not amend the process of redistricting.

25         So while Judge Perry and others have pointed out

1    that this is not an ideal way to run a railroad, to have to

2    come to this Court every time, the voters chose that again.

3    They didn't choose communities of interest.  They were aware

4    of the constitutional amendment.  This is election season and

5    they did not choose to amend their Charter.

6          So I wanted to clear that up for Your Honor.

7          As you heard, Commissioner Sandweiss was open that

8    she had numerous conversations with the County Executive and

9    the stated goal of the County Executive was to ensure that

10   Councilman Fitch, who's a political opponent, would be drafted

11   out, while ally Councilwoman Kelli Dunaway would be preserved.

12   That's obvious political gerrymandering.

13         And it's not a coincidence that when the titles of

14   the map as we discussed at length yesterday were changed by

15   the same commissioner, or at least at the request of the same

16   commissioner after the Commission had already legally existed

17   no more.

18         Some of the things that you will hear, I agree that

19   that Dr. Kimball's testimony will be the most important here.

20   But here are some of the things I want to highlight for

21   Your Honor.  First of all, the Commissioner, the Bowman

22   Plaintiffs, sought to hire him almost one month before the

23   Commission's time ended.  So in late October, they already had

24   asked him if he could be retained as an expert.  One can only

25   conclude from that that they knew in October that they were

1   going to end up here.

2           Although they sent Dr. Kimball the first map they

3   drafted, either at or before it was presented to the public,

4   they have ensured and specifically requested that Dr. Kimball

5   not review that map for purposes of his report.  That map,

6   when it was announced, was met with swift and harsh criticism,

7   especially from my client, Chairwoman Days, because it diluted

8   the minority population from her district from 75 to 40.  And

9   the Democrats swiftly changed their minds and moved to

10  another -- took another tack.  But that map, as

11  Mr. Wingbermuehle will testify, that map most purely was drawn

12  to keep municipalities together.  So when using their

13  standard, which is municipalities/communities of interest, it

14  produced a map that likely violated the Voting Rights Act.

15          You will hear that Dr. Kimball actually had to

16  change his report because of the alteration of the map's title

17  and he did -- he did change it to comport with the changes

18  that were made by the County at the request of a former

19  bipartisan commission commissioner.  And so the title of the

20  maps that we so, you know, aggressively argued about

21  yesterday, ended up in the expert report.

22          So it's hard to believe that it didn't matter and

23  it's hard to believe, why would they do it if it didn't

24  matter?  And it mattered because they wanted this Court to

25  have a different impression of what the names of these maps

 1   were.

 2          Let's see.  Dr. Kimball will tell you that all three

 3   of the maps that he examined are, quote, basically,

 4   equivalent.  So really what we're here with Your Honor, the

 5   only issue is whether you're allowed to apply factors that are

 6   different from the County Charter.

 7          Mr. Kimball will also testify that when he looked

 8   at, you know, the municipal boundary protection, that he only

 9   looked at it as a percentage.  How many municipalities were or

10   were not split?  There was no analysis done as to whether

11   certain municipalities actually, you know, have a community of

12   interest.  I mean, I'm from Chesterfield.  We don't -- I don't

13   identify with my municipality.  I lived there before it was

14   even a municipality.  You know, we have everything from

15   multi-million dollar homes to trailer parks.  I mean, so, I

16   don't know how that somehow would be a community of interest

17   just because it's a municipality.

18          Again, highlighting that community of interest is,

19   basically, undefinable and it needs more before, you know, a

20   judge can apply it.  It needs legislative application and

21   definition before this Court can apply it and I believe

22   separation of powers would require this Court to have some

23   legislative direction before implementing something like this.

24          But so --

25          **THE COURT:**  Let me -- I'm sorry.  I want --

1          **MS. DUEKER:**  Sure.

2          **THE COURT:**  Because you've discussed the issue of

3    communities of interest and municipal boundaries kind of

4    interchangeably.  Are you saying that that is what the

5    Bowman Plaintiffs, by talking about municipal boundaries,

6    they're really talking about communities of interest?  I'm

7    just -- I don't want --

8          **MS. DUEKER:**  Yeah.  It is a little confusing, Your

9    Honor.  And you can look at Dr. Kimball's report.  But for

10   purposes of his report, he says communities of interest are

11   municipalities.  However, in his deposition, and you will hear

12   in testimony, that he believes that there are other things

13   that could be a community of interest.  The other

14   commissioners talked about things -- everything from

15   socioeconomic to, you know, to any other number of things that

16   could constitute a community of interest like Affton.  Affton

17   is not incorporated, but Affton could be a community of

18   interest.

19          And that's our concern, Your Honor.  Is that for

20   purposes of the report, they say that municipal boundaries are

21   the only thing to look at.  But as Dr. Kimball admits, he

22   didn't look at anything else.  He didn't look at any other

23   possible communities of interest and so he only applied

24   municipal boundaries.  Well, how do you know if that's the

25   best community interest definition to apply if you haven't

1    looked at anything else?  So, again, that's part of our

2    problem with the standard here.

3            And by the way, we have no problem with the

4    standards that he applied according to the Charter.  So --

5    which is what was done in 2010 and the reason I know is that

6    we hired Dr. Kimball to do the map that was adopted by

7    Judge Adelman in 2012.

8            So, anyway, Your Honor, I just wanted to point to

9    some of that evidence and I think after you hear all the

10   evidence, you will determine that Democratic Version 3 is not

11   an appropriate map.  My client is fine with either of the

12   other two maps, but Democratic Version 3 is politically

13   gerrymandered and it can't be considered by this Court.

14           **THE COURT:**  So your client is not fine with

15   Democratic Version 3?  Is that --

16           **MS. DUEKER:**  I mean, she's fine with her district --

17           **THE COURT:**  Okay.

18           **MS. DUEKER:**  -- as far as the whole map and the

19   standards to be used.

20           **THE COURT:**  Uh-huh.

21           **MS. DUEKER:**  Obviously, she's very concerned because

22   when it was applied the first time, it diluted the First

23   District.  And, you know, so --

24           **THE COURT:**  Yeah.  We're not talking about that

25   today.  We're talking about Democratic Version 3, not

1  Democratic Version 1?

2         **MS. DUEKER:**  Correct.  Correct.  But if municipal

3  boundaries is determined to be a factor, in and of itself, it

4  can be applied, in her belief, to violate the Voting Rights

5  Act.

6         **THE COURT:**  Okay.

7         **MS. DUEKER:**  Thank you.

8         **THE COURT:**  Thank you.

9         **MR. GREIMAN:**  Your Honor, just a housekeeping

10  matter.

11         **THE COURT:**  Yes.

12         **MR. GREIMAN:**  My internet connection is not working.

13  I wonder if we have the right code.

14         **THE COURT:**  Okay.  Can you --

15         **MS. DUEKER:**  Mine worked.  Do you have the same one?

16         **THE CLERK:**  Are you selecting 13 North?

17         **MS. DUEKER:**  Yeah.  It worked.  What's the name of

18  the network?

19         **MR. GREIMAN:**  What's the network?

20         **THE COURT:**  13 North.

21         **MS. DUEKER:**  Oh, yeah.  That's important.  13 North.

22  That's what I have too.

23         **MR. GREIMAN:**  Okay.  One other point of

24  clarification, Your Honor.  Since the inception of this case

25  and our initial conference, you know, the Court and I thought

1  all the parties agreed that it would be helpful to make clear

2  in the pretrial disclosures what map the parties were

3  advocating for.

4          **THE COURT:**  Uh-huh.

5          **MR. GREIMAN:**  My recollection in the pretrial

6  disclosures is that the Arps Plaintiffs said their first

7  priority was the Proposed Compromise Map and their second

8  alternative was Republican Version 1.  I heard Mr. Spooner say

9  the opposite today --

10          **THE COURT:**  Uh-huh.

11          **MR. GREIMAN:**  -- and I'm just wondering, you know,

12  what their position is.

13          **THE COURT:**  What is your position, Mr. Spooner?

14          **MR. SPOONER:**  The evidence will be that Republican

15  Version 1 is the map.  The Court can go back and look at the

16  pleadings.  The pleadings are being mischaracterized, but

17  they'll speak for themselves.

18          **THE COURT:**  Okay.  So the map that the Arps

19  Plaintiffs are presenting for the Court is Republican Version

20  1, and alternatively, the Proposed Compromise Map?

21          **MR. SPOONER:**  That's correct, Judge.

22          **THE COURT:**  Okay.  And my understanding from

23  Ms. Dueker is that Ms. Days is fine with either the Republican

24  Version 1 or the Proposed Compromise Map, is my understanding?

25          **MS. DUEKER:**  Correct, Your Honor.

```
 1                THE COURT:  Okay.

 2                MR. GREIMAN:  All right.  Your Honor, we would now

 3      call Dr. Kimball, but I'm wondering if we could take a

 4      short --

 5                THE COURT:  Okay.

 6                MR. GREIMAN:  -- break to get the --

 7                THE COURT:  Yeah.  Is it working?

 8                MR. GREIMAN:  -- technology working.

 9                THE COURT:  Okay.  And with regard to the masks,

10      yes, if you want to take a sip if you have a drink or

11      something like that, you can remove your mask, obviously, to

12      take a sip of coffee or water.

13                Yes.

14                MR. SLUYS:  Your Honor, would you like me to state

15      for the record the defendants don't have --

16                THE COURT:  And I'm sorry.  I -- it's --

17                MR. SLUYS:  The defendants don't have an opening

18      statement to make.

19                THE COURT:  All right.

20                MR. SLUYS:  I'm sure the Court's aware of the timing

21      issue.

22                THE COURT:  All right.  Thank you.  Yes.  We're very

23      aware of the timing issue.

24                MR. SPOONER:  Judge, can I put this over by the

25      witness stand?  It's Dr. Kimball's deposition and our
```

1    exhibits --

2              **THE COURT:**  Okay.

3              **MR. SPOONER:**  -- just in case he --

4              **THE COURT:**  Sure.

5              **MR. SPOONER:**  -- needs a better view of them.

6              **THE COURT:**  Are you ready to proceed?

7              **MR. HAYDE:**  Yes, Judge.

8              **THE COURT:**  All right.  You may call your first

9    witness.

10             **MR. HAYDE:**  The Bowman Plaintiffs call Dr. David

11   Kimball.

12             **(Witness sworn.)**

13             **THE CLERK:**  Can you please say and spell your name

14   for the record.

15             **THE WITNESS:**  David Kimball, K-I-M-B-A-L-L.

16             **THE COURT:**  And, yes, you may remove your mask while

17   testifying.

18             **THE WITNESS:**  All right.  Thanks.

19             **THE COURT:**  All right.

20                        **DR. DAVID KIMBALL,**

21   **Having Been First Duly Sworn, Was Examined and Testified As**

22   **Follows:**

23                        <u>**DIRECT EXAMINATION**</u>

24   **BY MR. HAYDE:**

25   Q.   Good morning, Dr. Kimball.

1    A.    Good morning.

2    Q.    Just briefly, could you tell us a little bit about

3    yourself?  Are you a resident of St. Louis County?

4    A.    Yes.  I've lived in St. Louis County or moved back here

5    in 2001.  I live in Webster Groves.

6    Q.    Are you married?

7    A.    I'm married.  I have three kids who have grown up and

8    moved away, unfortunately, but yes.

9    Q.    And what's your occupation?

10   A.    I teach political science at UMSL.

11   Q.    Okay.  And what classes do you regularly teach in

12   political science at UMSL?

13   A.    I teach classes on American government and voting in

14   elections and on research methods.

15   Q.    And, briefly, what's the extent of your educational

16   attainment?

17   A.    I have bachelor's degrees in political science and

18   applied math from Brown University and I have a master's and

19   Ph.D. degrees in political science from Ohio State University.

20   Q.    And have you been published in the area of political

21   science, American elections, and voting behavior?

22   A.    Yes.  Most of my published research is on voting

23   elections in the United States.

24   Q.    And you have a binder there in front of you that's

25   labeled the Bowman Plaintiffs' Exhibits.  If you go to tab 4,

1  do you recognize that as a copy of your up-to-date curriculum

2  vitae?

3  A.   Yes.

4  Q.   Okay.  And it lists all your publications, your

5  educational background, so forth?

6  A.   Yes.

7  Q.   Okay.  You've also served as an expert in other election

8  and redistricting matters; is that correct?

9  A.   Yes.

10  Q.   Okay.  And what -- briefly, tell the Court what other

11  matters that you've been involved with where you were an

12  expert that involved redistricting.

13  A.   Right.  I was an expert and helped draw the County

14  Council map ten years ago in the *Stenger* case.  I was an

15  expert in the redistricting case -- the *Pierson* case from

16  Missouri congressional districts ten years ago.  Those are the

17  court cases involving redistricting.

18  Q.   Okay.  Now, in this case, my partner, Gerry, and I,

19  retained you to help with this redistricting matter as well;

20  correct?

21  A.   Yes.

22  Q.   Okay.

23  A.   This case as well.

24  Q.   And we asked you, specifically, to analyze three maps;

25  correct?

1    A.    Yes.

2    Q.    And in your work, you created a report; correct?

3    A.    Yes.

4    Q.    Now, in doing your work in this, tell the Court what

5    sources of data that you used to analyze the three maps that

6    are before the Court.

7    A.    Part of my analysis used mapping software called

8    ArcGIS Pro and so that uses map files or shape files, the ones

9    I used.  I used maps of each of the proposed district plans

10   that I downloaded from the St. Louis County website.  I also

11   used census data and data of census blocks that I downloaded

12   from the Census Bureau's website.  I analyzed municipal

13   boundaries in St. Louis County, a map of that that I

14   downloaded from the St. Louis County website.  And then some

15   election data from the St. Louis County Election Board and

16   maps of precincts in St. Louis County that I received by

17   e-mail from staff on the County Election Board.

18   Q.    And could you -- could you try to keep your voice up a

19   little bit, Dr. Kimball?

20   A.    Yeah.  Sorry.

21          **MS. DUEKER:**  Yeah.

22          **MR. SPOONER:**  It might help if he pulled the

23   microphone closer.

24          **THE WITNESS:**  Is that better?

25          **MR. HAYDE:**  Yes.

1   **Q.    (By Mr. Hayde)** So all of that that you just recited other

2   than the software -- well, let me step back.  The software,

3   you have a license for ArcGIS through UMSL; correct?

4   A.    Correct.

5   Q.    But other than that, all the data you just listed,

6   electronically, you provided to our law firm in connection

7   with disclosing your report in this case; is that correct?

8   A.    Yes.  That's correct.

9   Q.    So if you look in your exhibit binder, the tab 6, do you

10  recognize that as a thumb drive that contains all of the

11  electronic files of the data that you just testified to;

12  correct?

13  A.    Right.  Yes.

14  Q.    And then looking at Exhibit 7 is a thumb drive that has

15  all the census block data that you obtained and used in doing

16  your work in this case; correct?

17  A.    Yes.  Although I got the census block data from the

18  Census Bureau website, not from the County Election Board.

19  Q.    So the census block data that you downloaded from the

20  Bureau is on Exhibit 6; correct?

21  A.    Oh, okay.

22  Q.    And then there's also different census block data

23  available through the St. Louis County website; correct?

24  A.    I believe that's correct.

25  Q.    Okay.  And that's on Exhibit 7.  So -- well, let me step

1  back?

2       **MR. HAYDE:**  I would offer into evidence Bowman

3  Exhibit 4 and ask that Dr. Kimball be accepted by the Court as

4  an expert in voting behavior elections and districting in the

5  United States.

6       **THE COURT:**  Is there any objection?

7       **MR. SPOONER:**  No, Judge.  No objection.

8       **MS. DUEKER:**  None.

9       **THE COURT:**  All right.  Exhibit 4 will be admitted

10  into evidence and Dr. Kimball will be recognized as an expert

11  in this field.

12       **MR. GREIMAN:**  Your Honor, perhaps just to move

13  things along, I believe the parties have stipulated to the

14  admission into evidence of all the exhibits related to

15  Dr. Kimball's testimony including his CV, his report, and the

16  underlying data files.

17       **THE COURT:**  Is that correct?

18       **MR. SPOONER:**  That's correct, Judge.

19       **MS. DUEKER:**  That is correct, Judge.  If there are

20  other exhibits he used, I'm not sure.  But those, absolutely.

21       **THE COURT:**  All right.  So Exhibits 4, 5, the data

22  files, 6, 7 are all stipulated; correct?

23       **MR. SPOONER:**  That's correct, Judge.

24       **MR. GREIMAN:**  I believe we've also stipulated all of

25  the Bowman Trial Exhibits 1 through 15 as well as 17, 18, 19,

1    and 20.

2              **MR. SPOONER:**  That's correct, Judge.

3              **THE COURT:**  All right.  So Bowman Trial Exhibits 1

4    through 15, 17, 18, 19, and 20 have been stipulated to;

5    correct?  So those will -- okay.

6              **MR. HAYDE:**  Thank you, Judge.

7    **Q.    (By Mr. Hayde)** Now, Dr. Kimball, pertaining to some of

8    the exhibits that were just discussed by the parties as

9    stipulated to, some of the maps that you got were downloaded

10   from the St. Louis County open government portal; correct?

11   A.   Yes.  That's correct.

12   Q.   And if you look at your screen right now, in fact, one of

13   those maps is up on the screen -- on everyone's screen in the

14   courtroom; correct?

15   A.   Yeah.  I see it in front of me here.

16   Q.   Okay.  And which -- this is the existing

17   Council districts that were drawn pursuant to the 2012

18   decision of this Court; correct?

19   A.   Yes.

20   Q.   Okay.  And that is also in your -- there's an 11-by-17

21   printout of that that is Exhibit 8 in the binder for

22   reference.

23              So one of the things you did was to analyze this

24   current map in terms of what's happened to the population of

25   St. Louis County based on the 2020 Census; correct?

1    A.    Yes.

2    Q.    Okay.

3              **MR. SPOONER:**  Judge, I'm going to object.  The

4    stated opinions were an analysis of Democratic Version Map 3,

5    Republican Version Map 1, and the Proposed Compromise Map

6    dated 11/22/21.  There was no opinion offered as to an

7    analysis of the current boundary districts.  I mean, I

8    recognize he took it into consideration, but I'm not sure

9    where it's going in terms of what they're trying to show in

10   terms of --

11             **MR. HAYDE:**  Well, Your Honor, this goes to the --

12             **THE COURT:**  Right.  Why we're here.

13             **MR. HAYDE:**  -- Equal Protection Clause --

14             **THE COURT:**  Right.

15             **MR. HAYDE:**  -- whether the current districts are

16   unequal in population.  I don't think there's a dispute to

17   that and I'm not going to spend very much time on it.

18   There's --

19             **MR. SPOONER:**  That's fine.

20             **THE COURT:**  Yes.

21             **MR. SPOONER:**  No.  That -- yeah.  I just didn't know

22   where it was going.

23             **THE COURT:**  Okay.  All right.  I'll let you

24   continue.

25             **MR. HAYDE:**  Thank you, Your Honor.

1  **Q.    (By Mr. Hayde)** So, Dr. Kimball, when analyzing the

2  current districts for population equality, what did you

3  conclude?

4  A.    Right.  I indicated that in my report, that the current

5  Council districts no longer comply with the equal population

6  standard for redistricting.  The maximum deviation between the

7  most populous district and the least populous district, I

8  think, is around 15 percent which is well above the acceptable

9  standard for redistricting.

10  Q.    And let me ask you.  When you looked at it, did all of

11  the population change occur equally across all the districts?

12  A.    No.  The two districts that lost population over the last

13  ten years are the First and Fourth Districts and so the

14  St. Louis County population shifted to the south over the last

15  ten years.

16  Q.    So, generally, the population shifts went to the south?

17  A.    Correct.

18  Q.    And if you look at the map that's up on the screen now,

19  the existing Districts 1 and 4, are those that are in the

20  northeast corner of the county; correct?

21  A.    Correct.

22  Q.    So as a general proposition in redistricting this time

23  around, in order to move population where it needs to go,

24  borders of the districts, as a general matter, are going to

25  move to the south; correct?

1  A.   Because of the population shifts in the county over the

2  past ten years, some of the Council boundaries are going to

3  have to shift to the south somewhere.

4  Q.   And so what were the -- the other three maps that you

5  analyzed were what were called the Proposed Compromise Map,

6  the Republican Version 1, and the Democrat Version 3 from the

7  commission process; correct?

8  A.   Correct.

9  Q.   Okay.  What are the factors that you analyzed each of

10  those three maps for in your work and in your report?

11  A.   The factors I analyzed were equal population,

12  compactness, contiguity, compliance with the Voting Rights

13  Act, and splitting municipal boundaries or local political

14  subdivisions.

15  Q.   Okay.  Now, let's break those up.  First of all, with

16  respect to population equality, what did you conclude about

17  each of the three maps that you analyzed for this case?

18  A.   Yeah.  In broad strokes, I concluded that each of the

19  three proposed maps comply with the equal population standard

20  and, you know, each easily meet the standard there, and that

21  the differences between the three proposed maps in terms of

22  equal population is negligible.

23  Q.   Okay.  So from a statistical or applied mathematics

24  standpoint, each of these three maps does very well at

25  achieving equal population, particularly taking into account

1  the error rate in the census?

2  A.    Right.  Even under perfect conditions, there's typically

3  error in the census data.  We know the Census Bureau works

4  very hard and spends a lot of time and resources to complete

5  the census.  But we know, sometimes, they miss people.  They

6  might mistakenly double count some people.  The census was

7  conducted in 2020 and now we're in February of 2022.  And

8  so -- and people have moved and passed away since then.  So,

9  you know, even now, the numbers in the census, you know, don't

10  reflect what the numbers -- the population numbers today.  And

11  then on top of that, I think, you know, there were additional

12  challenges in the 2020 Census due to coronavirus that delayed

13  the process -- the data collection process for the census.

14         I think the previous administration cut short the

15  data collection process, maybe a month early, in 2020 as well.

16  And this time around, the Census Bureau has adopted a new

17  privacy protection method that adds additional error to the

18  census data at the block level.  And so there's a margin of

19  error.  There's some uncertainty in the census numbers.  And

20  so --

21  Q.    And you actually calculated all of the deviations for

22  each of the three maps and then set those forth in your

23  report?

24  A.    Yes.

25  Q.    And if you want to look at Bowman Exhibit 5 is your

1   report there in Table 1, which is page 6 of the report, tab 5

2   of the Bowman Plaintiff exhibit binder.

3   A.   Yes.

4   Q.   And you calculated both the maximum and average

5   deviations for the current districts in each of the three maps

6   you're analyzing that are before the Court for this case;

7   correct?

8   A.   Yes.

9   Q.   And you're telling the Court that the difference, for

10  instance, between Republican Plan 1 of 0.346 maximum

11  deviation, the Proposed Compromise, 0.429, and the Democrat

12  Version 3 of 0.63, in your opinion, as an expert in this, is

13  statistically insignificant?

14  A.   Right.  They easily meet, you know, a one percent

15  population deviation standard, and given the uncertainty in

16  the census data, that the differences in equal population

17  between these plans are negligible.

18  Q.   And you mentioned a one percent standard.  Is that your

19  understanding of what the standard is for local redistricting?

20  A.   That's my understanding for the standard for local

21  redistricting, particularly when a Court is drawing the

22  boundaries.

23  Q.   And each of them, in fact, meets that very well?

24  A.   Yes.

25  Q.   Okay.  Now, what did you determine with respect to the

1    three maps about the vector of contiguity?

2    A.    Right.  Contiguity just means that all the geographic

3    territory within a district is connected to other territory

4    within the district, that you could walk from one part of the

5    boundary in a district to another and remain in the district

6    the whole time.  And each of the plans I reviewed produces

7    contiguous districts for all districts.

8    Q.    And did you analyze the three maps for compactness?

9    A.    Yes.

10   Q.    Okay.  And what did you conclude with respect to how each

11   of the three maps performs with respect to the compactness

12   criteria?

13   A.    Right.  I used a measure of compactness called the

14   population polygon measure.  That's, like, stretching a

15   rubber band around the boundaries of a district and then

16   comparing the population within the district of the population

17   that's within that rubber band area.

18          And each of the three proposed maps I reviewed

19   produced very high population polygon scores for each of the

20   districts.  And on average, the perfect score would be one,

21   worst score you can get is a zero, and they all had average

22   scores between, I think, 0.86 and 0.90, so very, very high

23   compactness scores.  And given that the compactness measure is

24   also based on population data from the census and uncertainty

25   around the census data that I mentioned earlier, the

1  differences between the three maps in terms of compactness is

2  also negligible.

3  Q.   And so you set forth that calculation in Table 6 on

4  page 11 of your report; correct?

5  A.   Yeah.  That has -- yes.  That has the table comparing --

6  Q.   And the table shows, and in fact, you discussed in the

7  report, that if you look at it on a district-by-district

8  basis, each map does better on some of the districts than

9  others, but worse, you know, and that all those numbers are so

10 close you, you're saying that, again, this is something that,

11 as an applied math and election statistical expert, this is

12 statistically insignificant; correct?

13 A.   Yes.  These are all very good compactness scores and, as

14 I mentioned earlier, yeah, the differences between them are

15 negligible.

16 Q.   Okay.  And what did you conclude with respect to the

17 factor of racial fairness or compliance with the Voting Rights

18 Act about each of the three maps that you're looking at here?

19 A.   Right.  I analyzed each of the three proposed maps in

20 terms of compliance with the Voting Rights Act.  Each proposal

21 creates two majority black districts, the First and the

22 Fourth.  Each proposed map creates two districts where the

23 black share of the total population is above 60 percent.  And

24 I also analyzed voting in some recent elections and I

25 concluded that all three of the maps that I evaluated comply

1   with the Voting Rights Act.

2   Q.    And, in fact, you analyzed the element of whether or not

3   there's racial block voting in St. Louis County; correct?

4   A.    Yes.

5   Q.    What was your conclusion in that regard?

6   A.    Right.  So the important standard in terms of the

7   Voting Rights Act is whether there's racial block voting that

8   prevents a minority group, in this case, black voters, that

9   prevents them from electing candidates of their choice and --

10  Q.    So what does -- does that mean that racial block voting

11  is where if hardly any or none of the white voters would

12  support the same candidate that the African-American community

13  wants to support, that's considered racial block voting?

14  A.    Right.  Sort of an extreme case would be that white

15  voters vote entirely in a block against a black candidate or

16  against a candidate preferred by black voters.  I -- so I

17  looked at three recent elections in the proposed First

18  District in Democratic Version Map 3.  In that proposal, the

19  black share of the total population in the First District is

20  maybe four or five points lower than in the other two

21  proposals.  So I looked at that one -- that case,

22  specifically.

23          And there is evidence of racially polarized voting,

24  that is, in the elections I examined.  Black voters voted more

25  heavily for the black candidates in each of those elections

1   than white voters.  But, you know, roughly 40 to 50 percent of

2   white voters voted for the black candidates in those

3   elections.  So that satisfied me that the proposed

4   First District in Democratic Version Map 3 still protects

5   voting rights of black residents of that district.

6   Q.   So given the fact that you found in St. Louis County

7   40 to 50 percent of white voters will vote for a black

8   candidate or the candidate preferred by the African-American

9   community, would you say that there's not the necessity to

10  draw the line at the old standard of needing at least

11  65 percent in St. Louis County, specifically, in order to

12  maintain a minority-majority district?

13  A.   Right.  I think this is an area where evidence has

14  shifted our thinking some in the last two to three decades.

15  That 20 to 30 years ago, the conventional view was, in

16  creating a majority black district, you needed to make the

17  black share of the total population quite large, two-thirds or

18  higher, to ensure that black voters could elect a candidate of

19  their choice because turn-out and registration rates for black

20  voters tend to be lower than for white voters because the

21  black share of the voting age population, adults eligible to

22  vote, is lower than the black share of the total population.

23  And the thinking was that, 20, 30 years ago, a black candidate

24  had never won county-wide office in St. Louis County.  So the

25  thinking was, well, perhaps that's because white voters vote

 1   in a block against any black candidate.

 2          And we've seen in the last -- in several elections

 3   over the last 15 years that 40 to 50 percent of white voters

 4   will vote for a black candidate county-wide, in particular, in

 5   the proposed First Council District.  So you don't need to

 6   have a black percent of total population that's 67 percent or

 7   higher.  It could be lower than that.

 8   Q.   In fact, Dr. Kimball, there's already been mention that

 9   you were involved with helping to draft the map ten years ago

10   and you designed, at that time, Council District 4, in your

11   opinion, to be a majority-minority district that complied with

12   the Voting Rights Act; correct?

13   A.   Yes.

14   Q.   And what was the percentage black population that you

15   designed that district at that point in time?

16   A.   Right.  District 4, ten years ago, I believe the black

17   share of the total population was about 55 percent and the

18   black share of the voting age population was maybe 51 percent.

19   Q.   And you gave the opinion, based on those numbers, and the

20   fact you discussed last time about how racial polarized voting

21   is shifting away from being so polarized in St. Louis County,

22   that that district, at that time, complied with the Voting

23   Rights Act; correct?

24   A.   That's correct.

25   Q.   And, in fact, to your knowledge, thereafter, the

1   Fourth District has elected Council district persons of the

2   African-American communities' preferred choice; correct?

3   A.   Right.  In the two most recent elections, District 4 has

4   elected a black woman to represent District 4, and I think in

5   2016, a black woman defeated the white incumbent in the

6   democratic primary by a pretty comfortable margin.  Yes.

7   Q.   So in light of all that testimony you've just given, at

8   this point now, is there a concern about what's called packing

9   potentially with respect to the districts in northern

10  St. Louis County?

11  A.   Right.  I mean, I think -- I think, now, the concern is

12  if the black share of the total population is much higher than

13  what these maps propose, then we risk packing too many black

14  voters into those districts and diminishing the ability of

15  black voters in the neighboring districts to elect candidates

16  of their choice.

17  Q.   Okay.  So with respect to population equality,

18  contiguity, compactness and racial fairness, your opinion as

19  set forth in your report is that each of the three maps before

20  the Court, as far as legal requirements, statistically

21  speaking in your expert opinion, equally achieve those

22  criteria; correct?

23  A.   Yes.  Each of the -- each of the three maps that I

24  reviewed meets each of those criteria.

25  Q.   Now, you also said you analyzed each map for what you --

1    respecting municipal boundaries?

2    A.   Right.  Respecting local political subdivisions or

3    municipalities.

4    Q.   And what did you conclude with respect to the three maps

5    on respecting municipal boundaries?

6    A.   I concluded that the Democratic Map Version 3 splits

7    fewer municipalities than the other two maps.  I think

8    Democratic Map Version 3 splits ten municipalities.  The other

9    two split 18 and 22, respectively, so the Democratic Map

10   Version 3 does a better job of preserving local political

11   subdivisions or preserving municipal boundaries in this case.

12   Q.   And you set forth a lot of -- in your report about this,

13   but tell the Court what is your understanding of the history

14   of respecting municipal boundaries or other political

15   subdivisions as a traditional redistricting principle.

16   A.   Right.  My understanding is that there are many prior

17   court cases that have recognized protecting local political

18   subdivisions as a valid standard for redistricting, a

19   traditional criteria for redistricting.  I think there was

20   some mention earlier that the Missouri Constitution has

21   recently been amended to include provisions that require state

22   legislative districts to try and preserve local political

23   subdivision boundaries.  That makes Missouri similar to over

24   40 other states that have similar requirements for drawing

25   district boundaries that respect local political subdivisions.

1   Q.   So this isn't some odd esoteric criteria that was just

2   come up with, you know, yesterday; correct?

3   A.   Correct.  It's a common criteria for redistricting.  I

4   think it's also instructive that the constitutional amendment

5   that Missouri voters passed to adopt this provision of

6   protecting local political subdivisions passed statewide by a

7   healthy margin and passed in St. Louis County by a quite

8   healthy margin.  So that indicates to me that when St. Louis

9   County voters were given the chance to vote on this criteria,

10  they voted -- they liked it.

11  Q.   Now, is it your understanding that, in fact, in that

12  provision, it discusses political subdivisions?  Doesn't refer

13  to, simply, communities?

14  A.   I'm sorry.  The question was about --

15  Q.   About Clean Missouri, what -- the provision --

16  A.   Right.  The portion of the Missouri Constitution that I'm

17  referring to refers to local political subdivisions.

18  Q.   Okay.  Now, just in general, in redistricting --

19           **MS. DUEKER:**  Your Honor?  I'm sorry.

20           **THE COURT:**  Yes.

21           **MS. DUEKER:**  He referred to Clean Missouri.  What's

22  in the Constitution is not Clean Missouri.  That was actually

23  overruled by the voters.  So I'm confused.

24           **MR. HAYDE:**  Well --

25           **MS. DUEKER:**  Clean Missouri was enacted and then the

1  voters overwhelmingly voted to get rid of Clean Missouri and

2  enacted this provision.  So I just want to make sure what --

3      **MR. HAYDE:**  The provision about respecting political

4  subdivisions was part of Clean Missouri that was retained.

5  They got rid of the non-partisan demographer and kicked it

6  back to a bipartisan commission and kept the other provisions.

7  Did some other things, reversed some other parts of

8  Clean Missouri, but originally, this was in the 2018 ballot

9  measure that proposed an independent demographer and these

10  were what he or she was supposed to follow.  They kept those

11  criteria, but made it back into a more political process.

12      **MS. DUEKER:**  Your Honor, I would refer you to both

13  versions of the Missouri Constitution because I believe there

14  are more changes.  It's fine.  He can -- you know, it's his

15  expert.  He can testify.  But I just want to make sure that

16  when he throws out a term like that, that we refer to the

17  right portion of the Constitution.  Thank you.

18      **THE COURT:**  Thank you for the clarification.  I did

19  hear the term "Clean Missouri" not knowing exactly what he was

20  referring to.

21      **MR. HAYDE:**  Sure.  I was trying to direct him back

22  to the --

23      **THE COURT:**  Right.  Okay.

24      **MR. HAYDE:**  In 2018, he's talking about when the

25  voters voted on that.  That's where that -- the political --

1              **THE COURT:**  Okay.

2              **MR. HAYDE:**  -- subdivision factor originally came in

3    and it was kept under the 2020 amendments.  Didn't change

4    that.

5    **Q.   (By Mr. Hayde)** So, in general, in redistricting, where,

6    at the local level, where a state does have a provision about

7    respecting political subdivisions for their state legislature,

8    in your experience and in your expertise, is that generally

9    relevant to the political subdivisions redistricting at the

10   local level in that state?

11   A.   Can you repeat the question?  I'm not sure I quite --

12   Q.   So there's been -- so respecting political subdivisions,

13   for instance, to your knowledge, is not something specifically

14   mentioned in the Charter of St. Louis County; correct?

15   A.   Correct.

16   Q.   Okay.  But where, in redistricting generally, in your

17   experience and as an expert, where a state does have a

18   provision about that in their Constitution that pertains to

19   the state legislature, is that a -- does that make it relevant

20   to political subdivision redistricting throughout --

21             **MR. SPOONER:**  Judge, I'm -- I'm going to --

22   **Q.   (By Mr. Hayde)** -- the state even if it's not required at

23   their -- in their Charter or other governing document?

24             **MR. SPOONER:**  Judge, I'm going to object as direct.

25   It calls for a legal conclusion.  It lacks foundation.  This

1    witness is being asked to testify as to the application of the

2    meaning of a law.  And I'll also object that it's not in

3    the -- it's not in the report.  There's no mention of

4    Clean Missouri in the report.

5              **THE COURT:**  I'll sustain the objection.  I don't

6    know if there's another question.  It seemed that the question

7    was -- it seemed like you were asking for a legal conclusion.

8    But --

9              **MR. HAYDE:**  Well, I'll rephrase then.

10             **THE COURT:**  Okay.  I think that might be helpful.

11   **Q.   (By Mr. Hayde)** You've had -- Dr. Kimball, you've had a

12   career where you've looked at a lot of redistricting, whether

13   you were directly involved in it or not, you studied it,

14   correct?  And in your opinion, in general, in redistricting at

15   the local level, even if there isn't a local requirement about

16   political subdivisions, is it more relevant if the state -- in

17   that process, is it considered relevant to take into account

18   that the state has that in the constitution with respect to

19   the state houses?

20             **MR. SPOONER:**  Judge, I'm going to object.  It calls

21   for a legal conclusion.  It's asking this witness to comment

22   on the application of a constitutional provision to the County

23   Charter and it invades the province of the Court also.

24             **THE COURT:**  Overruled.

25   A.   I mean, I think what the Missouri Constitution says about

1  state legislative districts is relevant.  It indicates some

2  preference among the Missouri voters for protecting political

3  subdivisions in redistricting.  And so I think it's worth

4  taking that into account in County Council redistricting, even

5  though it's not part of the County Charter.

6  **Q.    (By Mr. Hayde)** Okay.  Thank you.  So I think it's going

7  to come out that when you drew the map last time or helped

8  draw the map, respecting municipal boundaries wasn't taken

9  into account; is that correct?

10 A.    That's correct.  Yeah.

11 Q.    And --

12 A.    And the plaintiffs that hired me didn't ask me to do that

13 and I didn't --

14 Q.    Okay.

15 A.    -- try.  Yeah.

16 Q.    Since you were involved in the last case, have you become

17 more aware of a body of scholarship that studies the benefits

18 of respecting political subdivision boundaries as a

19 traditional redistricting principle?

20 A.    Yes.  There's a growing body of evidence in political

21 science, some of which I cited in my report, noting the

22 benefits of drawing district boundaries that respect local

23 political subdivisions.  Some of this was published within the

24 past ten years.  Some of it was published around ten years

25 ago.  And I discovered it after the last County Council

1    redistricting process.

2          But the general idea is drawing district boundaries

3    that respect local political subdivisions, make the lines of

4    accountability clearer between constituents and their

5    representatives.  It makes it easier for constituents to know

6    who their representative is.  Makes it clearer to the

7    representative who their constituents are.  It's easier to

8    explain.

9          For example, if, say, District 1 contains all of

10   Municipalities X, Y, and Z, that's easier to convey than

11   saying District 1 contains parts of Municipalities X, Y, and

12   Z, because then that leads to the next question, well,

13   which -- which parts, and it's a more complicated

14   conversation.

15          So some of the research that I cite indicates when

16   district boundaries adhere to boundaries of local political

17   subdivisions, constituents are more likely to know who their

18   representative is, they're more likely to contact their

19   representative with issues or problems that they have.

20   They're more likely to report positive evaluations of their

21   representative.  They're more likely to know about things that

22   their representative has done.  You tend to get --

23   Q.   You cited some of the scholarship in your report.

24   A.   Yes.

25   Q.   Pages 12 and 13 of your report, which is Bowman

1   Exhibit 5.  You say -- the text corresponding to Footnotes 20

2   through 24.  And you said that's -- you've cited just some of

3   the scholarship that's out there that is finding that

4   respecting political subdivisions has clear positive benefits

5   for representative democracy?

6   A.   Yes.

7   Q.   Okay.  One thing I wanted to ask you.  You stated there's

8   a -- someone studied and concluded that respecting local

9   political boundaries reduces gerrymandering.

10  A.   Yes.

11  Q.   Which study was that?

12  A.   I think there are a couple.

13  Q.   Well, and I think I'm referring to the one cited in

14  Footnote 23.

15  A.   Yeah.  The Forgett and Platt.

16  Q.   So could you explain that to the Court?  What's your

17  understanding of how respecting political subdivision

18  boundaries actually reduces gerrymandering?

19  A.   Right.  So if there's a law or a policy or a requirement

20  that says district boundaries need to adhere to the boundaries

21  of local political subdivisions, that provides less wiggle

22  room for the people drawing the district boundaries and less

23  wiggle room for them to manipulate the boundaries for

24  political gain.

25  Q.   Would one way to manipulate or cut a district be to cut

1   it along racial lines?

2   A.   Well, perhaps, particularly, if you're packing more

3   voters of a particular racial group into one district and,

4   thus, diluting the ability of those voters to influence

5   elections in any of the neighboring districts.

6   Q.   Did you note in your analysis of these three maps that

7   that's a characteristic of the two maps being offered to the

8   Court by the Republicans that by dividing University City

9   along Delmar that they're keeping the African-American

10  population with the First District?  Is that something that

11  you noted when you analyzed this?

12  A.   Yes.  When I compared the proposed maps to more localized

13  maps of the racial population of St. Louis County, and this

14  applies to the current district maps that I helped draw

15  ten years ago, that the boundaries of the First District and

16  the current map and in two of the proposals, for much of the

17  border, reinforces residential segregation, basically, in

18  St. Louis County.  Right?

19          So the Proposed Compromised, Republican Map

20  Version 1, southern border of District 1 splits U. City in

21  half, puts the southern majority white part of U. City in --

22  below the border into the Fifth Council District, puts the

23  northern majority black portion of U. City into the First

24  Council district.  Much of the western border of the First

25  Districts of the border between the First and the Third of the

 1   current map.  And the Proposed Compromise and the Republican

 2   Map Version 1 similarly reinforces residential segregation

 3   placing majority black precincts on the eastern side of the --

 4   Q.   Let me --

 5   A.   -- border into the First --

 6   Q.   -- ask you a different --

 7   A.   -- and majority white precincts --

 8   Q.   Dr. Kimball?

 9   A.   Yeah.

10   Q.   I may have misheard you, but I thought you said the First

11   and the Third.  I think you're referring to the Fifth and the

12   Third?

13   A.   I'm sorry.  The First and the Second to the west and the

14   Fifth District to the south of the First.

15   Q.   Okay.  What about Florissant?

16   A.   Right.  Similar there.  The current boundaries and the

17   boundaries at least in Republican Map v1 and I think in the

18   Proposed Compromised splits Florissant such that the southern

19   portion of Florissant is split off from the rest of Florissant

20   and the southern portion that's split off from the rest has a

21   larger black population than the portion of Florissant that's

22   kept in the Fourth Council district on the other side of the

23   border.

24   Q.   So that's potentially -- this is an illustration of how

25   respecting political subdivision boundaries can actually

1  prevent things that might be considered gerrymandering like

2  splitting municipalities along racial lines to put one group

3  in one district and one group in the other?

4  A.    Correct.  And as I mentioned earlier, you know, thinking

5  about the Voting Rights Act and compliance with the Voting

6  Rights Act has evolved so that it's not necessary to pack as

7  many black voters in a single district in order to comply with

8  the Voting Rights Act.  And I think, as I mentioned in my

9  report and earlier, there are many benefits to drawing

10  district boundaries that respect municipal boundaries and

11  doing so in the case of the St. Louis County

12  Council districts, I think, would lessen the degree to which

13  the County Council district boundaries reinforce racial

14  segregation in St. Louis County.

15  Q.    Thank you, Dr. Kimball.  One other point here, I think,

16  that's been mentioned about the St. Louis County Charter being

17  put back up for a vote in 2020.  You're a resident of

18  St. Louis County; correct?

19  A.    Yes.  That's -- I am.

20  Q.    Did you have the chance to vote on whether or not

21  political subdivisions were going to be part of the

22  redistricting as part of that process?

23          **MS. DUEKER:**  Objection, Your Honor.  Without -- I

24  mean, he hasn't referred at all to the Charter Commission

25  where this was, in fact, discussed and every councilperson put

1  people on the Commission to represent each district.  There

2  were discussions about changing the process of redistricting

3  and they were rejected.  So I think answering that question

4  without referring to the Charter Commission is lack of

5  foundation.

6         **THE COURT:**  I'll sustain it for lack of foundation.

7  **Q.   (By Mr. Hayde)** You were a voter in St. Louis County,

8  correct, Dr. Kimball?

9  A.   Yes.  I live in Webster Groves.

10  Q.   Okay.  Did you vote in the election on which the 2020

11  St. Louis County Charter was being submitted to the voters?

12  A.   I did.

13  Q.   Okay.  And was there a provision in there about adding

14  political subdivisions to the criteria for redistricting the

15  County Council districts?

16  A.   No.  None of the ballot measures that I voted on included

17  a provision that would change the redistricting process for

18  St. Louis County Council.

19  Q.   Okay.  So when you voted, you didn't feel to be

20  expressing any opinion about whether that should be in or out

21  at the time that you voted on what was presented to you as a

22  voter; correct?

23  A.   Correct.

24         **MS. DUEKER:**  Objection.  Objection, Your Honor, just

25  for the record, that his views as a voter are not relevant to

1    the proceeding.  So I ask that it be stricken from the record.

2         **MR. HAYDE:**  Judge, I think the views of the

3    St. Louis County voters which Counsel Spooner professes to

4    represent all of them in his opening statement are very

5    relevant.

6         **MS. DUEKER:**  Your Honor, he wasn't brought in --

7    he's brought in as an expert witness, not as a voter, and he's

8    not a party to this litigation.  And I think that his one

9    person's opinion about voting on something, especially without

10   the context of the Charter Commission, is irrelevant.

11        **THE COURT:**  What was the actual last question?  He

12   answered the question about whether it was included.

13        **MR. HAYDE:**  Well, I asked him whether, as a voter,

14   he felt he was expressing whether it was appropriate to add

15   that to the criteria or not by voting on that proposition.

16        **MS. DUEKER:**  That's, specifically, irrelevant,

17   Your Honor.

18        **MR. HAYDE:**  I believe that Counsel has made this an

19   issue in her opening statement, the argument that because

20   there was a Charter amendment process and that wasn't part of

21   it, it reflects the judgment of the voters and he's one of

22   those voters and he can tell you that that wasn't even on what

23   he got to vote on, whereas it was part of the 2018 Missouri

24   constitutional amendment and St. Louis County voters

25   overwhelmingly approved that.

1          **MR. SPOONER:**  Judge, can I -- can I voir dire the

2     witness briefly on that subject?  A couple questions?

3          **THE COURT:**  Sure.  I'm not -- I'm not quite sure

4     where you're going, but sure.  Go ahead.

5          **MR. SPOONER:**  I'd just like to ask the witness when

6     he did the redistricting in 2012, he was familiar with the

7     provisions of the County Charter that applied to

8     redistricting.

9          **MR. HAYDE:**  Judge, I'm going to object.  I don't --

10         **THE COURT:**  Okay.

11         **MR. HAYDE:**  This is improper voir dire --

12         **THE COURT:**  Okay.

13         **MR. HAYDE:**  -- about the question.

14         **MR. SPOONER:**  The point is, Judge, the Charter

15    didn't change.  The witness is testifying that there was --

16    that changes to the Charter were put to the voters between

17    2012 and today and that those changes didn't include -- at

18    least those changes didn't include anything about adding

19    municipal boundaries.  I think that's the point.  And I think

20    that's the point he's trying to make.

21         **MR. HAYDE:**  Well, Judge, I'm doing that because

22    counsel for one of the Arps Plaintiffs said that they're going

23    to make that part of their evidence.

24         **MS. DUEKER:**  Your Honor, you're allowed to look at

25    what is the law, but not one person's vote.  I mean, you know,

1   frankly, the Charter that was passed in 2020 was passed with a

2   higher margin than St. Louis County voters voted for the state

3   constitutional change.  So, I mean, you can only look at what

4   the objective evidence of the vote is, not the subjective of

5   one person.

6          **THE COURT:**  I guess the -- I don't recall what was

7   on the ballot regarding the Charter amendment.  Whatever was

8   on the ballot was on the ballot.  I mean --

9          **MS. DUEKER:**  Correct.

10         **THE COURT:**  Okay.  So the question of whether, on

11  the ballot that he voted on, was a question of respecting

12  political subdivisions?  Is that generally --

13         **MR. HAYDE:**  Judge, Ms. Dueker, in her opening

14  statement, said that the evidence is going to be that in 2020,

15  the St. Louis County voters had to vote on another Charter and

16  this wasn't added to it and that's somehow reflective of the

17  judgment of the voters that this shouldn't be relevant or

18  taken into consideration at all.  This is of a piece with a

19  lot of their objection in this case.  They want to make an

20  argument and then say, We don't get to counter it at all.

21  Dr. Kimball is a resident of the county.  He voted on it and

22  he knows that as far as what was submitted to the voters that

23  she referred to in her opening -- that wasn't in there, so

24  there's no judgment about whether it should be in there or not

25  by virtue of the vote.

1          **MS. DUEKER:**  There absolute- --

2          **MR. HAYDE:**  And I think that's -- that's relevant.

3          **MS. DUEKER:**  There absolutely is, Your Honor.  The

4    voters of --

5          **MR. HAYDE:**  Well, then you can put that on -- you

6    said you're going to make this evidence, so we'll see.  You

7    can put on what you want.

8          **MS. DUEKER:**  Your Honor, the bottom line is the

9    voters had an opportunity when they redid the Charter to add

10   or modify redistricting.  They chose not to.  That is the law.

11   Now, they want -- I mean, it's all fine and dandy to want

12   these provisions in the Charter, but they're not there and the

13   voters recently said, We don't want it there.  This is what we

14   want our Charter to be, despite having the federal court draw

15   it for four decades.  We are not changing the procedure.

16          That is the law.  And so -- you know, and the law

17   was recently enacted.  That, to me, is the relevant portion

18   and that's what's relevant for this Court, because under

19   United States Supreme Court precedent, you are not allowed to

20   deviate from population equality absent historical policy.

21   And not only is the historical policy not consistent with what

22   they're presenting, it's contrary to it, according to

23   Judge Perry and according to the votes of County voters when

24   they reenacted their County Charter.  This is a legal -- not a

25   one person's view on the vote that took place in 2020.

1          **MR. HAYDE:**  Judge, I'm just trying to put in

2   evidence that I think was made relevant by her opening

3   statement.  I'm not trying to argue how I read all the

4   Supreme Court cases.  I'm just trying to put on the case and

5   move this along.

6          **THE COURT:**  All right.  And the question is whether

7   when the vote was taken regarding the Charter, whether there

8   was anything specifically about municipal boundaries?  Is

9   that --

10          **MR. HAYDE:**  Well, that wasn't the question they're

11   just now objecting to.  He answered "no" to that without

12   objection.

13          **THE COURT:**  Right.  Okay.

14          **MR. HAYDE:**  The question was whether then he, as a

15   voter, felt he was expressing, you know, his opinion about

16   whether or not it should be in there by virtue of voting on

17   that measure.

18          **MS. DUEKER:**  Your Honor, the voters already

19   expressed their opinion.

20          **MR. SPOONER:**  Judge, I'll just --

21          **MS. DUEKER:**  His opinion --

22          **THE COURT:**  Okay.

23          **MS. DUEKER:**  -- is not relevant.

24          **MR. SPOONER:**  Yeah.  I'll just object on relevancy.

25          **THE COURT:**  Okay.  I'll overrule it and allow him to

1  answer the question.

2        **MR. HAYDE:**  I think he's already answered it.

3  **Q.   (By Mr. Hayde)** But for the record, could you answer that

4  question again, Dr. Kimball?

5  A.   Sure.  I think when considering what the voters of

6  St. Louis County prefer about protecting political

7  subdivisions in redistricting, they voted heavily for the

8  Clean Missouri amendment in 2018 that applied protecting local

9  political subdivisions to the state process of drawing state

10  legislative district boundaries.  The Charter amendments that

11  St. Louis County voters were asked to vote on in 2020 did not

12  give them the opportunity to express whether or not they

13  preferred protecting local political subdivisions in drawing

14  County Council district boundaries.  So --

15        **MS. DUEKER:**  Your Honor, again, I want to say that

16  that opinion is irrelevant.  Unless he wants to go and talk

17  about that he had the opportunity to go to the Charter

18  Commission, that citizens had the ability to go to the Charter

19  Commission and put forth changes to the redistricting process,

20  no one did.  The commissioners, in fact, discussed it and

21  declined to put it on there.  There was opportunities for

22  voters to weigh in whether the redistricting process should be

23  changed and they did.  They voted no.  So I think his opinion

24  contrary to that is irrelevant.  He may have voted against the

25  Charter because redistricting wasn't in there, but that's not

1   relevant.  The voters did speak.

2         **MR. HAYDE:**  Judge, I would say, again, Ms. Dueker

3   made this relevant in her opening statement by saying that

4   we're going to go there.  She's now objecting that she doesn't

5   want to have to go there.  All that is fine.  Do that on your

6   examination of Dr. Kimball.

7         **MS. DUEKER:**  Go there, meaning the law.  The law has

8   already been decided.  That's different than you trying to put

9   in subjective opinions that's contrary to what actually

10  happened.  That's different.

11        **THE COURT:**  I understand.  But, I mean, I'm sure

12  we're going to get into what is included in the Charter,

13  however that process was done.  So I'm allowing his answer and

14  we should move on.

15  **Q.   (By Mr. Hayde)** Now, Dr. Kimball, you're familiar with the

16  fact that the Charter does only have three criteria that it

17  sets forth for redistricting the County Council districts and

18  those are equality of population, compactness, and contiguity;

19  correct?

20  A.   Correct.

21  Q.   Okay.  So when you go to -- you've gone to redraw the

22  district maps before in St. Louis County ten years ago;

23  correct?

24  A.   Correct.

25  Q.   When you go to do that, is it really possible to just

1  take into consideration those three factors?

2  A.   No.   There are other considerations that come into play.

3  There's been some discussion about avoiding splitting census

4  blocks in the redistricting process.   There's been discussion

5  about avoiding splitting precinct boundaries in the

6  redistricting process.   There's been discussion about whether

7  incumbents should remain in their districts in the

8  redistricting process.   The -- whether to use a least change

9  approach in redistricting.   Those are some of the other

10  factors that have been discussed here that are not in the

11  Charter.

12  Q.   And so, briefly on the topic of the least change method,

13  when you examined these three maps that are being put forth to

14  the Court, what is your opinion about whether each or any of

15  them follows the -- appears to have followed the least change

16  method?

17  A.   It looks to me like each of the proposals follows a least

18  change approach in that they started with the current

19  County Council boundaries and then made adjustments to those

20  boundaries in order to draw new districts.   That none of them

21  started from scratch.

22  Q.   And so since there are any number of factors that go into

23  drawing the lines that aren't in the Charter, if you were to

24  try to just look at the factors that are in the Charter, there

25  would be a myriad number of maps that you could come up with.

1  You need some other principles where you make decisions on ow

2  to change the lines; correct?

3  A.   Yes.  There are many, many ways you could draw different

4  County Council district boundaries that satisfy equal

5  population, contiguity, compactness, and the Voting Rights

6  Act.  And so other considerations are going to come into play

7  in deciding which of those alternatives to adopt.

8  Q.   Okay.  So if I could -- if we could put up what is

9  Plaintiffs' -- Bowman Exhibit 9, it's the Democrat Version 3

10  or what's now labeled on the website as Map Submitted by Brian

11  Wingbermuehle on 11/22/21.  And do you recognize that to be

12  the Democrat Version 3 Map, or as it's labeled here, Proposed

13  Map Submitted by Brian, to be the map that the Bowman

14  Plaintiffs are advocating be adopted by the Court to -- as the

15  County Council district boundaries for the next -- until the

16  next census?

17  A.   Yes.  That's my understanding.

18  Q.   So looking at this map, we see that certain areas in the

19  districts coincide with political subdivision boundaries along

20  between the First and the Fourth, the First and the Second,

21  the First and the Fifth, the Third and the Seventh.  Do

22  those -- does respecting the municipal boundaries, to some

23  degree, render -- might make you -- in order to do that, it

24  has to be a little less compact?

25  A.   Right.  Some municipal boundaries in St. Louis County are

1    not compact.  Florissant, you know, has that little shoe part

2    that comes down to the south into Hazelwood.  So the municipal

3    boundaries for Florissant and Hazelwood are not very compact.

4    The other parts of the boundary for Florissant on the eastern

5    side are not so compact either.

6              This map, the boundary of the Fourth District, part

7    of that somewhat jagged area there kind of in the middle of

8    the southern border of the Fourth District is, I think, part

9    of the boundary of Florissant and Calverton Park, I think.

10   And then just to the south and in the Second District, the

11   northern part of the Second District, that's following the

12   boundaries of Hazelwood, those municipalities -- those are the

13   municipal boundaries.  They're not exactly compact, at least

14   shaped like a circle or a square.  So I think that, yeah,

15   respecting local municipal boundaries makes, in that portion

16   of the map, makes the Council district boundaries a little

17   more jagged.

18   Q.   Okay.  Now, if you can look at the tab 12, Bowman

19   Exhibit 12, if we can pull up the Republican Version 1 Map on

20   the screen submitted by Adam Bohn on 11/8.

21             And, Dr. Kimball, do you recognize this to be the

22   map?  You referred to this map in your report as Republican

23   Map Version 1?

24   A.   Yes.

25   Q.   Okay.  And you've heard, you understand here today, the

1    Republicans are asking the Court to adopt this map?

2    A.   Right.

3    Q.   Okay.  And so if you look at the Third District in this

4    map, do you see the appendage sticking up out of the district

5    into Chesterfield, Town and Country, Creve Coeur area there?

6    A.   Right.  In the northwestern portion of District 3.

7    Q.   Okay.  And do you -- is it your understanding that that

8    is for the purpose of keeping Councilperson Fitch, his current

9    residence to which he's moved, in the Third District?

10          **MS. DUEKER:**  Objection, Your Honor.  Dr. Kimball

11   testified that he was not aware of the, quote, political

12   considerations that went into this map, so he has no basis to

13   opine as to whether and why that was done.

14          **MR. SPOONER:**  Judge, I want to add to the objection.

15   The question mischaracterizes the fact that Tim Fitch was

16   already in that district, and that when it comes to issues of

17   compactness, the *Fletcher* Court has said that political

18   considerations are not relevant.

19          **MS. DUEKER:**  And, Your Honor, and I believe he also

20   has failed to indicate that that, I guess, the head or thumb

21   was actually drawn in the last map that was authored by

22   Dr. Kimball.  So he is contradicting his own report.

23          **MR. HAYDE:**  That means this -- do you want to have

24   your direct examination in the middle of mine?

25          **MS. DUEKER:**  Well, you're testifying.  I might as

1   well.

2              **MR. HAYDE:**  Judge?

3              **THE COURT:**  Yes.

4              **MR. HAYDE:**  This is the -- this is, like, the heart

5   of their case about -- this is the main thing they care about,

6   keeping Councilman Fitch in the Third District.  They allege

7   that we're engaging in gerrymandering by drawing him out.  We

8   assert, you know, this is a factor that's also outside the

9   Charter.  This is where they're talking out of both sides of

10  their mouth.  They say you can't -- you can't consider

11  municipal boundaries to be something to take into account

12  because it's not in the Charter.  Well, drawing -- drawing

13  Mr. Fitch in and having the district be less compact as a

14  result isn't in the Charter either.  This is the very heart of

15  the dispute.

16             **MR. SPOONER:**  This is where --

17             **THE COURT:**  Okay.  I'm sorry.

18             **MR. SPOONER:**  This is where it mischaracterizes --

19             **THE COURT:**  The question -- the question was:  Is it

20  your understanding that that is for the purpose of keeping

21  Councilperson Fitch, his current residence, in the Third

22  District?  I'm going to overrule the objection and allow him

23  to answer that question.

24             **MR. HAYDE:**  Thank you, Judge.

25             Go ahead and answer, Dr. Kimball.

1   A.   I don't know exactly where Councilman Fitch's address --

2   current address is.  I understand he moved to the northwest

3   portion of his current district.  That part that sticks up in

4   the northwest corner, you know, makes the district a bit less

5   compact than if the northern boundary of the Third District

6   were, you know, flatter across that northern border.

7   **Q.   (By Mr. Hayde)** Okay.  And so, in fact, in this map,

8   they've moved the rest of the northern border a bit south but

9   kept that corner there; correct?

10  A.   I think that's correct.  I mean --

11  Q.   And so --

12  A.   -- if you overlaid the two maps, it would be clearer to

13  see.

14  Q.   Right.  So you noted in your report, in fact, that their

15  District 3 is less -- it's one of the things where the

16  compactness was all very good and, overall, it's about the

17  same.  But district-to-district, there's differences.  And in

18  this case, their District 3 is less compact than the Democrat

19  Version 3/Bowman Plaintiffs' Proposed Map; correct?

20  A.   Correct.

21  Q.   And it's your understanding that's, at least in that

22  northwest portion, it's for the purpose of keeping

23  Councilperson Fitch within the district; correct?

24  A.   That's my understanding.

25  Q.   And as you've testified, whether or not a councilperson's

1  residence is taken into account on redistricting is something

2  not in the St. Louis County Charter; correct?

3  A.    Correct.  That's not in the Charter.

4  Q.    What's your understanding, Dr. Kimball, of what we would

5  call partisan political gerrymandering?

6  A.    Broadly speaking, gerrymandering means redrawing district

7  boundaries to gain a political advantage for a particular

8  group or political party, for example.

9  Q.    What kind of political advantage?  Something like

10  disproportionate to their performance in recent elections?  Is

11  that what it is?

12  A.    Right.  That's sort of a common --

13  Q.    For instance, if --

14  A.    -- measure of --

15  Q.    -- one party in recent elections had, generally, in the

16  top-of-the-ticket races won, you know, 57 to 60 percent on

17  those statewide races --

18  A.    Uh-huh.

19  Q.    -- and when congressional redistricting come around,

20  there was a debate whether they get 75 or 90 percent of the

21  delegation to Congress, maybe that's sort of disproportionate

22  to their performance in recent elections?  Is that what we're

23  talking about?

24  A.    Right.  Partisan gerrymandering --

25  Q.    Okay.

1   A.   -- would be drawing districts that are out of proportion

2   with the --

3   Q.   Now, we -- we noted that you've supplied all of your data

4   included in what you provided using the software and looking

5   at that data.  Can you tell -- can anyone who has those things

6   tell what the partisan lean of the districts are under the

7   existing and any of the maps that we've been looking at?

8   A.   Yes.  Some of the data I provided, in my report, I

9   examined some election -- some recent elections and the data I

10  provided include, I think from the 2020 general election, the

11  vote for Governor, vote for Lieutenant Governor, vote for

12  Secretary of State.  They can include votes for President as

13  well.

14  Q.   So, in looking at that, did -- by respecting municipal

15  boundaries more than the other maps, did the Democrats here,

16  the Bowman Plaintiffs, in their map, achieve a measurable

17  partisan gain?  Did they shift any of the districts from the

18  current partisan lean under the current map?

19  A.   No.  I think that the Democratic Map Version 3, from what

20  I looked at, creates districts that are very similar to the

21  current districts in terms of the partisan lean.

22  Q.   And what about the partisan lean under the two maps

23  proposed by the Republicans?  In particular, what happens to

24  the Third District?  They change it to be a little bit better

25  for Republicans; correct?

1          **MR. SPOONER:**  Judge, I'm going to object.  This is

2   not in the report and he testified that his opinions don't go

3   to examining political leans or political make-ups.  And if he

4   was going to offer this testimony, I would ask that he give

5   the percentages, the exact percentages of what he's talking

6   about when he talks about changes in political leans.

7          **THE COURT:**  Is this part of the -- I don't -- didn't

8   see it in the report.

9          **MR. HAYDE:**  This is partially part of the report.

10         **THE COURT:**  Okay.

11         **MR. HAYDE:**  There's an addenda to the report --

12         **THE COURT:**  Okay.

13         **MR. HAYDE:**  -- which is page 17 of tab 5 which shows

14  some of the District 3 party lean under the proposed maps.

15  Judge --

16         **THE COURT:**  Oh, okay.  Sorry.

17         **MR. HAYDE:**  Part of the issue here is --

18         **THE COURT:**  I looked at the body of the report.  Not

19  this.

20         **MR. HAYDE:**  -- only over the last weekend in their

21  filings did they start talking about political gerrymandering

22  and accusing us of using the municipal boundaries as a

23  subterfuge for that.  So that was not at issue until, really,

24  the pretrial filings on Sunday that we actually were noted

25  were late --

1          **MS. DUEKER:**  Your Honor --

2          **MR. HAYDE:**  -- and then the pretrial conference

3     yesterday.  We haven't -- their pleadings and filings haven't

4     accused us of partisan political gerrymandering until just

5     then.

6          **MR. SPOONER:**  That's not true.  It's in the

7     complaint.  It's in the amended complaint.

8          **MR. HAYDE:**  They talked only about --

9          **THE COURT:**  So at this point, your objection had to

10    do with this not being part of the report.  There is an

11    addendum here.

12         **MR. SPOONER:**  But the addendum goes to an election

13    involving a governor's election.

14         **THE COURT:**  Okay.

15         **MR. SPOONER:**  Not the County election.

16         **THE COURT:**  Right.

17         **MS. DUEKER:**  And he indicated in his deposition that

18    the only reason he made that calculation was because Bowman

19    Plaintiff counsel asked him to do that.

20         **THE COURT:**  So you guys will have an opportunity to

21    cross-examine him.

22         **MS. DUEKER:**  Okay.

23         **THE COURT:**  And he's testifying about this.  I'm

24    going to overrule the objection.  Obviously, it's something

25    that you can get into on cross-examination.

1          **MS. DUEKER:**  Thank you.

2     **Q.    (By Mr. Hayde)** And so, Dr. Kimball, what you, in fact,

3     looking at page 17 of your report, what you concluded was with

4     respect to partisan lean in District 3 the way that the

5     Republicans' proposed map draws it gives them a couple points

6     advantage over where District 3 currently is; correct?

7     A.    Yes.  The --

8     Q.    So --

9     A.    When I looked at the 2020 governor results in the current

10    District 3, I think it's 49.5 percent Democratic, 49.0 percent

11    Republican.  So the Republican v1 Map of District 3 makes it a

12    bit more --

13    Q.    And so --

14    A.    -- Republican than the current districts.  The Republican

15    Alternative or the Proposed Compromise makes District 3 a bit

16    more Republican than the current districts and a bit more

17    Republican than the Democratic Map v3.

18    Q.    And when we look at the map that's up on the screen, can

19    you tell from the data that's been -- that you've looked at in

20    this case that's available to you concerning voting behavior

21    of St. Louis County citizens --

22          **MS. DUEKER:**  Objection, Your Honor.  Just for the

23    record, I'd like to say the entire addendum is irrelevant.  He

24    so indicated in his deposition and we would like it stricken.

25          **THE COURT:**  The whole --

1          **MS. DUEKER:**  The calculation that was added, the

2     addendum.  In his deposition, he indicated it didn't have

3     anything to do with his report, so I don't know why we are

4     discussing it now.

5          **MR. GREIMAN:**  Your Honor, it's been stipulated into

6     evidence.

7          **MS. DUEKER:**  That doesn't make it relevant.  I mean,

8     it doesn't mean that it shouldn't be stricken because now,

9     obviously, it's being used as part of his opinion when he said

10    in his deposition it wasn't part of his opinion.

11         **MR. HAYDE:**  I don't think that's exactly the

12    testimony and that's part of the record as well, Judge.  Just

13    examining the witness.  They've now accused us of partisan

14    political gerrymandering and it's relevant.  It also ties in

15    with the Tim Fitch.  That's where it's going next.

16         **THE COURT:**  Again, I believe that the Arps

17    Plaintiffs will have an opportunity to cross-examine the

18    expert --

19         **MS. DUEKER:**  Uh-huh.

20         **THE COURT:**  -- on this report and the addendum.  So

21    I'm going to allow his testimony at this time.  I'm overruling

22    the objection.  And so we can move on.

23    **Q.   (By Mr. Hayde)** Dr. Kimball, we noted earlier that the

24    Third District gained the most population between the last

25    census and the current, the 2020 Census; correct?

1   A.   It might be the Fifth District, but the Third and the

2   Fifth gained the most.

3   Q.   It was one of the ones that gained substantial population

4   compared to other districts; correct?

5   A.   Correct.

6   Q.   So, in general, not only are the lines going to generally

7   have to move south throughout all the districts, but

8   District 3 is going to have to give up some population to

9   other district; correct?

10  A.   Correct.

11  Q.   Okay.  So if we look at what we did with keeping the

12  appendage on the north border, those are people now that they

13  have to give up somewhere else; correct?  By not --

14  A.   Right.

15  Q.   By not making that line straight across, for instance,

16  they've now got to find somewhere else --

17  A.   The Third District has to get smaller somewhere.

18       **MR. SPOONER:**   Judge, I'm going to object to the

19  leading question.

20       **THE COURT:**   Sustained.

21  Q.   **(By Mr. Hayde)** Along the eastern border of District 5 and

22  the western border of District 3, from your examining the maps

23  in this case against the existing --

24  A.   The border between District 3 and District 5?

25  Q.   -- District 3 and District 5, the map the Republicans are

1  asking the Court to adopt, what did they do to give up some

2  population from the Third to the Fifth?

3  A.   It looks like there's that little chunk near the bottom

4  part of the border between District 3 and District 5 where

5  District 5 comes out into a part of the former District 3.  So

6  that's where population was taken out of District 3 and put

7  into District 5 --

8  Q.   And is that --

9  A.   -- under that proposal.

10  Q.   Are you familiar with the municipalities and the voting

11  behavior of the St. Louis County residents in that portion

12  that, under the Republican map, is jetting out of District 5

13  into District 3?

14  A.   I think that's part of Kirkwood and the Meacham Park area

15  is around there.

16  Q.   Okay.  And what type of -- what ethnicity or race is

17  heavily in Meacham Park?

18  A.   Meacham Park is historically a black community in

19  St. Louis County.

20  Q.   Okay.  And so they've taken Meacham Park and put those

21  black democratic voters in the Fifth in this map; correct?

22  A.   Right.  And much of the --

23  Q.   Okay.

24  A.   -- rest of Kirkwood then remains in the Third.

25  Q.   Okay.  Now --

1          **MR. HAYDE:**  Actually, at this point, if I could, I'd

2    like to confer with my counsel.

3          **THE COURT:**  Okay.

4    **Q.   (By Mr. Hayde)** Dr. Kimball, just to recap for the record,

5    as set forth in the report, your opinion is that the map

6    proposed by the Bowman Plaintiffs is the best option of those

7    being presented to the Court because all three maps equally

8    achieve the other criteria, but that the Bowman Map does a

9    materially better job of respecting municipal boundaries

10   without affording any partisan political advantage to the

11   Democrat party and that there are numerous benefits to

12   respecting municipal boundaries as set forth in the

13   scholarship you cite in your report; correct?

14   A.   Yes.  Though my report didn't examine the partisan

15   performance part of your question.

16   Q.   Right.

17         **MR. HAYDE:**  Those are all the questions I have for

18   you at this time.

19         **THE COURT:**  All right.  We are going to take a break

20   since it's been almost two hours.  And so we are going to take

21   a 15-minute break.  It says 10:55, so we will reconvene at

22   11:10.  All right?

23              **(Court recessed from 10:55 a.m. until 11:11 a.m.)**

24         **THE COURT:**  Now we can get started.  Mr. Spooner?

25         **MR. SPOONER:**  Thank you, Judge.

1                    **CROSS-EXAMINATION**

2  **BY MR. SPOONER:**

3  Q.    Still morning.  Good morning, Dr. Kimball.

4  A.    Good morning.

5  Q.    You and I met at your deposition and I asked you a lot of

6  questions.  I'm just going to go over a few points this

7  morning about your testimony.  If you could, please, refer to

8  your report.  It's Exhibit -- I have it marked as Exhibit N.

9  It's also marked as Exhibit 5.

10          And when you started your direct testimony, you

11  stated that you analyzed the maps regarding the splitting of

12  municipalities; isn't that correct?

13  A.    The three plans in terms of protecting municipal

14  boundaries.

15  Q.    Okay.  Protecting municipal boundaries.  If you look at

16  your report in the introduction, in your introduction, you

17  don't mention protecting municipal boundaries anywhere, do

18  you?

19  A.    Communities of interest.  That's what I was referring to

20  in the --

21  Q.    But that wasn't my question.  My question was:  You don't

22  refer to protecting municipal boundaries in your introduction,

23  do you?

24          **MR. HAYDE:**  I'm going to object to the question as

25  argumentative.

1          **THE COURT:**  Overruled.

2    A.   No.  I said protecting communities of interest in the

3    introduction.

4    **Q.   (By Mr. Spooner)** Correct.  And in the scope of your

5    report, under your scope, you didn't mention protecting

6    municipal boundaries either, did you?

7    A.   It says communities of interest in the --

8    Q.   And, in fact --

9    A.   -- sentence in the scope of the report.

10   Q.   And, in fact, in your scope, you specifically recite to

11   protecting local communities of interest, and in paren, you

12   put municipalities; isn't that correct?

13   A.   Yep, in the scope of the report section.

14   Q.   And if you go to page 8 of your report -- I'm sorry --

15   page 11, Section 8, the heading of that is "Political

16   Boundaries\Communities of Interest"; isn't that correct?

17   A.   Yes.  Local political subdivisions are often seen as

18   local communities of interest as well.

19   Q.   And it's fair to say that when you presented your report,

20   you, basically, opined as to municipalities being local

21   communities of interest and the reason why it's local

22   communities of interest.  I think that goes on page 12; is

23   that correct?

24   A.   Sometimes I used the phrase "local communities of

25   interest," sometimes I used the phrase "municipalities."

1   Q.   I just want the Court to be clear that what we're talking

2   about here is you're asking the -- you're asking the Court to

3   adopt a map that takes into consideration a factor of

4   municipal boundaries as municipal boundaries reference a

5   communities of interest; is that right?

6   A.   I think it's important to consider municipal boundaries

7   as local political subdivisions, but local municipalities are

8   also often considered as local communities of interest as

9   well.

10  Q.   Okay.  And we're not talking about -- the point being is

11  true that your report isn't talking about municipal boundaries

12  as a natural boundary line like a river or major roadway.

13  It's asking to consider municipalities as being a community of

14  interest; isn't that right?

15  A.   And as a local political subdivision.

16  Q.   Correct.  Yeah.  But not as a natural boundary?

17  A.   Municipal boundaries are different than rivers if

18  that's -- if that's what you're asking.

19  Q.   Well, you can use a municipal boundary for a natural --

20  as a natural boundary line on a redistricting map, can't you?

21  A.   Protecting municipal boundaries or protecting local

22  political subdivisions is a common standard of redistricting.

23  Q.   And you're talking about a common standard of

24  redistricting, so why don't we talk about that concept.

25  You're asking the Court to -- you're basically -- let me

1  rephrase the question.

2         Your position in this case is that local -- is that

3  respecting municipal boundaries should be recognized as a

4  redistricting factor in St. Louis County; is that right?

5  A.   For the many reasons I mentioned in my report, protecting

6  municipal boundaries as local political subdivisions has been

7  done frequently in other redistricting cases and research

8  shows the benefits of doing that, and I think municipal

9  boundaries are important, local governmental units in

10  St. Louis County in particular.

11  Q.   I understand.  I'm not arguing with you whether the

12  Court -- let me rephrase that.

13         I'm not arguing with you about whether the concept

14  of respecting municipal boundaries as a community of interest

15  should or shouldn't be adopted.  What I'm asking you is, using

16  the concept, or respecting municipal boundaries as a local

17  community of interest is a concept that you're saying is

18  recognized in other cases and in the different political

19  treatises, different political science manuals, whatever type

20  of data that would be or books, journals, that recognize that

21  is a valid criteria; is that right?

22  A.   If I understand your question correctly, yes.  I think

23  numerous states have requirements, for example, that state

24  legislative districts be drawn in ways that respect the

25  boundaries of local political subdivisions.  Numerous court

1  cases have held that protecting local political subdivisions

2  is a traditional redistricting criteria.

3           There's research that shows many benefits of drawing

4  district boundaries that adhere to local political

5  subdivisions.  I think the communities of interest concept and

6  the local political subdivision concept are sometimes seen as

7  synonyms and they overlap some.  I think protecting local

8  political subdivisions is acknowledged more frequently in

9  other -- in state requirements and in other court cases than

10 the communities of interest standard.

11 Q.   You are aware that respecting municipal boundaries has

12 not been applied in any previous St. Louis County

13 redistricting matter; isn't that correct?

14 A.   I didn't follow -- try to follow municipal boundaries in

15 helping to draw the County Council districts ten years ago.  I

16 don't know exactly what happened prior to my involvement

17 before that, so I don't know for sure.  But --

18 Q.   Well, let me ask --

19 A.   -- if that's the case, then --

20 Q.   Let me ask you.  Can you tell the Court what -- at what

21 previous time or on what occasion a Court has considered

22 municipal boundaries to apply in a redistricting case?

23          **MR. HAYDE:**  Judge, I'm going to object to the form

24 of the question.  Is this to his knowledge or is he asking,

25 you know, for him to recite everything on Westlaw and do some

```
 1  research?

 2           THE COURT:  I'm going to sustain the objection just

 3  based on how the question is asked.

 4           MR. SPOONER:  Let me rephrase, Judge.

 5           THE COURT:  Okay.

 6  Q.    (By Mr. Spooner) You can't tell the Court today -- you

 7  can't point to any past time where respecting municipal

 8  boundaries was taken into consideration in redistricting in

 9  St. Louis County, can you?

10  A.    Not in St. Louis County, and in my report, in

11  footnote 17, I cite some other court cases where Courts have

12  recognized protecting political -- local political

13  subdivisions is a valid redistricting criteria.

14  Q.    And you're aware in the *Fletcher* case that Judge Hamilton

15  didn't take into consideration or wasn't asked to take into

16  consideration municipal boundaries?

17  A.    The *Fletcher* case was --

18  Q.    The 1992 case.

19  A.    -- '92?  I'm not very familiar with that one, so I don't

20  know for sure.  But it seems -- yeah, seems possible.

21  Q.    And you are aware that the issue of municipal boundaries

22  was addressed by Judge Perry in this Court in the *Corbett* case

23  and that's the 1992 case?  Hamilton was --

24  A.    Judge Perry was 2002; right?

25  Q.    I'm sorry.  You're right.  2002 case.  You're aware of
```

1   that; right?

2   A.   I believe so.

3   Q.   You're aware that Judge Perry stated in 2002, "I have not

4   discovered any case holding that preserving municipal

5   boundaries should be considered when redistricting St. Louis

6   County, Missouri, or that it should be considered by a Court

7   when it has never been considered by the political area being

8   redistricted.  Respecting municipal boundaries has never been

9   a consistently applied legislative factor in the redistricting

10  process of St. Louis County."

11          **MR. HAYDE:**  Judge, I just want to object on the

12  basis of completeness.  The full *Corbett* decision is available

13  to the Court.

14          **THE COURT:**  You're just asking about that

15  particular --

16          **MR. SPOONER:**  Phrase.

17          **THE COURT:**  Overruled.  I'll allow him to answer

18  that.

19  A.   I see -- I believe Judge Perry wrote that.  I think for a

20  variety of reasons that I include in my report more recent

21  social science evidence, recent events in St. Louis County,

22  the importance of municipal governments in St. Louis County,

23  that I think this time around, it's important to consider

24  municipal boundaries in drawing the St. Louis County

25  Council districts.

1   **Q.    (By Mr. Spooner)** And when you were asked to draw a map

2   ten years ago, I think you've already told us, you didn't take

3   into consideration municipal boundaries, did you?

4   A.    The plaintiffs that retained me at the time didn't ask me

5   to and I didn't think it was -- yeah, I didn't think it would

6   be possible to do so I didn't try.  I wish I had.

7   Q.    To answer the question, it's true you didn't take into

8   consideration municipal boundaries when you drew the map

9   ten years ago, did you?

10  A.    Correct.  I did not.

11  Q.    And since ten years ago, up till today, you're not aware

12  of any change in any legislation in St. Louis County that

13  would include taking into consideration municipal boundaries

14  as a redistricting factor?

15  A.    I believe the County Charter section that applies to

16  redistricting is the same today as it was ten years ago.

17  Q.    And ten years ago, you're aware that Judge Adelman

18  stated, "The least change method is advantageous because it

19  maintains the continuity in representation for each district

20  and is by far the simplest way to reapportion the County

21  Council districts?

22  A.    I think Judge Adelman wrote that.

23  Q.    And you're aware that the least change method was

24  followed by -- or was followed in Republican Map Version 1?

25  A.    Well, I think all three of the proposals that I evaluated

1  used the least change approach.

2  Q.   Isn't it true that, at least when you did your report and

3  in your deposition testimony, you didn't have any knowledge of

4  what the drafters of Democratic Version Map 3 relied on other

5  than the concept of municipal boundaries; isn't that right?

6  A.   Right.  I wasn't present when any of those proposals were

7  made, so I don't know all the considerations that went into

8  any of those proposals.

9  Q.   So you don't know whether least change was used by the

10  Democratic commissioners when they drafted Democratic Map

11  Version 3; isn't that true?

12  A.   I just look at the maps and they're all pretty similar to

13  the current districts.  They include much of the main

14  territory of each current in the new districts.  It seems

15  pretty clear that they all followed the least change approach.

16  Q.   But you're offering an opinion of what they did.  The

17  truth of the matter is you have no idea what was relied on in

18  drafting Democratic Version Map 3 other than municipal

19  boundaries; isn't that true?

20  A.   I don't know all the considerations that went into the

21  maps, but I think you could -- you could look at them and

22  compare them to the current districts and see that they all

23  made modest adjustments to the current boundaries to create

24  new plans.

25  Q.   I understand that you're looking at the maps and it's

1  your belief by looking at the map that a least change -- it

2  reflects least change method.  But you have no idea whether

3  the Democrats -- the Democratic Version Map 3 actually took

4  least change into consideration when it drafted that map?

5  A.   I don't know all the considerations that went into

6  creating any of the maps I evaluated.

7  Q.   Now, you testified a little bit about compactness and you

8  referenced District 3 and the area that kind of has been known

9  as the "hump."  Were you aware that Judge Hamilton in *Fletcher*

10  stated that a plan is taken as a whole when it's considered

11  for compactness?

12  A.   I don't know exactly what Judge Fletcher [sic] --

13  Q.   Judge Hamilton?

14  A.   -- wrote.  I tried to examine each of the districts

15  individually and each plan as a whole in my assessment of

16  compactness of each of the proposals I evaluated.

17  Q.   But are you aware that, in this district, it was found,

18  when analyzing redistricting St. Louis County, that a plan is

19  looked at as a whole when it's considered for compactness?

20  A.   That Judge Hamilton wrote that?

21  Q.   No.  That that's a standard in redistricting St. Louis

22  County.

23  A.   Where is that standard written?  The Charter just says

24  compactness.  It doesn't say consider the plan as a whole.

25  But I tried to consider each plan as a whole and each district

1    individually in my report.

2    Q.    Yeah.  But in your report, you go down and you give a

3    mean score for compactness, don't you, on Table 6?

4    A.    Right.  The mean score was my attempt to assess each plan

5    as a whole.

6    Q.    And, in fact, the methodology for redistricting looks at

7    compactness as a mean score as opposed to a score for the

8    individual units being redistricted; isn't that true?

9    A.    Compactness scores can be applied to an individual

10   district or to an overall plan in terms of the average

11   compactness score.  You can do both.

12   Q.    In terms of a political science scientist offering an

13   opinion on compactness, that opinion is based on, when you

14   look at the compactness of an area, be it a county or a state,

15   that that compactness score is looked at as a mean average and

16   not as an area-by-area breakdown average?

17   A.    I disagree.  We use the compactness scores to assess

18   individual districts and overall plans that incorporate many

19   districts.

20   Q.    So if Judge Hamilton found in her opinion that a plan

21   must be considered for compactness as a whole, you would

22   disagree with that concept?

23            **MR. HAYDE:**  I'm going to object to lack of

24   foundation.

25   A.    I would say -- I would say --

1          **THE COURT:**  Sustained.  I'm sorry.  Sustained

2   because I'm -- I'm not quite sure.  Your question was having

3   to do with something that was stated in the *Fletcher* case?

4          **MR. SPOONER:**  Correct.

5          **THE COURT:**  Is that correct?  Okay.  And --

6          **MR. SPOONER:**  Let me rephrase the question.

7   **Q.   (By Mr. Spooner)** Do you disagree with Judge Hamilton's

8   statement in the *Fletcher* case that a plan must be considered

9   as a whole for compactness?

10         **MR. HAYDE:**  Same objections, Judge.  There's a lack

11  of foundation.

12         **THE COURT:**  Sustained.

13  **Q.   (By Mr. Spooner)** Now, in terms of compactness, if you

14  look at the mean scores for the different maps, it's true that

15  the Republican Map Version 1 has a better mean score than

16  Democratic Map v3?

17  A.   Republican Map v1 and the Republican -- or the Proposed

18  Compromise have mean scores of .0.90 which is a bit higher

19  than the Democratic Map v3 which has a mean score of 0.06, but

20  is a tad lower than the current districts which have a mean

21  score of 0.91.

22         As I said earlier and in my report, since these

23  compactness measures are based on census population and the

24  uncertainty around the census population, we're basically

25  splitting hairs and looking at the differences between the

1   mean scores for these different proposals.

2   Q.    And I think what you said is that those mean scores, the

3   changes, those differences are not significant.  I think that

4   was your testimony; isn't that right?

5   A.    Correct.

6   Q.    And when you talk about political leans, if you go to

7   page 17 of your report, you would agree with me that those

8   percentages that are listed also don't show a significant

9   district -- a significant difference?

10  A.    So the percentage voting for the Democratic and

11  Republican candidates in the 2020 governor's election, for

12  example, the differences between the different plans are on

13  the order of one percent to two percent, you know, which can

14  seem pretty small, but I imagine in a really close election, a

15  margin of one percent could be the difference between winning

16  or losing a seat.  So I can -- I mean, I think that's part of

17  the reason we're here.

18  Q.    So you're saying that going from -- and I'm not really

19  sure how you did.  You looked at a governor's race results for

20  District 3 and you don't have the current leanings in your

21  report, do you?

22  A.    The current -- oh, the current districts?  The

23  current District 3?

24  Q.    Yeah.  To compare this to.

25  A.    No.  But I went and checked it myself.

1  Q.    You didn't opine in your report -- you clued 17, but you

2  don't have anywhere in your report what those current leanings

3  are, do you?

4  A.    No.  But I mentioned them in my testimony earlier that in

5  current District 3, the Democratic share of the governor's

6  vote was 49.5 percent and the Republican share was

7  49.0 percent.

8  Q.    And if I look at the current leanings to these leanings

9  now, the differences between those figures are less than

10 one percent?

11        **MS. DUEKER:**  Your Honor.  Objection because I -- is

12 he relying on information that's not included in his report?

13 And if so, I object.

14        **THE COURT:**  To --

15        **MS. DUEKER:**  Well, I mean the calculation that he

16 mentioned, he said he mentioned it earlier in his testimony.

17 Is that in his report?

18        **THE COURT:**  He has -- he has stated -- I think he

19 stated clearly here that the current leanings are not in the

20 report.  That's what I heard.

21        **MS. DUEKER:**  Okay.  I just wanted to make sure that

22 was clear.  So I object to the extent that he's relying on

23 information not in his report.

24        **THE COURT:**  Well, he's being asked about --

25        **MR. SPOONER:**  Let me --

1          **THE COURT:**  He asked him about it, so --

2          **MR. SPOONER:**  Let me rephrase that.

3    **Q.    (By Mr. Spooner)** Isn't it true that if you compare your

4    leanings on page 17 of your report with the current leanings

5    that the differences are all less than one percent?

6    A.    Not exactly.  So the difference in vote margin, I think,

7    is one way to look at it.  Democratic Map v3, 49.6 percent

8    Democratic, 48.9 Republican, so that's a 0.7 percentage point

9    advantage for the Democrats.

10   Q.    That's --

11   A.    Republican v1, 48.7 percent Democratic, 49.9 Republican,

12   so that's a 2.2 percentage point --

13   Q.    But that's --

14   A.    -- advantage for Republicans.

15   Q.    Dr. Kimball, let me -- I'm going to interrupt you.

16   A.    Then the third --

17   Q.    That wasn't my question.  My question was when you

18   compare these numbers to the current leanings that they're

19   less than one percent.

20         **THE COURT:**  Okay.  So now I -- the objection by

21   Ms. Dueker was that the current leanings are not included.

22   He's testified that the current leanings are not included.  So

23   I'm not quite sure -- we don't have that, so I'm not quite

24   sure what you're asking him about.

25         **MR. SPOONER:**  Without that, we don't know what the

1   significance of these changes are.

2           **THE COURT:**  Okay.

3           **MR. HAYDE:**  Judge?

4           **THE COURT:**  Yes.

5           **MR. SPOONER:**  Let me -- let me rephrase the

6   question.

7   **Q.    (By Mr. Spooner)** Dr. Kimball, we would need to know the

8   current leanings in these districts to know what the

9   significance of the proposed leanings in District 3 are,

10  wouldn't we?

11  A.   Yeah.  That would be helpful information.  I mentioned

12  that earlier in my testimony, at least, in terms of the 2020

13  governor's results.

14  Q.   And I believe based on your testimony, you didn't look at

15  political leanings -- other than this analysis here, you

16  didn't consider political leanings when you evaluated the

17  three maps; is that right?

18          **MR. HAYDE:**  I'm going to object to the form of the

19  question as to when are you talking about?

20          **THE COURT:**  You're just saying at what point?

21          **MR. SPOONER:**  At any -- at any point.  Other than --

22  other than --

23          **THE COURT:**  That's your question.  All right.

24          **MR. SPOONER:**  Other than page 17 when he analyzed

25  the three maps, he didn't look at political leanings.

1   **Q.    (By Mr. Spooner)** Let me -- let me narrow it down a little

2   bit more.  Before -- you say at the time of your report, you

3   didn't take into consideration political leanings in your

4   opinions; isn't that true?

5   A.    Not that much.  In the voting rights analysis section, I

6   did look at voting in some recent elections including two

7   partisan elections county-wide and in the First District

8   proposed by the Democratic Map v3.  So there were some there,

9   but --

10  Q.    And then based on your prior testimony, you don't know

11  whether either -- whether anyone on the Commission took into

12  consideration political leanings when they submitted their

13  maps?

14  A.    I don't know all the considerations that went into

15  producing each of these three proposals.  I will say, you

16  know, I don't think it's a coincidence that the two proposals

17  here submitted by Republicans have a slightly better

18  Republican performance in District 3 than the proposal

19  submitted by the Democratic commissioners.

20  Q.    But you don't know what that number is because you didn't

21  put in your report what the current leanings are, did you?

22          **MR. HAYDE:**  I'm going to object.  That

23  mischaracterizes the testimony and the evidence.  He's

24  testified that it's in the data that you -- everyone's been

25  provided it to and has been stipulated into evidence and that

1   he looked at it and he's testified that it's 49.5 to 49.  So

2   the question is completely mischaracterizing the evidence.

3           **THE COURT:**  Overruled.

4   A.   Sorry.  So what was the question again?

5   **Q.   (By Mr. Spooner)** Let's -- let's move on to you had made a

6   comparison on your direct testimony between District 3 and

7   District 5 which was the Kirkwood/Meacham Park area.  If you

8   look at page 9 of your report, Table 3, isn't it true that the

9   current minority percentage is 3.3 percent and then if you

10  look at Republican Map Version 1, it goes down to 2.4 percent,

11  and if you look at the Democrat Version 3, it goes down to

12  2.9 percent.  Isn't that correct?

13  A.   Which -- which district are we comparing here?

14  Q.   We're looking at Table 1, District 3.

15          **THE COURT:**  What page again?  Because you said 9, I

16  thought.

17          **MR. SPOONER:**  It's page 7.

18          **THE COURT:**  Okay.

19          **MR. SPOONER:**  I said 9.  I can't read my own

20  handwriting.  Page 7.

21  A.   Okay.  Table 2 or Table 3?

22  **Q.   (By Mr. Spooner)** We'll start on Table 2.

23  A.   Okay.

24  Q.   Isn't it true on Table 2 the current minority make-up of

25  District 3 is 3.3 percent, and in Republican Map Version 1, it

1    goes to 2.4 percent, and in Democratic Map Version 3, it goes

2    to 2.9 percent?

3    A.    These are the black percents of the total population in

4    District 3 of those proposals.  Yes.

5    Q.    And when you look at voting age population on Table 3,

6    the black percentage was 3.1 percent, and in the Republican

7    Map Version 1, it goes to 2.3 percent, and Democratic

8    Version 3, it goes to 2.8 percent; is that correct?

9    A.    The black share of the voting age population in

10   District 3 in those proposals, yes.

11   Q.    And based on your previous testimony, you'll agree with

12   me that those differences are insignificant?

13   A.    If black share of the total population, the voting

14   population, right, those differences are not significant.

15   What's significant is that Meacham Park is part of Kirkwood

16   and splitting it off from the rest of Kirkwood into a

17   different County Council district, you know, when that could

18   be avoided, it would be better to avoid doing that.

19   Q.    I understand.  But in your direct testimony, you were

20   talking about potential racial impact.  And there is no

21   potential -- significant potential impact in black minority

22   voting when you move Meacham Park from one district to the

23   next?

24             **MR. HAYDE:**  I'm going to object again.  It's

25   mischaracterizing the testimony.  That concerned the partisan

 1    effect of that, not racial concerns.

 2              **THE COURT:**  Sustained.

 3    **Q.    (By Mr. Spooner)** And you also talked about U. City from a

 4    racial perspective, that dividing U. City may impact minority

 5    voting?

 6    A.   I said the current district and Republican Proposal

 7    Version 1 and the Proposed Compromise all have a boundary

 8    between the First and the Fifth Districts that it splits

 9    University City in half and places a southern majority white

10    portion into the Fifth District and places a northern majority

11    black portion of University City into the First District.  And

12    I think one of the reasons why protecting municipal boundaries

13    in drawing the County Council districts in addition to all the

14    benefits of doing that is to avoid drawing County Council

15    districts that reinforce residential segregation within

16    municipalities.

17    Q.   But isn't it true that you didn't take into consideration

18    the exact make-up of the black vote, the white vote, or any

19    other community of interest as it exists in those areas of

20    University City that are being divided?

21    A.   I didn't look at the -- I'm sorry.  I'm not sure I

22    understand the question.

23    Q.   You didn't look at any of the -- you didn't take into

24    consideration exactly what the differences are between black

25    vote and white vote or any other community interest as it

1   exists in the areas of University City that are being divided?

2   A.   Not in University City.  In isolation, I examined vote by

3   white and black voters for particular candidates county-wide

4   and in the proposed First District under the Democratic Map

5   Version 3.

6   Q.   You mentioned in direct examination that there's many

7   factors that somebody -- that can be taken into consideration

8   when drawing district lines that aren't in the Charter; is

9   that correct?

10  A.   I'm sorry.  I missed the end of your question.

11  Q.   In your direct examination, you basically said that

12  there's many ways that you can draw new districts?

13  A.   And comply with the three requirements of the County

14  Charter, yes.

15  Q.   But you said there was many factors to drawing lines that

16  are not in the Charter; is that right?

17  A.   Right.  I mentioned some that have been discussed here.

18  Incumbency, least change approach, not splitting blocks, not

19  splitting precincts, protecting local political subdivisions.

20  Q.   And you're aware that those particular decisions on what

21  to include, that the Commission was free to take in whatever

22  concepts they wanted to take in when they were drawing their

23  borders?

24  A.   The Redistricting Commission?

25  Q.   Correct.

1  A.   Yeah.  I -- yes.  And I don't know all the considerations

2  that they took into account in creating their proposals.

3  Q.   But you would agree with me that the Commission is free

4  to use any of these ways to try to come up with a new map?

5  A.   Yes.  They still need to comply with equal population,

6  compactness, contiguity, Voting Rights Act.

7  Q.   As long as it complies with the Charter is what you're

8  saying; is that correct?

9  A.   And the Voting Rights Act.

10 Q.   And the Voting Rights Act.  But you're not aware of any

11 legislative directives that would allow somebody, it could

12 be -- it would allow the Court to consider criteria that's

13 outside the County Charter.  I'm talking St. Louis County

14 legislative directives.

15 A.   I'm not aware of other legislative directives that

16 require that, but I'm not aware of legislative directives or

17 the County Charter that say you cannot take other factors into

18 consideration in addition to the three standards in the County

19 Charter.

20 Q.   But you'll agree that the legislative directive in the

21 County Charter specifically lists three directives that must

22 be taken into consideration?

23 A.   Right.  The County Charter just mentions equal

24 population, contiguity, and compactness.

25 Q.   And you'll agree with me that when you go beyond those

1    three factors that a map should be drawn with minimal or no

2    political considerations?

3    A.   I mean, there are always other considerations that go

4    into redistricting.  Even the County Council, in addition to

5    equal population, compactness, contiguity, Voting Rights Act,

6    I'm not aware of all the considerations that went into the

7    proposals that I reviewed.  The goal is to draw district

8    boundaries that are fair politically, that don't give an

9    advantage to one party or another or to one group or another.

10   But redistricting is also an inherently political act.  You're

11   redrawing the district boundaries.  It's an opportunity --

12   it's an opportunity for people or groups or parties to try and

13   gain an edge.

14   Q.   So if a Court's drawing a map, if the Court were to

15   consider any factors that aren't in the Charter, wouldn't you

16   agree with me that that would be taking into consideration --

17   taking a political matter, act, issue into consideration?

18          **MR. HAYDE:**  Judge, I'm going to object to the lack

19   of foundation and it's calling for him to provide an opinion

20   about what the law is.

21          **THE COURT:**  Sustained.

22   **Q.   (By Mr. Spooner)** I previously asked you about the history

23   of consideration of municipal boundaries in redistricting

24   St. Louis County.  Let me narrow that or change that to a

25   traditional principle.

1           So other than what's in the Charter, are you aware

2    of any traditional principles that were taken into

3    consideration when redistricting St. Louis County?

4    A.   Well, I mean, I guess I'm most familiar with ten years

5    ago since I was involved in that process.  You know, as I

6    recall, there was an effort to not split census blocks.  There

7    was an effort to try not to split precincts.  I know at some

8    point along the way, I evaluated the proposed districts to see

9    if incumbents remained in their districts.  So I don't know if

10   that counts as it was a factor that went into the map or not.

11   In my role, I tried not to consider other political factors,

12   but I don't think I was fully aware of all the considerations

13   of the people who retained me.  So --

14   Q.   My question goes to you're not aware of any traditional

15   principles that were taken into consideration in any previous

16   St. Louis County redistricting, are you?

17           **MR. HAYDE:**  I'm going to object to the question.

18   Taken into consideration by whom?  It's vague.

19           **THE COURT:**  And the question is any traditional

20   principles that were taken into consideration --

21           **MR. SPOONER:**  In previous redistricting of the

22   St. Louis County Council districts.

23           **THE COURT:**  Okay.  I think it is vague.  I'm not

24   quite sure what that -- and you're talking about in every

25   redistricting once done by the Court or adopted by the Court?

1          **MR. SPOONER:**  That's --

2          **THE COURT:**  Is that your question?

3          **MR. SPOONER:**  That's what we would have.

4          **THE COURT:**  Okay.

5          **MR. SPOONER:**  It would be what was -- what has been

6     previously done.

7     **Q.    (By Mr. Spooner)** We know in *Corbett*, there weren't any.

8     And we talked about history.  And I just want to find out if

9     you're aware of any traditional redistricting principles that

10    were taken into consideration when it was redistrict -- I

11    think you did the redistrict last time.  So you're not aware

12    of any?

13    A.   Well, I can think of a few.

14          **MR. HAYDE:**  Objection.  Asked and answered.  He's

15    talked about that.  What he considered?  Are you asking

16    something different now?  I'm not --

17          **MR. SPOONER:**  I'm asking what traditional -- what

18    traditional principles were considered in redistricting

19    St. Louis County Council districts since, let's say, since the

20    *Corbett* case?

21          **MR. HAYDE:**  Same objection.  Since -- by whom?  It's

22    vague.

23          **MR. SPOONER:**  By anybody.  Whatever it is.  He can

24    testify to what --

25          **THE COURT:**  You're saying since the *Corbett* case, or

1  you're saying the 2002 redistricting and the 2012?  Is that

2  what you're asking, about those two particular, or are you

3  asking all --

4          **MR. SPOONER:**  Up to the present.

5          **THE COURT:**  Okay.  So that's --

6          **MR. SPOONER:**  If he's aware of any traditional

7  principles that were taken into consideration --

8          **THE COURT:**  Okay.

9          **MR. SPOONER:**  -- when St. Louis County was

10 redistricted.

11         **THE COURT:**  All right.

12         **MR. HAYDE:**  Same objection.  By the Commissions that

13 didn't adopt any map?  By the Courts?  I mean, who are you

14 talking about?  It's too broad and vague to give the witness,

15 you know, facts to frame an answer.

16         **MR. SPOONER:**  We can narrow it to the Courts

17 because --

18         **THE COURT:**  Okay.

19         **MR. SPOONER:**  -- it's the Courts that did it.

20         **THE COURT:**  Okay.  I'll allow that question.

21 A.   Well, I'm mainly familiar with the case ten years ago

22 since I helped draw those County Council boundaries.  And I'm

23 aware of some other considerations that other traditional

24 redistricting principles came into play.  I tried not to split

25 precinct boundaries.  Those are local political subdivisions.

1    I tried to follow the least change approach.  That's another
2    traditional redistricting principle.
3              I know at some point I evaluated the maps for where
4    the incumbents live.  I don't recall if that was -- at what
5    point along the -- you know, along the way that was done, so
6    that whether it was a factor in drawing lines or just
7    evaluated after.  But at least that was something that I
8    evaluated ten years ago.  So those are some other
9    redistricting principles that, at least I'm aware of, that
10   were applied in the past.
11   **Q.   (By Mr. Spooner)** Are you aware that Republican Map
12   Version 1 doesn't divide census blocks?
13   A.   I believe that's correct.
14   Q.   Are you aware that Republican Map Version 1 minimizes, if
15   it does at all, any divisions of precinct boundaries?
16   A.   I don't believe any of the three proposals that I
17   evaluated divide census blocks or split precinct boundaries.
18   Q.   And you had mentioned the incumbent issue.  You're aware
19   that as the district is currently drawn, Councilperson Fitch
20   resides in District 3?
21   A.   As I understand, he moved somewhat recently but still
22   resides in District 3 near the northwest border somewhere.
23   Q.   Why it is significant to you as a political scientist
24   when looking at where somebody resides to know when they move
25   there or how close their residence is to a boundary?

1  A.   The general principle that, I guess, I try to apply here

2  is that we want the voters to choose their representatives and

3  not -- and not the other way around in the redistricting

4  process.  And so I guess, you know, there are sort of a

5  couple, you know, extreme cases that you try to avoid, I

6  suppose.

7          One, you know, dramatically redrawing the boundaries

8  so that you draw an incumbent out of his or her district into

9  another so that two incumbents are forced to run against each

10 other.  You know, that would tend to run against that

11 principle.  But redrawing the boundaries to accommodate an

12 incumbent who recently moved is also somewhat problematic with

13 that principle.  So I think that the situation with Mr. Fitch

14 is, you know, is problematic.  I don't have a good easy

15 solution here.

16 Q.   But when you talk about redrawing the boundaries to keep

17 somebody in, if the current boundary has Mr. Fitch in the

18 district, then you're not redrawing them to keep him in.

19 You're just drawing the boundary to maintain the status quo;

20 isn't that correct?

21 A.   The challenge is that over the past ten years, the

22 population of St. Louis County has shifted to the south.  So

23 some of the Council district boundaries are going to have to

24 shift to the south as well.  And if he moved right near the

25 northern border of his district, you know, that puts him in

1    danger there.  So that's the problem.

2    Q.    But that wasn't my question.  My question is that in the

3    current boundaries, Mr. Fitch lives in the Third District.

4    And if you're going to redraw the boundaries, you're not

5    redrawing the boundaries to keep him in, you're redrawing the

6    boundaries to maintain the status quo; isn't that correct?

7                **MR. HAYDE:**  Objection.  Asked and answered.

8                **THE COURT:**  Sustained.

9    **Q.    (By Mr. Spooner)** And you had mentioned a principle is to

10   let people decide -- choose who they want to vote as being an

11   important principle?

12   A.    Letting the voters choose their representative rather

13   than the other way around, rather than using the redistricting

14   process to let politicians choose their -- who their

15   constituents are going to be.

16   Q.    And that's an important principle?  Is that what

17   you're -- is that correct?

18   A.    Right.  Yeah.  That's the general idea of trying to

19   avoid -- trying to avoid gerrymandered districts.

20   Q.    So if you move Mr. Fitch out of the Third District,

21   aren't you depriving the voters of the Third District the

22   right to have their councilperson -- choose their current --

23   or incumbent councilperson?

24   A.    As I mentioned, I mean, I see this as -- I see the

25   problem here.  But part of the problem is because he moves

1    right close to the boundary of the district and the population

2    has shifted south, so some of the boundaries are going to have

3    to shift south.  And so it's a problem.  I mean, and I don't

4    have a good, easy solution that would be simple and please

5    everybody.

6    Q.   Do you believe that keeping Mr. Fitch in the district --

7    Third District or taking him out of the Third District is a

8    political consideration?

9    A.   I think that's right.

10            **MR. SPOONER:**  I can go through each of these maps.

11   I don't think there's any need to, if I put the different maps

12   up, to show him the different boundaries under different

13   scenarios and ask him to comment.  But for purposes of the

14   Court, I'd like to offer Plaintiff's Exhibits B, HH, V, C, II,

15   W, E, and D.  I think we've agreed to most of those other than

16   HH and II.

17            **MR. GREIMAN:**  Can you recite the list again?

18            **MR. SPOONER:**  B.

19            **MR. GREIMAN:**  I'm sorry.  B?

20            **MR. SPOONER:**  B, HH.  Which, B, we've agreed -- I

21   believe we've agreed to.  We have HH, which is a copy of the

22   Republican Map Version 1 without the County Council districts

23   shown.  V, which we've agreed to.  C, which we've --

24            **MR. GREIMAN:**  I've got B.  I've got HH.

25            **MR. SPOONER:**  V.

1          **MR. GREIMAN:**  V, as in "Victor"?

2          **MR. SPOONER:**  V, which we agreed to V.  C --

3     "Charlie," C, which we've agreed to.  II, which hasn't

4     previously been agreed to, which is a copy of the proposed map

5     Democratic Version 3 without the County Council districts

6     shown on it.  Exhibit W, which we've agreed to.  Exhibit E,

7     and Exhibit D.

8          **MR. GREIMAN:**  So Exhibit B, we've stipulated to.  No

9     objection there.  On the pretrial list of exhibits, you listed

10    HH as some kind of a tweet?

11         **THE COURT:**  Yes.  That's what I have as well.  And I

12    don't have an II on my list.

13         **MR. SPOONER:**  So we could -- why don't we just use

14    HH for this map?

15         **THE COURT:**  HH is what now?

16         **MR. SPOONER:**  It's a copy -- it's a picture from the

17    website.

18         **MR. GREIMAN:**  Are these the ones you just --

19         **MR. SPOONER:**  Yeah.  Yeah.

20         **MR. GREIMAN:**  Which one is which?

21         **MR. SPOONER:**  HH is -- this one's HH.  This one

22    here.  HH is a copy of the Democratic Version 1 Map without

23    the County Council districts shown.  And II is a picture of

24    the Democratic Version 3 without the current County Council

25    boundaries shown.

1          **THE COURT:**  Okay.

2          **MR. GREIMAN:**  As just identified by Mr. Spooner, we

3    have no objection to Exhibit HH.  We have no objection to

4    Exhibit II.  Exhibit V, we previously agreed to stipulate to,

5    so no objection there.  Exhibit C, we previously stipulated

6    to.  No objection there.  Exhibit W, we previously agreed to

7    stipulate to.  No objection there.  Exhibit E we agreed to

8    stipulate to.  No objection there.  And Exhibit D, we agreed

9    to stipulate to.  No objection there.

10         **THE COURT:**  Okay.  All right.  Thank you.  Then

11   those will all --

12         **MR. SPOONER:**  And II and HH?

13         **THE COURT:**  He said those first.  Didn't you?

14         **MR. GREIMAN:**  II and HH are fine.

15         **THE COURT:**  Okay.  Then those will all be admitted.

16   Q.   **(By Mr. Spooner)** Mr. Kimball, if you'd take a look at

17   Exhibit BB, which is an e-mail that you produced dated

18   December 28, 2001.  Moving on.

19         **MR. SPOONER:**  Do I need to do something to put it on

20   the screen?

21   Q.   **(By Mr. Spooner)** Isn't it true that on December 28, 2001

22   [sic], you referred to the Proposed Compromise Map as the

23   Compromise Map?

24   A.   I called it the Proposed Compromise Map.  I think, at

25   that time, on the County website, the maps had different names

1   than they do now.

2   Q.   And in your report, you refer to that particular map as

3   Republican Alternative; isn't that correct?

4   A.   In my report, I referred to it as Republican Alternative,

5   and in a footnote, I indicated that that's the one that had

6   previously been called the Proposed Compromise Map.

7   Q.   And when you referred to it as Republican Alternative,

8   that's a term that you created.  It wasn't in any Commission

9   proceedings or in any previous document?

10          **MR. HAYDE:**   Judge, I just want to pose an objection.

11  We went over there at the pretrial.  Unless there's something

12  in addition to determining what the Court has already ruled on

13  about how we're to refer to the maps, this is not useful and

14  should not be admitted under Rule 403.

15          **MS. DUEKER:**   It's -- Your Honor, I would disagree.

16  I think that it needs to be in evidence.  We talked about this

17  and we need to get it into evidence in order for Your Honor to

18  consider it.

19          **THE COURT:**   Consider the fact that the map was

20  referred to --

21          **MR. SPOONER:**   As the Republican Alternative Map as a

22  political -- it shows political bias or political

23  considerations by calling the map something that it had never

24  been referred to as.

25          **THE COURT:**   Okay.  All right.  You can -- I'm going

1   to overrule the objection and we'll see where this goes.

2   A.   As I -- if I understand your question, as I indicated in

3   the footnote in my report, the -- this was the map that was

4   submitted to the County website by Adam Bohn who was one of

5   the Republican commissioners.  Since it was submitted by a

6   Republican commissioner, that's why I called it Republican

7   Alternative Map.

8   **Q.   (By Mr. Spooner)** And just so we're clear, I believe you

9   already testified.  The -- all three maps meet the criteria

10  under the County Charter; isn't that correct?

11  A.   As I indicated in my report, I think each of the three

12  proposals that I evaluated meet the equal population

13  standards, the contiguity standard, and the compactness

14  standard.  Yes.

15  Q.   And what you're asking the Court to do is to pick a map

16  that takes into consideration the additional factor of

17  protecting municipal boundaries?

18  A.   Yes.  I think the Democratic Map Version 3 does a better

19  job of protecting municipal boundaries, local political

20  subdivision, all at the same time doing as well on the other

21  criteria as the other proposals.

22        **MR. SPOONER:**  Thank you, Dr. Kimball.

23        **THE COURT:**  You may proceed, Ms. Dueker.

24

25

1                           **CROSS-EXAMINATION**

2     **BY MS. DUEKER:**

3     Q.    In your testimony -- good morning, Dr. Kimball --

4     A.    Hello.

5     Q.    -- if it's still morning.  I think it is.  You've

6     indicated numerous times that the basis of your report,

7     generally, is to respect, in addition to the other factors,

8     respect municipal boundaries; is that correct?

9     A.    One of the factors I examined was respecting political --

10    local political subdivisions or local municipal boundaries.

11    Yes.

12    Q.    And you opined negatively about any line that would

13    necessarily, for the sole purpose, protect an incumbent?  For

14    example, Councilman Fitch.  You opined that voters should

15    choose their representatives, not the representatives;

16    correct?  And that was one of the reasons why you negatively

17    opined on the line, you know, allowing Councilman Fitch to

18    remain in his district?

19            **MR. HAYDE:**  I'm going to object to the -- I think

20    the question is vague and it's also mischaracterizing the

21    testimony.  But I don't -- I think it's pretty argumentative

22    as well.

23            **THE COURT:**  I'm going to overrule the objection.

24    A.    As I indicated earlier, it's a predicament.  Mr. Fitch

25    recently moved to an address near the border of his current

1   district.  The population in the county has shifted south,

2   therefore, some of the district boundaries are going to have

3   to shift to the south.  And so it's a challenge about how to

4   handle that situation.

5   **Q.    (By Ms. Dueker)** Were you aware that the subdivision

6   Councilwoman Dunaway lives in was drawn to remain in the

7   Fifth District under the Dem v3 Map?

8   A.   I didn't analyze where all the incumbents live in all the

9   plans, so --

10  Q.   Well, just Councilman Fitch's; correct?  You analyzed --

11  A.   Well, that's --

12  Q.   -- him?

13  A.   -- been -- well, that was discussed in the Commission

14  hearings and prior to here, so that was the one situation that

15  I was aware of that was -- that's been a controversy in this

16  process.

17  Q.   So you're saying that you were not aware that

18  Ms. Dunaway's subdivision was drawn by the Democrats to remain

19  in the Fifth District?

20  A.   No.  But -- no.

21  Q.   Were you also aware or were you unaware that her

22  subdivision is in Chesterfield and her subdivision is the only

23  portion of Chesterfield that's drawn into the Fifth and the

24  remainder is drawn into Councilman Harder's district?

25  A.   I know that the Democratic Map Version 3 splits

1  Chesterfield.

2  Q.    Uh-huh.  You were not aware that the only portion of

3  Chesterfield that is drawn into the Fifth is Ms. Dunaway's

4  subdivision?

5  A.    No.  If that's the case, then I know now.

6  Q.    And would you consider that political gerrymandering?

7  A.    I mean, I said earlier that --

8  Q.    Especially given the whole --

9  A.    Considering where incumbents are going to be and which

10  district they stay in, that's a political consideration.  Yes.

11  Q.    Oh, okay.  So you believe it's political gerrymandering?

12  A.    Well, not necessarily gerrymandering, but it's a

13  political consideration about whether you're going to keep

14  incumbents in their district and how hard you want to try to

15  do that, particularly if an incumbent moves to a new address.

16  Q.    Well, you opined that drawing to keep Councilman Fitch in

17  his district was political gerrymandering.  I mean, how is

18  this any different?  The only part --

19  A.    I didn't call it political gerrymandering.  I just said

20  it's problematic.

21  Q.    Okay.

22  A.    It's -- there's not a simple situation, you know, so it's

23  a challenge.

24  Q.    You don't think that it's somewhat disingenuous to argue

25  for somebody who's -- for, you know, a group of plaintiffs

1    that are arguing that municipal boundaries should be

2    respected, that taking off a sliver of Chesterfield to keep

3    Councilwoman Dunaway in the Fifth isn't disingenuous at best?

4            **MR. HAYDE:**  I'm going to object to the question.

5    It's argumentative.  There's also a lack of foundation as to

6    whether the witness has any understanding or knowledge of

7    facts underlying whether that portion of Chesterfield was in

8    or out of the existing districts, was in or out of any of the

9    other maps or why it was drawn the way it was.

10           **THE COURT:**  Sustained.

11   **Q.    (By Ms. Dueker)** Okay.  So you have selective knowledge as

12   to where council members live?

13   A.    The situation with Mr. Fitch was mentioned publicly at

14   the Commission hearings, so that's how I knew about that.

15   Q.    You don't remember Councilman Fitch going to the

16   Commission and raising this exact concern?

17   A.    I remember it coming up at the Commission hearing.  Yes.

18   I can't remember who -- who all mentioned it.  As I recall,

19   multiple people mentioned it.

20   Q.    But did he also mention Councilwoman Dunaway's district

21   or that her residence was actually being protected in the

22   Fifth?

23   A.    No.  I didn't -- I mean, that part, I didn't know.

24   Q.    You testified in your deposition that you were asked in

25   late October to be an expert for the plaintiffs.  Is that

1  accurate?

2  A.    Yes.

3  Q.    And --

4  A.    Well, for the -- to be an expert for the Democratic

5  members of the Commission is how I took it.

6  Q.    Okay.  And did you believe that you were being asked to

7  be retained for Commission purposes or for litigation

8  purposes?

9  A.    I understood it to be for the purpose of the Commission

10  since that was the process that was about to -- about to take

11  place.

12  Q.    So it's your testimony now that they approached you about

13  being an expert consulting with them during the Commission

14  process?

15  A.    That's how I understood it.

16  Q.    Were you ever hired in that capacity?

17  A.    No.

18  Q.    Okay.  So you were only hired for purposes of the

19  litigation; correct?

20  A.    Correct.  Yeah.  I was retained in some time in early

21  December after the -- after the Commission failed to reach an

22  agreement.

23  Q.    Correct.  But they mentioned hiring you -- hiring you as

24  early as October?

25  A.    They asked me, yeah, I think it was late October.  My

1   first conversation, I was asked if I wanted to be an expert

2   for the Democratic members of the Commission and I said no.

3   Q.   Were you aware that Mr. Wingbermuehle was the person

4   charged with drawing the first Democratic map?

5   A.   I'm not sure I knew that, but I may -- it may have

6   indicated on the website that he was the one that submitted it

7   to the County, so I think I may have known that.

8   Q.   And you indicated that they gave you that map somewhere

9   maybe before the Commission meeting or shortly thereafter; is

10  that correct?

11  A.   I remember they e-mailed it to me, yeah, sometime around

12  early November, as I recall.

13  Q.   And didn't they tell you what they based the drafting of

14  that map on?

15  A.   Well, they indicated that one of the considerations was

16  to keep municipal boundaries intact.

17  Q.   Okay.  And you indicated that when you saw the map, it

18  looked -- in respecting municipal boundaries, that that map

19  looked significantly different than what currently existed; is

20  that correct?

21  A.   I remember thinking that that map was significantly

22  different than the current Council districts.

23  Q.   And do you remember indicating to me that communities of

24  interest can be something other than municipalities?

25  A.   Communities of interest is a -- there isn't one uniform

1   definition of it.  I think local political subdivisions are

2   easier to understand and municipal boundaries can count as

3   local political subdivisions and they can also count as local

4   communities of interest.

5   Q.   Are you aware that nearly one-third of St. Louis County

6   is not incorporated?

7   A.   Yes.

8   Q.   And so one-third of the county, this factor doesn't even

9   apply; is that correct?

10  A.   Well, there's a significant portion of the St. Louis

11  County population that lives in unincorporated St. Louis in

12  South County that's largely in the current Sixth District.

13  There's another significant portion of unincorporated

14  St. Louis County that's in the current Fourth

15  Council District.  So I think even respecting community --

16  respecting local municipal boundaries does and, I think, to

17  some degree, the current maps already have significant

18  portions of the unincorporated county in -- mostly in one

19  council district or in another.

20  Q.   So is it fair so say -- I'm so sorry.  Is it fair to say

21  that you didn't examine communities of interest in the

22  unincorporated areas?

23  A.   I just examined municipal boundaries because those are

24  the local political subdivisions that, I think, are the most

25  important ones to consider for County Council redistricting.

1  We have a lot of municipalities in St. Louis County.

2  Q.   Uh-huh.

3  A.   They have a lot of important functions.  There are many

4  areas that I mention in my report where there's some

5  coordination between municipal government and county

6  government and I see important benefits to drawing County

7  Council districts that try to adhere to municipality

8  boundaries.

9  Q.   But 320,000 people in St. Louis County don't have a

10  municipality government?

11  A.   Right.

12  Q.   Isn't that correct?

13  A.   That's correct.

14  Q.   Okay.  So they, obviously, don't have any tie to any

15  municipality.  So what factors is the Court supposed to look

16  at when you're looking at one-third of St. Louis County?

17  A.   But residents of unincorporated St. Louis County don't

18  have a municipal government that sets their property tax rate,

19  that sets their zoning rules, other ordinances.  St. Louis

20  County does that.  And so St. Louis County Council is the

21  government they go to if they have a problem.

22  Q.   But you don't think that it's significant that one-third

23  of the County clearly has no allegiance interest whatsoever in

24  a municipality at all?  Doesn't that sort of undercut your

25  argument that communities of interest are so very important to

1    the residents of St. Louis County?

2    A.    No.   I think municipalities are still an important local

3    governmental unit in St. Louis County.   The residents who do

4    live within a municipality, I think it's worth trying to draw

5    County Council districts that keep residents of a municipality

6    within a single council district.   I think there are many

7    benefits of that from the research I cite in my report.   So I

8    still think it's a worthy consideration for redistricting the

9    County Council boundaries.

10   Q.    Isn't it true that you have no data whatsoever to support

11   your contention that people who live in municipalities believe

12   that should be taken into account when redistricting County

13   Council districts?

14   A.    Data that that's what the residents of St. Louis

15   County --

16   Q.    Want.

17   A.    -- want.   I'm not aware of polling data showing that, if

18   that's what you're asking.   But I think, you know, there have

19   been many efforts over the past several decades to try and

20   reduce the number of municipalities in the County.   Those

21   efforts have failed, sometimes been defeated by ballot measure

22   where the voters voted against the proposal.   I think the most

23   recent effort was the Better Together plan a few years ago,

24   and part of the Better Together proposal would have

25   significantly diminished municipal governments in St. Louis

1   County.  I think that's part of the -- one of the reasons why

2   it generated a lot of opposition in St. Louis County.  The

3   County residents or some County residents objected to it and

4   voiced their objections because they didn't want to see their

5   municipal government diminished.  I think -- I mean, I think

6   those things are kind of understood.

7   Q.   But just because people may not like their municipalities

8   and don't want them irradicated doesn't mean that they want

9   municipalities to determine how their County Council districts

10  are drawn; isn't that correct?

11          **MR. HAYDE:**  Object to the question.  It's

12  argumentative and there's a lack of foundation.

13          **THE COURT:**  Sustained.

14  **Q.   (By Ms. Dueker)** But you acknowledge that you have no data

15  that indicates that St. Louis County voters want municipal

16  boundaries to be a factor in determining their County Council

17  districts?

18          **MR. HAYDE:**  Asked and answered.

19          **THE COURT:**  Sustained.

20  **Q.   (By Ms. Dueker)** When I -- I asked you that -- I asked you

21  about communities of interest.  What's your definition of a

22  community of interest?

23  A.   There isn't a single uniform definition of it.  In the

24  case of the County Council redistricting, I think local

25  municipalities are the most relevant or an important local

1   political subdivision to consider when drawing the County

2   Council boundaries.  I also think for the purpose of drawing

3   County Council boundaries, municipalities are a relevant

4   community of interest as well.  Residents who live within the

5   same municipality are governed by the same municipal

6   government, they pay the same property tax rate, they have the

7   same zoning ordinances.  They have -- they can enjoy the same

8   municipal services provided by that municipality.  So there's

9   some shared interest there.

10  Q.   Do you believe that the voters of St. Louis County should

11  have a voice in whether municipal boundaries are used to draw

12  County Council districts?

13  A.   Well, as I mentioned earlier, I think by voting heavily

14  in favor of the Clean Missouri amendment which had a provision

15  requiring state legislative districts, protect local

16  subdivisions, that suggests to me that the residents of

17  St. Louis County like that general idea even if they haven't

18  had the chance to vote specifically on whether to do that in

19  drawing the County Council boundaries.

20  Q.   So you're clear that the Missouri constitutional

21  provision that mentions communities, that only applies to the

22  State House and the State Senate, correct, by its terms?

23  A.   The provision of the Missouri Constitution refers to

24  state legislative districts.

25  Q.   Correct.  And so there's no way that that Missouri

1   constitutional provision applies to the drawing of St. Louis

2   County Council districts?

3            **MR. HAYDE:**  Objection.  It calls for a legal

4   conclusion.

5            **MS. DUEKER:**  Well, he just opined about the

6   Constitution.  I think -- he says he can define what people

7   think by that, so let's see what he -- I mean, I'm going by

8   the plain words.

9            **MR. HAYDE:**  Well, he didn't offer -- he didn't offer

10  a legal conclusion about it and now you're asking him to agree

11  with your legal argument.  Objection.

12           **THE COURT:**  What was the question again?  You said

13  that -- oh, your question was there's no way that Missouri

14  constitutional provision applies to the drawing of St. Louis

15  County Council districts.

16           **MS. DUEKER:**  And -- okay.  So I'll rephrase.

17           **THE COURT:**  Yeah.

18  **Q.   (By Ms. Dueker)** Is it your contention that the voters

19  didn't know when they voted on this that it didn't apply to

20  St. Louis County?

21  A.   I think voters understood they were voting on a

22  constitutional amendment dealing with the state legislature.

23  But I think it demonstrates voter support within St. Louis

24  County at least for the idea of drawing district boundaries

25  that respect the boundaries of local political subdivisions.

1   Q.    For the state offices; correct?

2            **MR. HAYDE:**  Objection.  Asked --

3   **Q.  (By Ms. Dueker)** That's what it indicates to the voters?

4            **MR. HAYDE:**  Objection.  Asked and answered.  I also

5   want to object.  This is cumulative.  Mr. Spooner's already

6   gone over this.  This has been a phenomenon in this case that

7   things get reported -- repeatedly asked of witnesses four or

8   five times.

9            **THE COURT:**  I will sustain it on asked and answered.

10  **Q.  (By Ms. Dueker)** Are you aware that in Section --

11  Article III, Section 3 of the Missouri Constitution that we

12  were just talking about, that it actually sort of lays out a

13  process and a priority for looking at communities for

14  determining House and Senate districts?

15  A.    I'm aware that that section of the Constitution requires

16  drawing state legislative districts that respect local

17  political subdivisions as much as possible or wording

18  something to that effect.

19  Q.    In fact, it indicates that to the extent it's consistent

20  with the first three factors, that communities shall be

21  preserved.  So that goes behind the Voting Rights Act, goes

22  beyond, "one person, one vote," goes beyond -- past

23  contiguity -- contig- -- I don't say it right -- being

24  contiguous, and compactness; isn't that correct?

25           **MR. HAYDE:**  Objection.  The question misrepresents

1    the provision and it's been happening repeatedly.  It refers

2    to political subdivisions, not communities.

3              **THE COURT:**  Sustained.

4              **MS. DUEKER:**  Well, it says here, "To the extent

5    consistent with subdivisions 1 to 3 of the subsection,

6    communities shall be preserved."  It refers, specifically, to

7    communities.  Right here.  Is that it?  So I think it's a fair

8    question.

9    **Q.    (By Ms. Dueker)** So are you aware that it's the fourth

10   factor to be considered after all of the other things I

11   mentioned were considered for purposes of drawing state rep

12   and state Senate districts?

13   A.    Right.  Protecting political subdivisions is not the only

14   factor that the Missouri Constitution requires in drawing

15   state legislative districts.

16   Q.    Not only is it the only factor but the Constitution goes

17   into great detail to saying what priority level such factors

18   shall have; isn't that correct?

19   A.    I think that's correct.

20   Q.    Okay.  So did you follow the constricts -- constricts of

21   this provision in having communities of interest being fourth

22   in priority to compactness, contig- -- being contiguous, and

23   being compact?

24   A.    I don't know how each of the three plans that I evaluated

25   were created, so I don't know which priority which factor got

1    in each of those plans.  I evaluated them after the fact.

2    Q.    Uh-huh.

3    A.    And in my assessment, the Democratic Map v3 does a better

4    job in drawing County Council boundaries that adhere to local

5    political subdivisions than the other two plans and that the

6    three proposals are, you know, roughly equivalent in terms of

7    the other criteria I evaluated.

8    Q.    So you did not do any analysis or you did not determine

9    which factors deserved priority, the Charter factors or

10   communities of interest?

11        **MR. HAYDE:**  I would object to the question.  It's

12   argumentative.  It's asked and answered.

13        **THE COURT:**  Overruled.

14   A.    I didn't do an analysis of which is most important.  No.

15   I evaluated them in term of all of the criteria that I

16   mentioned in my report and I don't know how in creating each

17   of those proposals how those factors were weighed in that

18   process.

19   **Q.    (By Ms. Dueker)** In your expert opinion, could it be --

20   can communities of interest trump, let's say, compactness?

21   A.    I think respecting local political subdivisions, if

22   you're drawing district boundaries to respect local political

23   subdivisions, you can maybe get a little bit of leeway on

24   compactness, for example, because sometimes local political

25   subdivisions like municipalities don't have compact

1  boundaries.

2  Q.   And who gets to make that decision as to what relative

3  priority certain factors are supposed to get, especially ones

4  that are not in the Charter?

5          **MR. HAYDE:**  I'm going to object to the question as

6  compound.

7          **MS. DUEKER:**  I mean, Your Honor, you know, you've

8  been tasked -- you've been asked to draw a map.  This expert,

9  I'm asking him, which priority are you supposed to respect

10  more than others?  I think it's a fair --

11          **THE COURT:**  Who gets to make the decision as to what

12  relative priority certain factors are supposed to get?

13          **MS. DUEKER:**  Uh-huh.

14          **THE COURT:**  How about we just go with that question

15  at this point?

16          **MS. DUEKER:**  Okay.  That's fine with me.

17  A.   Well, for the three plans I evaluated, I don't think you

18  need to make that call because I think the Democratic Plan

19  Version 3 does a better job than the other two in terms of

20  protecting local political subdivisions on doing just as well

21  as the other plans in terms of the other criteria,

22  compactness, contiguity, equal population, and Voting Rights

23  Act.

24  Q.   **(By Ms. Dueker)** But are you aware though that if factors

25  are determined to be used by this Court that that's something

1  that could govern redistricting for a very long time?

2        **MR. HAYDE:**  I'm going to object to that.  I think

3  that --

4        **MS. DUEKER:**  Well, I mean, if the judge --

5        **MR. HAYDE:**  -- calls for a legal conclusion.

6        **MS. DUEKER:**  -- determines that this is a factor

7  that should be legally included, I mean, shouldn't it be, I

8  guess, less amorphous as to how it's applied?

9        **MR. HAYDE:**  Same objection.  And now also objection,

10  the question's vague.  I mean, this is a legal argument that

11  you're making.

12        **MS. DUEKER:**  Well, no.  It's a practical one.

13  **Q.    (By Ms. Dueker)** What -- if you're asking the judge to

14  draw a map in this case, which we may be, is she supposed to

15  use preserving municipal boundaries ahead of, for example,

16  compactness?

17        **MR. HAYDE:**  Objection.  You're mischaracterizing the

18  witness' opinions and testimony.

19        **MS. DUEKER:**  No.  I'm asking his opinion.  That's

20  valid.

21        **MR. HAYDE:**  Okay.  Well, he's already given -- it's

22  been asked and answered several times.  You're trying to

23  mischaracterize his opinions.

24        **THE COURT:**  So now the question you're asking is

25  which factor should be relative -- I mean --

1          **MS. DUEKER:**  Should be -- should take priority over

2     which other factors?

3               **MR. HAYDE:**  There's a lack of --

4          **MS. DUEKER:**  In what order?

5          **MR. HAYDE:**  There's a lack of foundation.  There's

6     no testimony saying any factors were given priority over

7     anything.  The testimony is what he just answered a couple of

8     times that they all meet the other factors --

9               **MS. DUEKER:**  Uh-huh.  So you're telling me --

10              **MR. HAYDE:**  -- equally.

11         **MS. DUEKER:**  -- there are no -- so are you saying

12    that there are no standards which determine which factors are

13    more important?

14              **MR. HAYDE:**  Again, that's a legal conclusion that

15    Counsel is trying to argue what the law is about --

16         **MS. DUEKER:**  No.  I'm not arguing the law.  I'm

17    asking, for practical purposes, when you're drawing maps, if

18    you're going to add this new factor, what priority level

19    should it be given?  He's indicated that he believes that it's

20    appropriate to add this factor.  Well, I'd like to know where

21    he opines it fits in the priority list with the Charter's that

22    are -- with the factors that are actually in the Charter.  I

23    don't think that that's unreasonable.

24              **THE COURT:**  Okay.  You can answer that question.

25    A.   I think protecting municipal boundaries in drawing County

1    Council districts is an important factor to take into

2    consideration, but it's still important.  It has to be

3    considered in addition to the other factors I evaluated in my

4    report, which are contiguity, compactness, equal population,

5    and the Voting Rights Act.

6    **Q.    (By Ms. Dueker)** So how is the Court or anyone else able

7    to apply this if there are -- if there's no standards by which

8    it's supposed to be included or evaluated?

9    A.    Well, one method would be to see if one potential map

10   does a better job than others in terms of protecting municipal

11   boundaries, but still does an excellent job in meeting the

12   other criteria.

13   Q.    Yeah.  Isn't it --

14   A.    And is equivalent to the other proposed maps in terms

15   of -- I mean, that's what I evaluated in my report.

16   Q.    Okay.  So isn't it true that applying the municipal

17   boundaries as was done for Dem v3 in District 1 which is

18   represented right now by Chair Rita Days, the compactness

19   score for that district went down from 0.93 all the way down

20   to 0.82; is that -- isn't that correct?

21            **MR. HAYDE:**  Counsel, where is this?

22            **MS. DUEKER:**  Oh, on page 11 of his report, Table 6.

23            **MR. HAYDE:**  Thank you.

24   A.    Yeah.  So for District 1.  For District 2, the

25   compactness scores for Democratic Map v3 are lower than in the

1  other two proposed maps that I evaluated and in the current

2  districts.  But in District 3, the compactness score for

3  Republican Map v1 is lower than for Democratic Map v3.  So,

4  some districts --

5  **Q.   (By Ms. Dueker)** So what accounts for the reduction in

6  compactness for District 1?

7  A.   Let me look at the map.  My guess is part of it is that

8  there's a section around the northwest corner of District 1

9  where District 1, District 4, and District 2 come together

10  where the Democratic Map v3 follows the boundaries of

11  Florissant and Hazelwood and I think maybe Calverton Park is

12  in there.  So, you know, that adds a little jaggedness to the

13  boundaries in that area there.

14  Q.   So is it fair to say that by respecting municipal

15  boundaries, you decrease the compactness of District 1?

16  A.   Yes.  And I think -- yes.

17  Q.   So is it fair to say that in that circumstance,

18  respecting municipal boundaries was more important than

19  preserving compactness?

20        **MR. HAYDE:**  I'm going to object to the form of the

21  question.  That's argumentative.

22        **MS. DUEKER:**  I'm asking.

23        **THE COURT:**  Overruled.

24  A.   Well, so there are a couple of other districts where

25  Democratic Map v3 does better in compactness than the other

1  proposals.  This compactness measure is based on the census

2  population data where, you know, there's some uncertainty

3  about the precision with those numbers.  And so all of these

4  plans have districts with relatively high compactness scores

5  and all these plans have mean scores that are very high on the

6  compactness measure.  So I don't see really much -- a

7  significant difference between the plans in terms of

8  compactness.

9  Q.    **(By Ms. Dueker)** Except that the standard deviation from

10  the current districts went from 0.049 to 0.079, correct, when

11  you compare current versus Dem Map 3?

12  A.    Correct.

13  Q.    Okay.

14  A.    But for the reasons I mentioned, you know, these are

15  pretty negligible small differences.

16  Q.    Okay.  And do you know what causes the reduction in

17  compactness in District 2 from Dem Map 3?

18  A.    I mean, I think it's that same area, around the -- since

19  the districts are drawn to follow the boundaries of

20  Florissant, Hazelwood, Calverton Park, in that area.

21  Q.    Okay.  Isn't it --

22  A.    And since --

23  Q.    Oh.

24  A.    I guess, to complete my answer --

25  Q.    Okay.

1   A.    -- since the current districts, and I think one or two of

2   the Republican Alternatives, you know, chop off part of

3   Florissant, the part of Florissant that has a larger black

4   population, you know, I think there are advantages to keeping

5   Florissant whole, keeping it within one County Council

6   district.  Yeah.

7   Q.    So would it be possible for the Court to use school

8   districts as a community of interest?  Would that be

9   appropriate?

10          **MR. HAYDE:**  Object to the form of the question.

11   That's -- to the extent it both calls for him to speculate

12   about what a Court would do and asking him to opine on the law

13   as to whether it would be appropriate.

14          **THE COURT:**  Can you rephrase the question about -- I

15   think you're asking a question about what is a community of

16   interest.

17          **MS. DUEKER:**  Well, I asked whether it would be

18   appropriate for school districts to be used as a community of

19   interest.

20          **THE COURT:**  I'll allow that question.

21   A.    I guess it's worth thinking about school districts as

22   local political subdivisions.  I think, for St. Louis County,

23   municipalities make more sense as local political

24   subdivisions.  Many families in St. Louis County don't send

25   their kids to public school.  They send their kids to private

1   school.  Many adults living in St. Louis County don't have

2   children.

3         I think much of the school districts, their

4   interaction with higher levels of government, is more with

5   state government rather than county government.  I think there

6   are many more areas where municipalities interact with county

7   government.

8   **Q.   (By Ms. Dueker)** So did you determine -- for purposes of

9   analyzing these maps, did you determine which municipalities

10  in St. Louis County that voters have an especially high

11  interest in their communities versus others?

12  A.   No.  I applied the general principle that it's better to

13  split fewer municipalities than more municipalities in drawing

14  the County Council boundaries.

15  Q.   So you don't think that it's relevant for drawing a map

16  whether a certain community identifies with its municipality?

17  A.   I don't have polling data specifically on that.  I mean,

18  as I've mentioned earlier and in my report, I think there are

19  a number of reasons why municipal boundaries are important to

20  consider in drawing the County Council boundaries.

21  Q.   Well, when determining communities of interest, is it

22  actually the people in the communities that decide that or is

23  it, I mean, you?

24  A.   Municipalities, to me, makes sense, as a local political

25  subdivision.  They've been used as local political

1  subdivisions in other redistricting efforts.  The Courts have

2  frequently recognized protecting local political subdivisions

3  as a traditional redistricting criteria.

4  Q.   No Courts in Missouri have so found, have they?

5  A.   There's research showing the benefits of drawing district

6  boundaries that adhere to local political subdivisions.  I

7  think many events over the last ten years show local municipal

8  governments are an important governmental unit in St. Louis

9  County.  Municipal governments interact with county government

10  on a number of issues.  So I think there are a number of good

11  reasons why municipalities makes sense as a local political

12  subdivisions in drawing the County Council boundaries.

13  Q.   Isn't it true that you didn't look at any other possible

14  communities of interest when analyzing these maps?

15  A.   I thought municipalities made the most sense in terms of

16  a local political subdivision that would be relevant in

17  drawing County Council boundaries.

18  Q.   But if you looked at no other communities of interest,

19  how do you know that?

20  A.   I mean, I'm aware there's fire districts, there's

21  townships, there's school districts.  You know, I think for a

22  variety of reasons, municipalities make more sense as a local

23  political subdivision worth protecting when drawing the

24  County Council boundaries.

25  Q.   Were you aware that Commissioner Wingbermuehle looked at

1    community interests in terms of socioeconomics or average

2    household incomes?

3    A.    No.

4    Q.    Were you aware that he did that in portions of

5    South County that aren't in municipalities?

6    A.    No.

7    Q.    Do you think that's appropriate?

8    A.    Defining communities of interest by --

9    Q.    Socioeconomic --

10   A.    -- socioeconomic status?

11   Q.    Uh-huh.

12   A.    I mean, there isn't one uniform definition of a local

13   community of interest.  I'm aware of some research that has

14   tried to define communities of interest different ways.  Some

15   use demographic data like income to do that.  So I'm at least

16   aware of other attempts in scholarly research that have done

17   that.

18   Q.    So in your opinion, is community of interest arbitrary?

19            **MR. HAYDE:**  I'm going to object.  That calls for a

20   legal conclusion.

21            **MS. DUEKER:**  No.  I'm asking -- "arbitrary" has an

22   everyday definition that's not a legal term, meaning it can

23   mean whatever you want it to mean.  That's what I'm asking.

24            **THE COURT:**  Overruled.

25   A.    I think local communities of interest is harder to define

1  than local political subdivisions for the purposes of

2  redistricting.

3  **Q.    (By Ms. Dueker)** So were you aware that Commissioner

4  Sandweiss defined communities of interest as communities that

5  have a shared interest?

6  A.    No.

7  Q.    Okay.  Would that be an appropriate definition for

8  communities of interest?

9  A.    I mean, that's a broader definition.  I guess the

10  question is how do you measure -- how do you measure that?

11  Q.    Okay.  And do you believe that communities of interest

12  should be capable of definition in order to be implemented?

13        **MR. HAYDE:**  I'm going to object.  That

14  mischaracterizes the witness' testimony.  He's talked about

15  political subdivisions.

16        **THE COURT:**  Sustained.  He has been talking about

17  political subdivisions.

18        **MS. DUEKER:**  Except that his report defines it as

19  communities of interest.  I mean, he now isn't talking about

20  communities of interest, but that's what it has been all the

21  way through deposition and all the way through until today.

22  **Q.    (By Ms. Dueker)** So, I mean, community of interest is

23  something that the Democratic commissioners looked at.  Are

24  you aware of what definition of communities of interest they

25  applied when they drew Dem Map v3?

1          **MR. HAYDE:**  I'm going to object.  It calls for

2    speculation and it's an irrelevant question.

3          **THE COURT:**  Sustained.

4    **Q.    (By Ms. Dueker)** In referring to -- in discussing

5    University City, you indicated that you thought it was

6    inappropriate to divide University City on Delmar; correct?

7    A.    I would prefer not to do that.

8    Q.    Okay.  And the reason for that is you believe that that

9    is somehow -- that dividing line at Delmar is a racial

10   boundary; is that correct?

11   A.    The southern portion of U. City that's south of Delmar is

12   majority white.  The northern portion of U. City that's north

13   of Delmar is majority black.  Both sections are within

14   University City as I've mentioned in my report and previously.

15   There are many benefits to drawing County Council boundaries

16   that respect municipal boundaries so I would prefer to draw

17   U. City into one district and I think, in particular, I'm

18   uncomfortable drawing County Council boundaries that reinforce

19   residential segregation -- particularly reinforces residential

20   segregation within municipalities.

21   Q.    Okay.  So -- but you didn't have any trouble drawing the

22   line at Delmar in the last redistricting; correct?

23   A.    I didn't take race into account when I drew that map

24   ten years ago.  I think if I had looked more carefully at, you

25   know, at where people lived and the residential segregation

1    and could go back and do it over, I would do things

2    differently.

3    Q.   Do you believe that it's appropriate to take race into

4    account when drawing County Council districts in a context

5    that's not necessary to comply with the Voting Rights Act?

6    A.   Well, I mean, you still have to comply with -- you still

7    have to draw district boundaries that comply with the

8    Voting Rights Act, so you can't -- you certainly can't ignore

9    that.  But I think it is worth trying to draw County Council

10   boundaries that don't reinforce residential segregation while

11   still complying with the Voting Rights Act, and the Democratic

12   Map v3 shows to me that that can be done, you know, to a

13   pretty significant degree.

14   Q.   But you agree that the maps that leave it at Delmar don't

15   violate the Voting Rights Act; correct?

16           **MR. HAYDE:**  Objection.  Calls for a legal

17   conclusion.

18           **MS. DUEKER:**  Well, no.

19           **THE COURT:**  Overruled.  Because he takes the Voting

20   Rights Act into consideration in drawing maps or analyzing

21   maps.

22   A.   The map I drew ten years ago which had Delmar as the

23   boundary between District 1 and District 5, or at least a

24   portion of the boundary, complied with the Voting Rights Act

25   when I drew that ten years ago.

1   **Q.   (By Ms. Dueker)** So if you draw -- if you take -- if you

2   move the line off of Delmar for purposes of race, is that

3   racial gerrymandering in your opinion?

4           **MR. HAYDE:** Objection.  It calls for a legal

5   conclusion.

6           **MS. DUEKER:** He was able to define political

7   gerrymandering.  Why can't he define racial gerrymandering?

8           **THE COURT:** And I'm not quite sure when you asked

9   the question, when you say move it off of Delmar, where are

10  you talking about moving it?  I think it makes it unclear.

11          **MS. DUEKER:** I gotcha.  That makes sense.

12  **Q.   (By Ms. Dueker)** So if unifying U. City is done solely for

13  the purpose of, I guess you said eliminating residential

14  segregation, is that racial gerrymandering if it's not

15  necessary to comply with the Voting Rights Act?

16          **MR. HAYDE:** Objection.  That is a question that --

17  it mischaracterizes the testimony.  It's -- there's no

18  foundation that anyone unified U. City solely for racial

19  reasons.  He's testified for hours today about the benefits of

20  respecting municipal boundaries.  Subject to that...

21          **THE COURT:** Go ahead.

22  **Q.   (By Ms. Dueker)** Do you believe it's appropriate to take

23  it into account if not complying with -- is that -- okay.  Let

24  me -- let me rephrase, Your Honor.

25          Would you consider it racial gerrymandering if you

1   consider ending residential segregation by unifying U. City

2   into one County Council district?

3   A.   I don't consider it racial gerrymandering.  The map --

4   the Democratic Map v3 that I evaluated keeps University City

5   in one County Council district and still complies with the

6   Voting Rights Act with respect to Council District 1 and

7   Council District 4.  I think drawing County Council districts

8   that respect municipalities has an advantage in avoiding

9   racial gerrymandering because there are many municipalities in

10  St. Louis County that have mixed -- racially mixed

11  constituents.  And University City is one, Olivette,

12  Florissant, Ferguson.  There are several.  And so drawing

13  County Council districts that respect municipal boundaries

14  actually would help avoid racial gerrymandering.

15          I think, if in drawing the County Council districts,

16  we continue the, sort of, older practice of trying to pack as

17  many black voters into the First and the Fourth, that's

18  potential racial gerrymandering if you're then diminishing the

19  opportunity for black residents in the neighboring districts

20  to elect candidates of their preference.

21  Q.   Are you claiming that the other maps you evaluated are

22  racially packing?

23  A.   No.  I said earlier --

24  Q.   Okay.  Just making sure.

25  A.   -- if the black share of the population in those

1   districts gets much higher than they are in these proposals,

2   then that's -- then you're running that risk.

3   Q.   So what's your definition of racial gerrymandering?

4   A.   Either packing voters of a particular group into one or a

5   few districts so that the other voters of that group don't

6   have any influence in the neighboring districts or splitting

7   voters of a particular group into many districts so they're

8   unable to elect candidates of their choice in any districts.

9   Q.   So would diluting a -- for example, would diluting the

10  First County Council district from a 75 percent minority

11  population down to a 40 percent minority population, would

12  that be cracking?

13              **MR. HAYDE:**   Judge, I'm going to object.  It's

14  irrelevant.  None of the maps before the Court do that and the

15  plaintiffs have dismissed whatever Voting Rights Act claims

16  that they previously had filed.

17              **MS. DUEKER:**   Your Honor, I mean, one, the first map

18  is before the Court and I am trying to determine.  He said

19  that these various things could be, you know, cracking or

20  packing.  So the parameters --

21              **THE COURT:**   The question -- just the question, which

22  wasn't actually about that map, was just an example question

23  of what "cracking" is.

24              **MS. DUEKER:**   Correct.

25              **THE COURT:**   So I will allow the answer to that

1   question if we go from the 75 percent minority population to a

2   40 percent minority population, would that be -- would that be

3   cracking, I guess, was the question.

4           **MS. DUEKER:**  Yes, Your Honor.

5           **MR. HAYDE:**  In that case, I would object.  It's an

6   incomplete hypothetical.  It doesn't provide him all the facts

7   that would go into whatever hypothetical scenario this is and

8   calls for him to offer a legal conclusion about an incomplete

9   hypothetical.

10          **MS. DUEKER:**  I think it's calling on him to answer

11  an uncomfortable question, but I don't think it's so vague

12  that he doesn't understand what I'm asking him.  And I don't

13  think it's a legal conclusion because, you know, he's the one

14  who said what the definition of racial gerrymandering is.

15          **THE COURT:**  Right.  I will allow the question.  It

16  was just an example of was that cracking or would that be

17  considering cracking or racial gerrymandering.

18  A.   I mean, it potentially could be.  It would take further

19  analysis.  I would want to do further analysis like the

20  analysis I did in the report to examine the voting patterns,

21  estimate white and black voter support for candidates in

22  previous elections in such a district.

23  Q.   **(By Ms. Dueker)** You aware that the City of Florissant is

24  currently considering annexing property within next to its

25  boundaries in St. Louis County?

1   A.    I'm not aware of that.

2   Q.    Were you aware that the City of Manchester right now is

3   pursuing annexing a large portion of District 3?

4   A.    Not aware of that.

5   Q.    And should annexing be part of the analysis when

6   determining whether to respect municipal boundaries because

7   they change?

8   A.    I guess, currently, the municipal boundaries are what

9   they are.  I don't know how realistic those annexing proposals

10  are.  If they happen, once they happen, then you'd have to

11  reconsider, you know, what the municipal boundaries are for

12  those municipalities that have grown larger.

13  Q.    But doesn't it -- if people are -- if municipalities are

14  annexing property, doesn't that indicate that maybe

15  communities of interest are not what you think they are?

16            **MR. HAYDE:**  Objection.  Argumentative.

17            **THE COURT:**  Sustained.  Sustained as to the

18  objection.

19  **Q.    (By Ms. Dueker)** Okay.  Do you know why -- were you aware

20  that commissioners -- Democratic commissioners did not want to

21  move Councilwoman Dunaway's district to the north?

22            **MR. HAYDE:**  Objection.  This has been asked and

23  answered, covered by co-counsel.

24            **MS. DUEKER:**  No.  I don't remember him asking about

25  not ensuring that her district is not moved north.

1          **THE COURT:**  You asked was he aware; correct?

2          **MS. DUEKER:**  Yes.

3          **THE COURT:**  Okay.  I will allow that question.

4    A.   I don't know the considerations that went into making any

5    of the proposals that I created, so I don't --

6    Q.   **(By Ms. Dueker)** But you were not aware of whether that

7    was a goal or not from the Democratic commissioners?

8    A.   I do not know.  Yeah.  I do not know because -- I don't

9    know.  I wasn't there when they made the maps.  I don't know

10   what factors they considered.

11   Q.   One more piece and then I should be done.

12          Were you aware that Councilwoman Days' current

13   County Council district includes all or part of 40

14   municipalities in St. Louis County?

15   A.   I didn't know the exact number, but I know there are many

16   relatively small municipalities within the -- within the First

17   Council District.

18   Q.   And, for example, were you aware that Councilman Fitch

19   only has 22 municipalities in his district?

20   A.   I didn't know the exact number, but --

21   Q.   Were you aware that Council Chair Days, her district has

22   far more municipalities that are either all or in part of her

23   district more than any other council member?

24   A.   I think that makes sense.  There's very little

25   unincorporated St. Louis County in the First -- in current

1    First District.

2    Q.   So do you believe then that respecting municipal borders

3    is likely to affect her district more than the other County

4    Council districts?

5    A.   Well, not necessarily.  I mean, it depends on how the

6    boundaries are drawn.  I think -- you know, as I mentioned

7    earlier, I think it's an important consideration in drawing

8    the County Council boundaries to try and respect municipal

9    boundaries.

10   Q.   But can you say that had you drawn the map to consider

11   municipal boundaries that it would be identical to the

12   Dem 3 -- v3 Map?

13   A.   No.

14   Q.   Okay.  So there's many ways to do; correct?

15   A.   Correct.

16   Q.   In your deposition, I asked you about the addendum that

17   you were discussing with Mr. Spooner and I think it was, like,

18   what, Republican performance or -- it's page 17 of your report

19   that was added.  And it was a calculation that your counsel,

20   Mr. Greiman, asked you to do.  Do you remember that?

21          So you indicated that Mr. Greiman asked you to

22   develop that calculation; correct?

23   A.   Yes.

24   Q.   And I asked you, did you believe that either of these

25   data points that you put on here, did they have any effect on

1  your opinion in your report or the remainder of your report,

2  and you indicated no; correct?

3       **MR. HAYDE:**  Objection.  This is improper use of a

4  deposition.  She's not improperly impeaching the witness.

5       **THE COURT:**  What do you --

6  **Q.**  **(By Ms. Dueker)** Okay.  So do you believe that that

7  calculation has anything to do with your report?

8  A.   It's based on data I used in my report.  That addendum

9  wasn't in the report I originally used.  But --

10  Q.   But the data that you used in your report could be used

11  for a lot of different purposes that aren't relevant to this

12  case; correct?

13  A.   People could use the data for lots of calculations.

14  Yeah.  I'm not sure I understand the question.

15  Q.   Well, I'm trying to understand.  So is that calculation

16  necessary for the opinions you're offering in this case?

17  A.   Well, I think I was asked earlier about the, you know,

18  partisan performance measures, what they say about the

19  proposed Third Districts of each map, so I gave my opinion on

20  that.

21  Q.   Is that part of the opinion that you want the Court to

22  consider for purposes of drawing these maps?

23  A.   You know, well, I mean, I think it's worth considering.

24  It seems to me like a big source of disagreement is between --

25  is about what's going to happen with the Third District.  So

1    in trying to draw fair County Council districts, it's worth

2    looking at what the party performance numbers are under the

3    different proposals.

4    Q.   So when I asked you in your deposition, do you believe

5    that either of these data points that you put here, do they

6    have any effect on your opinions in your report or the

7    remainder of your report and you said no.  Is that -- that's,

8    obviously, not true anymore; correct?

9    A.   Well, if the question was --

10         **MR. HAYDE:**  Objection.  That mischaracterizes -- he

11    just testified to it that it's in his opinions here today.

12    And now --

13         **THE COURT:**  I can't hear you.  I'm sorry.

14         **MR. HAYDE:**  Objection.  She's mischaracterizing the

15    witness' testimony.  She just asked him about his opinions and

16    now she's -- the question is about his report.  It's not

17    proper impeachment.

18         **MS. DUEKER:**  Well, first of all, he asked me -- so I

19    laid the foundation that he believes now he wants to include

20    that chart as part of his opinions.  When we deposed him, he

21    said it was not relevant to his opinions.  So I'd like to know

22    which because, you know, we relied on his deposition.  And so

23    if, I believe, in his deposition, he said it wasn't relevant,

24    and so I want the calculation stricken.

25         **MR. HAYDE:**  Well, Judge, this goes -- the question

1  in there you're reading, it says the report; right?

2          **MS. DUEKER:**  Did that calculation have anything to

3  do with his report?

4          **MR. HAYDE:**  Okay.  That was a different question

5  that you asked and we've covered this earlier.  You just

6  started accusing us of political gerrymandering this past

7  weekend.

8          **MS. DUEKER:**  Not relevant.

9          Your Honor, I asked him -- Gerry -- he -- I asked

10  him how he came up with this exhibit.  And he said, "Gerry

11  asked me to produce the numbers and I did.  I wasn't really

12  aiming for any conclusion."

13          And I said, "Outcome?"

14          And he said -- he said, "Outcome?  No."

15          I said, "Okay.  Do you believe that either of these

16  data points that you put on here, do they have any effect on

17  your opinions in your report or the remainder of your report?"

18          And he said, "No."

19          But now it seems to be relevant.  I want it

20  stricken.

21          **MR. GREIMAN:**  Your Honor, the question was -- the

22  question was does he have -- does it have an effect on the

23  remainder of his report.  His testimony was --

24          **MS. DUEKER:**  No.  I asked both.

25          **MR. GREIMAN:**  His testimony was it has an effect on

1   the testimony he just gave on this.  This -- part of his

2   report --

3           **MS. DUEKER:**  And he specifically said --

4           **MR. GREIMAN:**  Jane, can I finish, please?  I'm

5   directing my comments to the Court, not to you.

6           **MS. DUEKER:**  Apparently not.

7           **MR. GREIMAN:**  Your Honor, this page of his report,

8   page 17, which has been marked in evidence, has been

9   stipulated into evidence.  Mr. Spooner asked the witness all

10  kinds of questions about it.  I think the witness' testimony

11  is clear.  It relates to what he said about this page.  It

12  doesn't impact his conclusions on the rest of the report.  And

13  so it's, you know, a completely unfair question and

14  inappropriate motion.

15          **THE COURT:**  All right.  Ms. Dueker?

16          **MS. DUEKER:**  Well, it specifically says, "Gerry

17  asked me to produce the numbers and I did.  I wasn't aiming

18  for any conclusions or outcomes."  So if it's not part of his

19  opinion, why is it in evidence at all?  That's why I'm asking

20  to have it stricken.

21          **THE COURT:**  Mr. Greiman?

22          **MR. GREIMAN:**  Your Honor, it's in evidence because

23  it's been stipulated into evidence and because the witness

24  just explained how it's relevant.  He said he thinks it's a

25  good idea if the Court is drawing a map to look at the

 1  partisan fairness, especially of a swing district, and that's

 2  what it pertains to.

 3       **MS. DUEKER:**  So it's a good idea now but it wasn't a

 4  good idea when I asked him on his deposition.  So if the

 5  document is in, it's not his opinion.  So that's fine.  You

 6  can keep the document.  But anything he said regarding that

 7  document I want stricken because he gave me a different answer

 8  when he was deposed.

 9       **MR. GREIMAN:**  Your Honor, I don't believe that

10  there's a difference in the witness' testimony.  If there is,

11  it goes to the weight of the evidence, not its admissibility.

12  The document is stipulated into evidence.  Mr. Spooner asked

13  all kinds of questions about it.  Ms. Dueker's asked all kinds

14  of questions about it.  There's no basis for striking it

15  whatsoever.

16       **MS. DUEKER:**  Except prejudice.  So had I know that

17  this was going to be part of his opinion, then I would have

18  gone and maybe had somebody look at the calculations and

19  determine, you know, whether I wanted to come up with any

20  argument that, you know, that it's not relevant.  But I didn't

21  think I had to worry about it, so...

22       **MR. GREIMAN:**  This was marked in evidence at

23  Dr. Kimball's deposition --

24       **MS. DUEKER:**  Uh-huh.

25       **MR. GREIMAN:**  -- many days ago.  It was stipulated

1    into evidence after that.  There was no question or suggestion

2    that Ms. Dueker would like to do something in response to

3    that.  There is partisan leaning data in all of the data

4    that's been admitted into evidence.  It can be pulled up on

5    virtually any of the maps except for the Republican Compromise

6    Map which is curious.  So this is --

7         **MS. DUEKER:**  Why I didn't complain is because he

8    said it wasn't relevant.

9         **THE COURT:**  If he testified that this information is

10   not part of the conclusion of his report, that's your --

11        **MS. DUEKER:**  Yes.

12        **THE COURT:**  And he testified in his deposition that

13   this data was not -- did not factor into his conclusion?

14        **MS. DUEKER:**  Yes.

15        **THE COURT:**  I'm assuming what Ms. Dueker has said is

16   true.  I have to say I'm not quite sure what I would do with

17   this information if it doesn't go toward his ultimate

18   conclusion that Democratic Version 3 is the map that is the

19   best of the three maps.  Is that --

20        **MR. GREIMAN:**  Well, Your Honor, what he said was it

21   doesn't go to the conclusions in the remainder of his report.

22        **MS. DUEKER:**  Nope.

23        **MR. GREIMAN:**  It goes to the conclusions in this

24   part of his report and it's in response to the accusations by

25   the Arps Plaintiffs that Democratic Map 3 represents partisan

1   gerrymandering.  It's directly germane to that.

2          **MS. DUEKER:**  He specifically said, "I wasn't aiming

3   for any conclusion."  And he said, "Outcome?  No."  So it

4   wasn't one part of the report.  It wasn't supposed to be part

5   of the outcome.  I mean, I can ask him if that's what he

6   meant.

7          **MR. GREIMAN:**  Those are the other aspects of his

8   report and the main body of the report.

9          **MS. DUEKER:**  No.

10          **MR. GREIMAN:**  No.  It doesn't change anything on

11   that.  But it addresses an issue that the Arps Plaintiffs have

12   raised later and it addresses an issue that may be germane to

13   the Court's consideration of either adopting one of these maps

14   or drawing a different map.

15          **MS. DUEKER:**  "Do they have any effect on your

16   opinion in your report or remainder of report?"  I mention

17   both.  That's the whole report.  He said no.  So, no, I don't

18   have a full argument developed on how to address that issue

19   because I was told I didn't need to worry about it.

20          **MR. GREIMAN:**  That's right.  He said, you know, he

21   doesn't take this and build a whole alternative argument or

22   set of opinions around it, but, you know --

23          **MS. DUEKER:**  Well, then what's the harm in

24   striking --

25          **MR. GREIMAN:**  Can I -- can I --

1          **MS. DUEKER:**  -- anything he's talked about?

2          **MR. GREIMAN:**  Can I finish?  He was talking about a

3     page of his report and he explained what the relevance of that

4     page has to what's on that page.  He said it doesn't change

5     anything in the rest of his report, doesn't change what he

6     thinks about how these maps meet various criteria, but he's

7     responding to a recently made charge by the Arps Plaintiffs

8     and he's addressing a point that may be very important for the

9     Court to consider in deciding whether to draw a new map or

10    adopt one of these maps.  It's partisan fairness.  And there's

11    all kinds of data in the evidentiary base that's already

12    admitted in this case as to what other maps provide in terms

13    of partisan lean and partisan fairness so it's part of the

14    whole picture.

15         **MS. DUEKER:**  If it's an important -- if it's an

16    important issue, it should have been in the report then.

17    Because this idea that he gets to add about it, tell me that

18    it's not relevant to his expert report, and then now we find

19    out it's really important, then that should be more of a

20    reason why I'm prejudiced because I didn't get a chance or an

21    opportunity to try to deal with it or come up with anything

22    about it because I was told it wasn't part of his opinions.

23    It can't be an opinion and not an opinion at the same time.

24         **MR. GREIMAN:**  Your Honor, that's just complete

25    nonsense.  If it was inappropriate and had nothing to do with

1  his property or his opinions or was late, then why did they

2  stipulate to have it added as pages 17 and 18 to his report?

3          **MS. DUEKER:**  Because he said --

4          **MR. GREIMAN:**  Why did they stipulate to have the

5  report with those pages admitted into evidence?  And why did

6  Mr. Spooner ask all sorts of questions about it without any

7  objection from his co-counsel, Ms. Dueker?  You can't unring

8  the bell.  This argument --

9          **MS. DUEKER:**  I asked to have it stricken.

10          **MR. GREIMAN:**  This argument has been waived.  I

11  mean, Ms. Dueker and Mr. Spooner have been a tag-team

12  throughout this case and for one of them to rely on this

13  document, ask all kinds of questions about it that's in the

14  record, and then, you know, Ms. Dueker, after all that, to

15  claim it should be stricken after it was stipulated into

16  evidence just makes no sense.

17          **MS. DUEKER:**  I asked that it be stricken when they

18  first put it forth because I said that --

19          **THE COURT:**  She did.

20          **MS. DUEKER:**  I did.  I did.  And the judge overruled

21  me.  But I'm renewing my objection again.  After now finding

22  out that you think it's so fundamentally important, I really

23  want it stricken now.

24          **MR. GREIMAN:**  I don't think it's fundamentally

25  important and it's not even an opinion.  It's a data point.

1          **MS. DUEKER:**  Then if it's not an opinion, it's not

2    relevant.  So either way --

3          **MR. GREIMAN:**  Facts -- facts are --

4          **MS. DUEKER:**  -- it comes out.

5          **MR. GREIMAN:**  I know, Jane, that facts are not

6    relevant to you, only opinions are.  But --

7          **THE COURT:**  Mr. Greiman, Ms. Dueker.

8          **MR. GREIMAN:**  I withdraw that.  I'm sorry,

9    Your Honor.

10          **MS. DUEKER:**  Right.  I just --

11          **THE COURT:**  Okay.

12          **MS. DUEKER:**  It's either an opinion or not an

13    opinion.

14          **THE COURT:**  Okay.  It is obvious he has testified,

15    apparently, in his deposition that it's not part of his

16    report.  And Mr. Greiman is stating it's a data point.  I'm

17    going to allow this page 17 because it was admitted into

18    evidence.  As far as the weight of it --

19          **MS. DUEKER:**  Thank you.

20          **THE COURT:**  -- at this point, I'm not sure it has

21    much weight at all.

22          **MS. DUEKER:**  Thank you, Your Honor.

23          **THE COURT:**  It is not part of the overall opinion of

24    his -- which is set forth in his opinion.  But I'm not going

25    to strike it.  So I'm going to overrule the motion to strike

1  page 17 and --

2          **MS. DUEKER:**  Thank you for letting me make my

3  record, Your Honor.

4          **THE COURT:**  You are welcome.

5          **MS. DUEKER:**  I think, yeah, that's all I have.

6  Thank you.

7          **THE COURT:**  Yes?

8          **MR. SLUYS:**  Your Honor, I do have one question.

9          **THE COURT:**  Please.

10                        **CROSS-EXAMINATION**

11  BY MR. SLUYS:

12  Q.   Dr. Kimball, could you tell me why it is important --

13          **MR. SLUYS:**  Sorry.  Let me take this off.

14          **THE COURT:**  That probably would be easier.

15  **Q.   (By Mr. Sluys)** Dr. Kimball, could you tell me why it's

16  important to avoid splitting census blocks?

17  A.   Right.  The reason it's important is that's the smallest

18  geographic unit where we have census population data available

19  and so if a district boundary was drawn that's split -- that

20  split a census block, we don't know how many residents of that

21  block live on one side of the boundary or the other, and so

22  that would add further challenge to calculate in the

23  population totals within the district.

24          **MR. SLUYS:**  Thank you.

25          And, Your Honor, while I'm up here, I'll say as

1    well, on behalf of the defendants, with respect to the

2    exhibits, we don't have any objections as to any of the

3    exhibits listed on the exhibit list, so...

4            **THE COURT:**  All right.  Thank you.

5            **MR. SLUYS:**  Thank you.

6            **THE COURT:**  Do you have some redirect?

7            We'll take a break after this witness.

8            **MR. GREIMAN:**  Very briefly, Your Honor.

9                        **REDIRECT EXAMINATION**

10   **BY MR. GREIMAN:**

11   Q.   Dr. Kimball, you were asked about what you did ten years

12   ago on the *Stenger* case with respect to considering municipal

13   boundaries and you said you didn't factor those in in your

14   work ten years ago.  Do you recall that?

15   A.   Yes.

16   Q.   Is one of the reasons for that there are so many

17   municipalities you didn't think it was practicable to try to

18   take into account municipal boundaries?

19           **MR. SPOONER:**  Judge, I'm going to object.  It's

20   leading.

21           **THE COURT:**  It's sustained.

22   Q.   **(By Mr. Greiman)** Dr. Kimball, can you tell us any reason

23   why you didn't take into account municipal boundaries in the

24   work you did in the *Stenger* case ten years ago?

25           **MS. DUEKER:**  Your Honor.  I object to the relevance

1    of anything that's not contained in his report for that case.

2         **THE COURT:**  He was -- you opened the door.  You

3    asked him about the municipal boundaries in the previous so

4    I'm going to allow it and overrule the objection.

5    A.   Right.  Ten years ago, the plaintiffs didn't ask me to

6    consider municipal boundaries and I didn't -- because there

7    were so many municipalities, I didn't think it was feasible to

8    try and draw County Council districts that adhere to municipal

9    boundaries.

10   **Q.   (By Mr. Greiman)** Did the various maps drawn in connection

11   with the 2020 process and the work done by the Commission have

12   any impact on your views as to the practicality of taking into

13   account municipal boundaries?

14   A.   No.  I mean, as I indicate in my report, I think there's

15   scholarship that shows the benefits of drawing

16   Council Districts that respect municipal boundaries and I

17   think there are other good reasons given the recent events in

18   St. Louis County why it would be a good idea to draw

19   Council Districts that respect municipal boundaries.

20   Q.   And in looking at the maps that emerge from the

21   Commission process, did you come to a conclusion as to the

22   practicability of factoring in, in the maps, municipal

23   boundaries notwithstanding the number of municipalities there

24   are in St. Louis County?

25        **MR. SPOONER:**  Judge, I'm going to object to this

1   questioning.  It exceeds the scope of redirect.  They had to

2   bring a new attorney up to ask the same questions and go over

3   the same material.

4        **MR. GREIMAN:**  Your Honor, this is asking about

5   something they went into in great length in their

6   cross-examination.

7        **THE COURT:**  Overruled.

8   A.   Sorry.  Can you repeat the question?

9   **Q.   (By Mr. Greiman)** Sure.  We talked about your concluding

10  ten years ago it was impractical to consider municipal

11  boundaries.  Do you remember that?

12  A.   Yeah.  Yeah.

13  Q.   My question is, in the work you did in 2021, did you come

14  to a different conclusion regarding the practicability of

15  taking into account municipal boundaries despite the fact that

16  there's a lot of municipalities in St. Louis County?

17  A.   Yes.  I think the Democratic Map Version 3 shows that you

18  can draw County Council districts that respect local municipal

19  boundaries to a great degree while still meeting all the

20  other -- meeting other redistricting criteria like

21  compactness, contiguity, equal population, and racial

22  fairness.  So if I could go back ten years ago and draw new

23  boundaries for the Council, you know, to try to follow

24  municipal boundaries, I would try to do so.

25  Q.   You were asked some questions about Judge Perry's opinion

1   in the case of *Corbett v. Sullivan*.  Do you recall that?

2   A.   Okay.

3   Q.   Do you recall that Judge Perry stated in her opinion in

4   that case that she really didn't have a record before her

5   considering taking into account municipal boundaries and what

6   she did 20 years ago?

7            **MR. SPOONER:**  Judge, I'm going to object.  That

8   mischaracterizes the case.  The case speaks for itself as to

9   that term.  If he wants to read the provision in or whatever

10  it is he's referring to.

11           **MR. GREIMAN:**  This is redirect on, you know, what

12  Mr. Spooner asked the witness about.

13           **MR. SPOONER:**  I read the case.

14           **MR. GREIMAN:**  Which I thought was unfair, but --

15           **THE COURT:**  You asked him about specific portions --

16           **MR. SPOONER:**  Correct.

17           **THE COURT:**  -- of the *Corbett* case.

18           **MR. SPOONER:**  I read from the *Corbett* case.

19           **THE COURT:**  Okay.  I'm -- I'm not sure exactly

20  what -- you were just asking generally --

21           **MR. GREIMAN:**  I was asking a specific question of do

22  you recall that Judge Perry said she did not have -- really

23  have a record before her as to the municipal boundaries and

24  the impact of taking them into account and that was one of the

25  reasons why she didn't do that.

1          **MR. SPOONER:**  And I'm going to object, Judge,

2    because that mischaracterizes the case.  The case speaks for

3    itself as to what Judge Perry found.

4          **THE COURT:**  Sustained.

5          **MR. GREIMAN:**  Nothing further.

6          Thank you, Your Honor.

7          **THE COURT:**  Are we done with this witness?

8          **MR. SPOONER:**  Nothing further.

9          **THE COURT:**  All right.  Dr. Kimball, you are

10   excused.

11         What additional -- how many additional witnesses do

12   we have?  Who do we have and how long do we think?  I think

13   it's time to take a break just because -- especially the court

14   reporter has been working very hard for the last several

15   hours.

16         **MR. GREIMAN:**  Your Honor, we have only just very

17   short testimony from Mr. Wingbermuehle to talk about

18   Exhibits 21 and 22.

19         **THE COURT:**  Okay.

20         **MR. GREIMAN:**  I think, yesterday, we agreed that the

21   other witnesses were deposed, their testimony would be

22   submitted by agreed on portions of their depositions and,

23   you know, we have prepared a notebook for the Court with

24   highlighted portions of anything that's been designated by

25   either of the parties.

1          **THE COURT:**  Okay.

2          **MR. GREIMAN:**  So we wouldn't anticipate really

3    anything else.

4          **THE COURT:**  All right.

5          **MR. SPOONER:**  And, Judge, Exhibit 21 and 22 were the

6    exhibits that we objected to because they weren't disclosed in

7    the Rule 26.  They weren't previously produced.  Produced for

8    the first time when the exhibit list was -- they were

9    identified for the first time when the exhibit list was

10   provided.

11         **THE COURT:**  Oh.  That's going -- that's the one that

12   will come up with the testimony of Mr. Wingbermuehle?

13         **MR. GREIMAN:**  Yes, Your Honor.  That's the,

14   you know, illustration of, you know, what it looks like if you

15   want to take Democratic Version 3 and, you know, alter it to

16   include Mr. Fitch in there, what minimal corresponding changes

17   do you make elsewhere in the map to accommodate that and what

18   does that look like.  It's just a --

19         **THE COURT:**  That'll be part of

20   Mr. Wingbermuehle's --

21         **MR. GREIMAN:**  Yes.

22         **THE COURT:**  Okay.

23         **MR. SPOONER:**  He didn't --

24         **MS. DUEKER:**  And we'll be objecting.

25         **MR. SPOONER:**  He didn't -- yeah.  This is new.  They

1    didn't provide that map to us before.  It wasn't part of

2    anything and it's a blatant attempt to put a map into evidence

3    to give you --

4            **THE COURT:**  Okay.  We aren't there yet.  I mean, I

5    understand that -- I know he mentioned that he will -- first

6    of all, I just really was just trying to find out what do we

7    have coming up and to take a break, how long of a break to

8    take.  Honestly, that's where I was at this moment.  I'll deal

9    with the objection to --

10           **MR. SPOONER:**  Okay.  So this issue --

11           **THE COURT:**  Your point is that Mr. Wingbermuehle

12   should not even testify because you have an objection to this

13   map.  Is that your point?

14           **MR. SPOONER:**  If that's all he's testifying to as to

15   that particular map, then yeah.

16           **THE COURT:**  All right.  I will give --

17           **MR. GREIMAN:**  But that's all -- that's all we --

18           **THE COURT:**  -- give an opportunity to lay a

19   foundation with the witness.  We'll see what happens.  Okay?

20           **MR. SPOONER:**  Okay.

21           **THE COURT:**  So is there any --

22           **MS. DUEKER:**  However long she needs.

23           **THE COURT:**  Okay.  So other than that, we have no

24   other live testimony, just argument; is that correct?

25           **MR. SPOONER:**  We'd have one witness.

1              **THE COURT:**  You have one witness.

2              **MR. SPOONER:**  It'll be -- it'll just be brief to go

3     through --

4              **THE COURT:**  Okay.

5              **MR. SPOONER:**  -- some issues.

6              **THE COURT:**  All right.

7              **MR. GREIMAN:**  What -- what witness is that?

8              **MR. SPOONER:**  It's Adam.

9              **MR. GREIMAN:**  Pardon me?

10             **MR. SPOONER:**  Adam.

11             **MS. DUEKER:**  Mr. Bohn.

12             **MR. SPOONER:**  I mean, if his whole -- we can talk

13    about it.  If his whole deposition comes in, then -- but I'd

14    still have the right to call him.

15             **MR. GREIMAN:**  You know, I thought the discussion we

16    had yesterday was, you know, there were 8 witnesses deposed

17    and there's 14 potential witnesses, if we were going to go

18    into live testimony, we wouldn't get this trial done in one

19    day.  You know, if they want to go back on that and start to

20    introduce live witnesses, then, you know, I would have to, you

21    know, reconsider.

22             **THE COURT:**  So there's the potential to have Mr. --

23    the potential to have two, Mr. Wingbermuehle and Mr. Bohn; is

24    that correct?

25             **MR. SPOONER:**  That's correct.

1            **THE COURT:**  Okay.

2            **MR. GREIMAN:**  Well, and depending on what Mr. Bohn

3    says, then, you know, we would reserve the right to have

4    other --

5            **THE COURT:**  I thought you guys were going to talk

6    about whether the deposition suffices or you definitely want

7    to call Mr. Bohn?

8            **MS. DUEKER:**  Well --

9            **MR. SPOONER:**  We can talk about it.

10           **MS. DUEKER:**  -- we can talk about it.  But, yeah, I

11   mean, he's calling a live witness.

12           **MR. GREIMAN:**  Well, I'm calling a live witness only

13   to lay a foundation for, you know, one exhibit and, you know,

14   I don't think the foundation is in controversy.  I'm happy to,

15   you know, stipulate here's the foundation we offer and the

16   Court can take the objection and take the objection with the

17   case and decide and we can dispense with Mr. Wingbermuehle.

18   I'm happy to do that.

19           **THE COURT:**  Okay.  So the purpose of calling

20   Mr. Wingbermuehle is to lay the foundation for this

21   illustration that you want to get into evidence, No. 21?  I'm

22   sorry.  That was, yeah, 21, which is the map.

23           **MR. GREIMAN:**  21 is the drawing of a map and --

24           **THE COURT:**  Drawing, okay.

25           **MR. GREIMAN:**  -- 22 is just the data behind it.

1          **THE COURT:**  Okay.  And this is -- I'm sorry.  Did

2     you have more?

3          **MR. SPOONER:**  No, Judge.

4          **THE COURT:**  Okay.  All right.  So what I'm going to

5     do is -- we are -- it looks like -- about 1:25.  What do you

6     want, a half an hour?  Is that okay?  Is 30 minutes -- would

7     that work for you to take a break?

8          **THE COURT REPORTER:**  Sure.

9          **THE COURT:**  Okay.  All right.  We'll start back at

10    2:00.  We'll take a recess until 2:00.

11         **(Court recessed from 1:24 p.m. until 2:02 p.m.)**

12         **THE COURT:**  All right.  Mr. Greiman, you may call

13    your witness.

14         **MR. GREIMAN:**  Yes, Your Honor.  We call Brian

15    Wingbermuehle.

16         **(Witness sworn.)**

17         **THE CLERK:**  Please say and state your name -- state

18    and spell your name for the record.

19         **THE WITNESS:**  Brian Wingbermuehle.  It's

20    W-I-N-G-B-E-R-M-U-E-H-L-E.

21         **THE COURT REPORTER:**  Thank you.

22         **THE WITNESS:**  May I take a seat?  Okay.  Thank you.

23              **BRIAN WINGBERMUEHLE,**

24    **Having Been First Duly Sworn, Was Examined and Testified As**

25    **Follows:**

1          **DIRECT EXAMINATION**

2    **BY MR. GREIMAN:**

3    Q.   Good afternoon.  Would you state your full name for the

4    record, please.

5    A.   Yes.  Good afternoon.  My name is Brian Wingbermuehle.

6    Can you hear me okay with my mask?

7    Q.   You can take your mask off while you're testifying.

8              Where do you currently live?

9    A.   I live in, technically, unincorporated St. Louis County,

10   but I have a Fenton mailing address.

11   Q.   All right.  And what do you do for a living?

12   A.   I am the manager of political advocacy at Pro-Choice

13   Missouri.

14   Q.   Do you hold any political positions?

15   A.   I'm also the Democratic Committeeman of Meramec Township.

16   Q.   Were you a member of the Bipartisan Reapportionment

17   Commission in 2021?

18   A.   Yes.

19   Q.   And you were on the Commission as a Democrat; is that

20   right?

21   A.   That is correct.

22   Q.   And were you the Democratic secretary?

23   A.   Yes.

24   Q.   Did you participate in drawing some of the maps that one

25   group or another of the Commission came up with during the

1   commission process?

2   A.   Yes.  Most of what I did throughout the commission was

3   take feedback from our other Democratic commissioners and try

4   and get them into the computer.

5   Q.   And were you the lead person for the Democratic

6   commissioners in terms of operating the computer and using

7   software and coming up with maps?

8   A.   Yes.

9   Q.   What kind of software program did you use?

10  A.   We used Dave's Redistricting.

11  Q.   And was -- did you have a counterpart among the

12  Republican commissioners?

13  A.   Yes.  We were co-secretaries.  That would be Commissioner

14  Bohn.

15  Q.   That's Adam Bohn; is that right?

16  A.   Yes.

17  Q.   And did you work with him on coordinating some of the

18  technical aspects of the commission work?

19  A.   Only very briefly.  We did agree, you know, that Dave's

20  was a software -- I believe, the Republicans had their map

21  first and they had used Dave's, and so that's just kind of how

22  the Commission proceeded.

23  Q.   And when you refer to Dave's, you're referring to Dave's

24  Redistricting software; is that right?

25  A.   That is correct.

1    Q.   Is that an open source free software that can be used to

2    draw districting maps?

3    A.   Yes.  It's free on the internet.

4    Q.   And do I understand correctly that all the maps that you

5    and the Democratic commissioners came up with and all the maps

6    that the Republican commissioners came up with originally were

7    done in Dave's Redistricting software; is that right?

8    A.   Yes.

9    Q.   And do I understand correctly they were then submitted to

10   St. Louis County and County -- either County personnel or

11   Election Board personnel converted them into the Esri software

12   that the County uses?

13   A.   Yes.  We e-mailed them to a woman named Courtney Corman

14   and she uploaded them into the County's geospatial program.

15   Q.   And in the course of your work on the Commission, did you

16   become skilled in utilizing Dave's Redistricting software?

17   A.   I'd like to think so.

18   Q.   And did you find that software to be reliable and

19   workable?

20   A.   Yes.

21   Q.   Now, did you recently, at my request, create an

22   illustration using Dave's Redistricting software of what a

23   variation of Democratic Map Version 3 might look like if

24   minimal changes were made to it to include Tim Fitch's current

25   residence in the Third District?

1      **MR. SPOONER:**  Judge, we'll object to any testimony

2  as to any additional maps that were recently created.  First

3  of all, they weren't disclosed in Rule 26.  They were just

4  identified when the exhibits were identified this week.  And

5  more importantly, there would be no relevance to this map

6  because the expert hasn't opined as to whether this map meets

7  any of the County requirements.  Therefore, there's no point

8  other than -- in addition to the fact that it shouldn't be

9  allowed because it wasn't disclosed, there's no value to

10  bringing this map up.  If the Court's called upon to draw its

11  own map, the Court can do whatever it wants.  It doesn't

12  need -- the map doesn't assist the Court in any way.

13      **THE COURT:**  And what is the reason for presenting

14  this map or trying to get this map into evidence or this

15  illustration?

16      **MR. GREIMAN:**  Yeah.  So, Your Honor, we're simply --

17  as we discussed yesterday, we're simply laying a foundation

18  right now.  We're not offering this as a map that the Bowman

19  Plaintiffs are advocating.  We're simply offering it as an

20  illustration of one way tweaks can be made to the Democratic

21  Map Version 3 to include Mr. Fitch in the district and show

22  what kind of minimal corresponding changes would need to be

23  made in District 2 to accommodate that.

24      It's just an illustration of what might be done, one

25  way to do it, and, you know, that's all we're offering it for.

1   I think it's useful to the Court to the extent that the Court

2   goes beyond maps that the parties have proposed and, you know,

3   looks at different options that might be considered.

4        **THE COURT:**  Here's my concern.  You offer this as an

5   illustration and then the Arps Plaintiffs say, Well, we've got

6   an illustration for how you can do, you know, XYZ.  I don't

7   know what it might be.  These are not -- this illustration

8   would not -- was not opined upon by the expert.  I really

9   don't know what evidentiary value there would be to this

10  illustration.

11       So now, having heard the foundation for this witness

12  and for this map, at this point, I am going to sustain the

13  objection of the Arps Plaintiffs to the illustration of this

14  map.

15       **MR. GREIMAN:**  All right, Your Honor.  May I have

16  Exhibits 21 and 22 made part of the record as an offer of

17  proof?

18       **THE COURT:**  Yes.  Yes, you may.

19       **MR. GREIMAN:**  And just for the record, Exhibit, you

20  know, 21, would be a drawing, a pictorial representation of

21  the illustration --

22       **THE COURT:**  Okay.

23       **MR. GREIMAN:**  -- and Exhibit 22 would be the data

24  underlying that and the depiction of that map on Dave's

25  Redistricting software.

1          **THE COURT:**  Yes.

2          **MS. DUEKER:**  So both are excluded, correct,

3     Your Honor?

4          **THE COURT:**  They both are excluded.  He's just

5     entering them as an offer of proof for whatever happens in the

6     future.

7          **MS. DUEKER:**  Okay.

8          **MR. GREIMAN:**  Just to complete the offer of proof,

9     we would, you know, offer into evidence not only the

10    illustration, but the fact that this illustration complies

11    with the requirements of equal population, contiguity, and

12    being reasonably compact.

13         **MS. DUEKER:**  Your Honor, and we would object to

14    that.  I mean, again, the whole reason why it's being excluded

15    is no expert -- designated expert has indicated that this map

16    would otherwise qualify with, you know -- for all these other

17    factors would be met.  So we have trouble having that being an

18    offer of proof through this witness.

19         **MR. GREIMAN:**  Well, it's an offer of proof,

20    Your Honor.

21         **THE COURT:**  It is an offer of proof and I don't know

22    what this witness -- how this witness would testify regarding

23    those particular factors.  I mean, the illustration as it

24    is --

25         **MR. GREIMAN:**  So I don't want to belabor this,

1   Your Honor, but as part of our offer of proof --

2           **THE COURT:**  He would testify.

3           **MR. GREIMAN:**  -- if allowed, we would have the

4   witness testify that utilizing Dave's Redistricting software,

5   he's in a position to testify that this drawing meets the

6   requirements of equal population, contiguity, and compactness.

7   I'd just ask that that be made part of my offer of proof.

8           **THE COURT:**  All right.  That will be made part of

9   your offer of proof.

10          **MR. GREIMAN:**  All right.

11          **MS. DUEKER:**  And just for the record, we would argue

12  that he -- it lacks foundation.  He's not been certified as an

13  expert and can't -- is not qualified to testify as to those

14  factors.

15          **THE COURT:**  Okay.

16          **MR. GREIMAN:**  Thank you, Your Honor.  That's all I

17  have with this witness.

18          **THE COURT:**  All right.  Thank you.  You may step

19  down.

20          **MR. SPOONER:**  Judge, do I have a right --

21          **THE COURT:**  You are excused.

22          **THE WITNESS:**  Thank you.

23          **THE COURT:**  Yes.  Oh, did you have something?  I'm

24  sorry.  You can --

25          **MR. SPOONER:**  Do I have a right to cross-examine

1   him?

2            **THE COURT:**  Yes.  You can cross-examine him on --

3            **MR. SPOONER:**  Just on one point.  Gerry --

4            **THE COURT:**  Okay.

5            **MR. SPOONER:**  I think we -- we're agreeing that his

6   deposition in the entirety will be in evidence as well as

7   Adam's?

8            **MR. GREIMAN:**  Yes.  And the designated portions of

9   the others.

10           **MR. SPOONER:**  And the designated portions of the

11  others?

12           **MR. GREIMAN:**  Yes.

13           **MR. SPOONER:**  I just want to ask him one question

14  about the minutes.

15                     **CROSS-EXAMINATION**

16  **BY MR. SPOONER:**

17  Q.   I just wanted to kind of clarify a question on the

18  minutes.  I'm going to show him Exhibit A.

19           Just so the Court knows, on Exhibit A, the

20  minutes -- the Commission minutes were created by -- between

21  you and Mr. Bohn as the secretaries and then they were taken

22  back to the Commission for approval; is that right?

23  A.   I'm sorry.  Can you repeat that?

24  Q.   The minutes for the meeting that are contained within

25  Exhibit A, those were worked on or created between you and

1   Adam Bohn, and once you received the final product, you would

2   take them back to the Commission for approval; is that right?

3   A.   Yes.

4   Q.   That's the process.  But the process for the minutes for

5   the last meeting, those were approved via e-mail; is that

6   right?

7   A.   Yes.

8   Q.   And at the last meeting in your minutes, you did, as

9   shown on the screen, reference the Compromise Map, and the

10  next paragraph said there was no confidence in a further

11  meeting to work on a second Compromise Map; is that right?

12  A.   I'm sorry.  Can you repeat that?

13  Q.   In the minutes, you referenced a Compromise Map.  And

14  under New Business/Open Discussions, the minutes reference

15  that there was no confidence in further meeting to work on a

16  second Compromise Map; is that right?  That's right, isn't it?

17  A.   That is correct.  That's in the minutes.

18  Q.   And these minutes were approved by Dana Sandweiss; isn't

19  that true?

20  A.   They were approved, I believe, by all the commissioners,

21  all 14 of them.

22          **MR. SPOONER:**  Okay.  I don't have anything further,

23  Judge.  Thank you.  That wasn't clear, so I just wanted to

24  clarify that.  Thank you.

25          **MR. GREIMAN:**  Nothing further, Your Honor.

1              **THE COURT:**  All right.

2              **MS. DUEKER:**  Nothing from me, Your Honor.

3              **THE COURT:**  All right.  Anything from the Election

4    Board?

5              **MR. SLUYS:**  No questions, Your Honor.  Thank you.

6              **THE COURT:**  All right.  You may step down.

7              **THE WITNESS:**  Thank you.

8              **MR. GREIMAN:**  So, Your Honor, I believe that counsel

9    for all parties have reached an agreement on the remainder of

10   the evidentiary record to depart with any further live

11   testimony.  Let me just go over my understanding of what else

12   will be in the record.  So there was a joint stipulation of

13   facts that was filed before trial started.  That's been filed

14   and I assume that will be part of the evidentiary record?

15             **THE COURT:**  Yes.

16             **MR. GREIMAN:**  Other counsel and I, we stipulated to

17   most of one or another's exhibits, leaving aside Exhibits 20

18   and 21.  There were a handful of other of our exhibits that

19   the Arps Plaintiffs objected to.  Counsel has agreed that --

20   and most of those relate to the deposition testimony that's

21   going to be submitted to the Court.  All counsel have agreed

22   that those objections can be taken with the case and the Court

23   can consider those and rule on those objections as you look at

24   the depositions and the evidence.

25             Those exhibits as to which objections have been made

1   are the Bowman Plaintiffs' Exhibits 16, 24, 25, 27, 28, 30,

2   and 31.  I believe, by stipulation, we've already admitted

3   into evidence the Bowman Plaintiffs' Exhibits 1 through 15, 17

4   through 20, 26, and 29.

5            **THE COURT:**  Okay.

6            **MR. GREIMAN:**  We have exchanged and agreed upon

7   designated deposition testimony and we will jointly submit to

8   the Court the transcripts with the agreed upon testimony

9   highlighted.  The witnesses whose depositions will involve

10  designated testimony are Rita Days, Tim Fitch, Sue Meredith,

11  John Bowman, and Becky Arps.

12           **MR. SPOONER:**  Dana Sandweiss.

13           **MR. GREIMAN:**  And Dana Sandweiss.  I'm sorry.  Thank

14  you.

15           And then the parties have also jointly agreed to

16  submit to the Court for your consideration the entire

17  deposition of Brian Wingbermuehle and the entire deposition of

18  Adam Bohn.

19           We had, prior to trial, the Bowman Plaintiffs had

20  raised objections to just a handful of the Arps Plaintiffs'

21  trial exhibits, mostly on grounds of relevance and

22  materiality.  The objections were asserted to Arps Trial

23  Exhibits F, H, Y, Z, AA, FF, and GG.  With respect to those

24  exhibits, the parties have agreed that those objections can be

25  taken with the case and the Court can consider them as the

1    Court considers the rest of the evidence.  I believe that

2    should complete the trial record from our standpoint.

3           **MR. SPOONER:**  Judge, I would just have one issue.

4    Because this case is essentially paid by St. Louis County,

5    when the Bowman Plaintiffs designated Kimball as their expert

6    witness, we disclosed Dr. Kimball that we may utilize him as

7    an expert witness.  I think it's pretty clear from the

8    evidence that other than his opinions concerning

9    municipalities and communities of interest that we would adopt

10   his opinions that the Republican Map v1 and the Proposed

11   Compromise Map meet the criteria under the Charter and are not

12   in violation of the federal -- of the Voting Rights Act and

13   the basis for those opinions as described in Dr. Kimball's

14   report, we would -- we would be adopting those as well.

15          **THE COURT:**  All right.  Thank you.

16          **MS. DUEKER:**  That goes for us as well, but I just

17   want to make sure that any other conclusions he made, one,

18   outside the report, that those, obviously, we're not adopting

19   and still object to, and then object to any testimony, as in

20   my motion *in limine*, any testimony regarding those factors

21   outside the Charter and the VRA.

22          **THE COURT:**  All right.  Thank you.

23          Anything from the defendants?

24          **MR. SLUYS:**  Nothing from the defendants and we

25   appreciate the Court considering this on an expedited basis.

1    Thank you.

2              **THE COURT:**  All right.  Is there a desire to do any

3    post-hearing briefing?

4              **MR. GREIMAN:**  Your Honor, we are happy to do any

5    post-hearing briefing the Court might find helpful.  I think

6    that the pretrial briefing was pretty comprehensive.  I'm not

7    sure anything in particular --

8              **THE COURT:**  Okay.

9              **MR. GREIMAN:**  -- occurs to me, but we're happy to

10   provide whatever would be helpful to the Court.

11             **THE COURT:**  Do you need any?

12             **MR. SPOONER:**  I think we either do a closing or we

13   do a brief.  Either way.  But I would like to submit something

14   to the Court or at least make some statements about the law as

15   it applies to the evidence.

16             **THE COURT:**  Okay.  Yes.  I was going to allow for a

17   closing.  But I didn't know if you wanted, you know, having

18   heard the evidence, if there was anything that you -- and it

19   would be, when I say brief, I mean, it would be -- it would

20   be --

21             **MS. DUEKER:**  Unless you want more paper.

22             **THE COURT:**  I actually --

23             **MR. SPOONER:**  No.  I'm good.

24             **THE COURT:**  -- don't.  And Julia's shaking her head.

25             **MS. DUEKER:**  Yes.  So...

1          **THE COURT:**  All right.  Yes?

2          **MR. SLUYS:**  Your Honor, do we need anything on the

3     record about the potential use of Election Board staff or --

4     oh, I'm sorry.  Do we need anything on the record about the

5     use of the Election Board staff or is that adequately covered

6     in the brief?

7          **THE COURT:**  The potential use of the --

8          **MR. SLUYS:**  The Election Board status staff to

9     help you in your --

10          **THE COURT:**  So we have just done -- has it been

11     entered?  I've signed off on a protective order regarding that

12     so hopefully that will cover anything and I guess we will

13     likely -- yeah, I might as well -- first of all, I'll let you

14     do your closings and I will be -- I will need a transcript

15     quickly so -- but go ahead, Mr. Greiman, you may proceed, with

16     your closing.

17          **MR. GREIMAN:**  Gerry, before you start, we need to

18     mark -- or no, you have Adam's depositions.  I'm sorry.

19          **THE COURT:**  Okay.

20          **MR. GREIMAN:**  May it please the Court.  Your Honor,

21     let me add my thanks to the Court and your staff for the quick

22     and expeditious handling and scheduling of this case so that

23     the districts can be drawn in a timely fashion.

24          I'm going to be fairly brief because, you know, I

25     think what the evidence has shown in this case is exactly what

```
 1    I said the evidence would show in my opening statement.

 2              This case is about the Court having to adopt or draw

 3    a new map because the Commission didn't adopt a map and using

 4    the old districts would violate equal protection.  I believe

 5    that the evidence the Court has heard from Dr. Kimball shows

 6    the appropriateness of -- and the evidentiary force and the

 7    persuasiveness of the case the Arps Plaintiffs have made that

 8    the Charter criteria of drawing a map of equal population,

 9    contiguity, and compactness, are a starting point, but only a

10    starting point.  That doesn't tell a Commission or the Court

11    what else to consider.

12              And there are other factors that need to be

13    considered because just looking to those factors, there's

14    myriad ways to draw a map and those factors don't tell the

15    Court or anyone where to start.

16              We've heard from all the parties and Dr. Kimball and

17    from the Election Board that it's very important that

18    districts not split census blocks, that districts not cross

19    precinct boundary lines and those factors are not in the

20    Charter.

21              We've heard from Dr. Kimball and from the

22    Arps Plaintiffs that they believe that protecting incumbents

23    and taking a least change approach should be considerations.

24    We don't necessarily disagree with that, but those aren't in

25    the Charter.
```

1        And so it's also appropriate, and for the very

2   persuasive reasons Dr. Kimball went over, to take into other

3   accounts like respecting and preserving political boundary

4   lines and political subdivisions.  Those are recognized as

5   important redistricting criteria.  They have been for a long

6   time.  They've been recognized by the Supreme Court,

7   recognized in the Missouri Constitution, and in various

8   academic writings.

9        I think Dr. Kimball was very frank and persuasive as

10  to the differences between what transpired ten years ago and

11  the situation we find ourselves in today.  Ten years ago, the

12  counsel who hired him, Ms. Dueker, didn't ask or make any

13  suggestion that he consider political subdivision boundaries.

14       The record in that case will show that the topic

15  came up and Dr. Kimball, as he testified to on the stand, said

16  he didn't think it was really practicable to do that given

17  that there are 88 -- there were, at the time, 88

18  municipalities in St. Louis County.  But, you know, I think he

19  candidly recognized that we've learned some things over the

20  last ten years thanks, in part, to the work that the Bowman

21  Plaintiffs did.

22       The feasibility of taking into account political

23  subdivision lines to the maximum extent possible was

24  demonstrated.  And Dr. Kimball testified at length to the

25  importance and the value of taking those municipal boundary

1   lines into account when drawing district lines.  He talked

2   about that improving the political process, he talked about

3   that addressing some of the racial divides that have plagued

4   this region for so long.  You know, Dr. Kimball said those are

5   very valid criteria to take into account and they are.

6           We've heard, you know, throughout this case all

7   kinds of allegations flung about, about political

8   gerrymandering, racial gerrymandering, animus toward Tim

9   Fitch.  There's been no evidence presented to bear any of that

10  out.

11          The Democratic Version 3 Map advances all the

12  criteria that are relevant here, as Dr. Kimball testified to.

13  The Mr. Fitch issue, as Dr. Kimball testified to, is a

14  difficult one and self-created by Mr. Fitch.  There is no law.

15  There is no redistricting criteria generally accepted in the

16  law or in political science that someone can move to the very

17  tip of his district contrary to the trend of population growth

18  and then have a God-given right to demand and expect that

19  whatever authorities are charged with drawing new districts

20  must place him in his old district.  That's a risk that one

21  will take.

22          It was said, I think, by everybody and there can't

23  be any dispute that the Commission process is inherently

24  political to some extent.  It was a bipartisan process, not a

25  non-partisan process.  But Politics to the extent we can, and

1    now that the Court is charged with adopting and drawing a map,

2    should be kept out of it.  And the best way to do that is to,

3    you know, not look at lineage of various proposals or maps or

4    discussions held at the Commission level.  It's to look at the

5    attributes and the impact of the maps that have been presented

6    to the Court.

7            There are no hidden features to any of these maps.

8    The data and the analytical tools are such that the parties

9    and the Court and anybody else who wants to utilize the tools

10   can see exactly what the attributes and what the impact is of

11   every map that's been proposed in terms of partisan lean,

12   demographics, racial, minorities, everything.  Absolutely

13   everything.

14           And so, you know, it's those attributes and those

15   impacts that should, we submit, you know, drive the Court's

16   decision as to what map to adopt or what map to draw.

17           I believe the best evidence in this case has come

18   from Dr. Kimball.  He is very knowledgeable.  He is eminently

19   well qualified.  He has no political axe to grind.  Ms. Dueker

20   hired him in the case ten years ago.  The other side tried to

21   hire him in this case after he had already agreed to work with

22   us as an expert.  So he's eminently well qualified.  He's

23   highly credible and persuasive.  And the Arps Plaintiffs have

24   presented no evidence to rebut or contradict what he had to

25   say and we would ask the Court to give great credence to what

1  Dr. Kimball had to say and to follow his opinions and

2  recommendations.  Thank you, Your Honor.

3           **THE COURT:**  All right.  Thank you.

4           Mr. Spooner?

5           **MR. SPOONER:**  Thank you, Judge.  I'd like to thank

6  opposing counsel for the courtesies, I think it went pretty

7  smooth, and for the Court's hard work in putting up with us

8  this afternoon.  I was confident we would get it done in one

9  day and we were able to do that so I'm thankful to everybody

10  for helping us get that done.  And I'm thankful for Jane.  I

11  don't often get to work with a Democratic operative in my

12  business.  It was -- it was a good experience.

13           Judge, just in terms of background, when the

14  Commission -- when the Commission expired, there had been a

15  map, the Democratic Version Map 1, that had been put out there

16  which had significant issues in terms of the Voting Rights Act

17  and other issues that were contrary to the rights of the

18  St. Louis County voters.  And it wasn't known what map would

19  be put forward in this case until early January.  And even

20  then, we still didn't know what the expert would testify to

21  until mid January.  So there was a lot we had to do in a very

22  short period of time.

23           And also in mid January, we learned that

24  Ms. Sandweiss had changed some evidence on the identification

25  of the maps which raised another issue and, essentially, it

1  was around January 17th, and here we are.  So we're trying to

2  get everything done and having to deal with all these factors

3  which kind of explains what we did and how we got here.

4        But now that we're here, there's two things that are

5  clear.  Number one, our path has been walked on in *Fletcher*,

6  *Corbett*, and *Stenger*, and we have not broke any new ground.

7  And there aren't any other St. Louis County redistricting

8  cases or guidance from any Courts about St. Louis County

9  districting that have occurred since the last time the

10  districts were drawn to go by.

11        So we can follow those cases and if we follow those

12  cases and apply the evidence in this case to the law in those

13  cases, it's -- I think what the Court can do becomes pretty

14  clear.  And the main question then that comes in from this

15  case really is whether the Court can use municipal boundaries

16  as a redistricting factor for St. Louis County.

17        The law is very clear and there's numerous

18  Supreme Court cases and I cited them in the trial brief as to

19  what a Court can do as opposed to a Commission.  And I agree

20  that the Commission, they all have to follow the Charter and

21  the law and the Constitution.  But the purpose of the

22  Commission is to talk about issues to see if they can adopt a

23  map that is satisfactory to both Republicans and Democrats,

24  and this is where we get into the issue of what are

25  traditional factors or historical factors.

1           And, unfortunately, since no maps had been agreed to

2    over the last 50 years, there are no historical or traditional

3    factors that the Court can look at to say that this is what

4    was considered in the past.  There was some talk about census

5    blocks or precincts being divided, but the evidence was that

6    the Republican Map 1, and I believe he said all three maps,

7    didn't divide census blocks and had minimal, if any, division

8    of precincts.

9           So to the extent that those would be considered a

10   traditional type of factor, it's not really relevant.  Which

11   takes us back to what can a Court consider?  Dr. Kimball --

12   there's no quarrel with Dr. Kimball's testimony about you can

13   draw a map a lot of ways and consider a lot of things, and if

14   a map is drawn and adopted by the Commission and a party then

15   wants to challenge that map, on Constitution grounds, they

16   have a right to do that, and then they can raise some issues.

17   That's never happened in St. Louis County.  At least not in

18   the last 50 years.

19          So when that doesn't happen, the law saws that this

20   Court has the ability to either adopt the map as proposed or

21   draw its own map.  But that -- all these factors -- and I

22   think it's great that -- I think it's great that the concept

23   of municipal boundaries is developing and that some states

24   have adopted it, and even Missouri, when it comes to the

25   legislature that they have some additional criteria, but that

1   doesn't make them either traditional or historic or

2   historical.

3            And it can't come from litigation because we can go

4   back to the *Corbett* case.  And if you read the trial brief

5   from the Bowman Plaintiffs, they're, basically, telling us

6   that Judge Perry got it wrong, that she misapplied a case and

7   that you shouldn't pay any attention to that particular case.

8   And I would say to that, what do they say, horse hockey, or

9   whatever term you want to use.  That opinion is well thought

10  out, well written, and consistent with *Fletcher* and consistent

11  with the overall law.

12           When Judge Hamilton decided *Fletcher*, she was clear

13  that -- they were only looking at the County Charter and the

14  parts of the County Charter that were consistent with the

15  state constitution because there was some consistency.  They

16  didn't take anything beyond that.  So this is consistent, so

17  this is what we're going to apply.  And that's what she did.

18           She also said, in that case, that, as an issue, is

19  that compactness is not -- it's considered as a whole, not in

20  a single district.  So this whole notion that I understand you

21  can look at it differently, but the law says you've got to

22  look at the overall mean average and not at any particular

23  district when you're analyzing a map.

24           There's also the difference between an adopted

25  map or a drawn map and when a Court -- I'm saying -- I'm

 1   sorry -- there's a difference between when the Commission or

 2   the legislature approves a map, puts a map out there or the

 3   Court draws it.

 4           And they were clear in *Fletcher* that, while

 5   legislatures may legitimately compromise based on partisan

 6   considerations -- and here's what we're talking about all

 7   those other factors -- those are partisan considerations.

 8   Where a Court -- where no legislative body has adopted a plan

 9   should base its decision on the Constitution and the laws

10   rather than become embroiled in partisan political questions.

11   And that's really what we have here is the use of municipal

12   boundaries in itself is a partisan political question on

13   whether to use it because our legislature hasn't included that

14   in the Charter.  And this was confirmed in *Corbett*.

15           And *Corbett* even went further because, in that case,

16   interestingly, it was the Democrats trying to work with

17   municipal boundaries as opposed to the Republicans and there's

18   a lot of analysis in that opinion of what the judge looked at.

19   But the judge did say at the end that there was no real

20   evidence.  I mean, they were talking about political issues

21   and other issues that have to deal with what a municipality

22   does.  But in the end, there was no evidence of any

23   traditional or historic factors just as they were here.

24           And in *Corbett*, it went as far as to say that

25   municipal boundaries cannot be considered because it would be

1    a factor considered in litigation as opposed to legislation.

2    And this goes back to Supreme Court cases which say that the

3    Court is held to a higher standard and when the Court

4    determines what map to address, to draw, it should get one

5    that's free of any taint of arbitrariness or discrimination

6    and that does not take into account political considerations.

7           In this particular case, I believe the evidence

8    shows that we have political considerations in Democratic

9    Map v3 by virtue of the fact that where or how certain

10   councilpersons were drawn in or out of districts.

11          Now, I understand that all the maps can't be

12   absolutely free of political consideration.  This clearly is.

13   So in addition to the ability of the Court to consider a

14   factor that is neither traditional nor historic that the

15   Court -- that the Court can see that the use of municipal

16   boundaries, while it's a good idea and while it may have been

17   brought in good faith, is too intermixed with political

18   considerations given, again, how they handle the putting in or

19   out certain council people, that it's hard to say what

20   percentage is tainted and what percentage isn't tainted.  But

21   if there's any taint in it, any political consideration, it

22   can't be -- it can't be adopted.

23          I think that what the case law tells us then if you

24   go to the *Stenger* case, and that's on the heels of the *Corbett*

25   case, the Court said, Hey, we've got to use the least change

1    method.  And the evidence is that Republican Map 1 just used

2    the least change approach and shifted some boundaries, and I

3    understand that it was done by Republicans, but it was still

4    minimal, if any political consideration that goes into that.

5    And I think when the Court compares the maps and looks at all

6    the different maps and how they look without the current

7    districts on them, it becomes pretty clear that, look, I only

8    have to shift certain areas.  I don't need to make big

9    changes.  And I don't think the Court can.

10            I think the Court has to do the same thing and start

11   with the least change method.  And if it draws a map, if it

12   determines that it can't adopt any map like Judge Perry did,

13   then it can start with Republican Map 1 or it can take the

14   second round of maps and look at those and say, Okay, how do I

15   do this?  Which is what the Compromise Map essentially did.

16   But how can I do this in order to be compliant with the

17   Charter?

18            **THE COURT:**  So the Charter doesn't say anything

19   about keeping incumbents in their district; correct?

20            **MR. SPOONER:**  No.  That's -- but that issue of when

21   you put an incumbent -- draw one out or draw one in, I think

22   it inherently is a political -- it's a partisan issue.  And

23   that's what happened to these maps is when they started off on

24   Map 1, Mr. Fitch was out.  They were able to draw Map 2 and

25   they attempted to get another map in, but it could be done, to

1   take that political consideration out.

2            I mean, if Democrat Map 3 didn't have Mr. Fitch

3   outside of his district, I think that there'd be a better

4   argument for using that map.  But not because of municipal

5   boundaries.  It would have to be based on the other factors.

6   But here, because of this issue, and because of everything

7   that happened with this compromise meeting and how they

8   changed the names of the maps and how the expert refers to the

9   map in his report, it just -- it just -- it taints the entire

10  process on that side to say that there's political

11  consideration here and the Court has to set that aside and

12  come up with a map that doesn't include any of that.

13           **THE COURT:**  I guess the reason I ask the question is

14  if the Court has to draw the maps, using the Charter

15  considerations, and in drawing the map, I'm not just saying

16  Mr. Fitch or anyone ends up not being in the district where

17  they currently reside, that's not necessarily a political

18  reason.  It could be that just in trying to make it compact

19  and contiguous and the factors that we have, that could

20  happen.  So that's why I'm asking the question of other

21  factors that can be considered.

22           Obviously, other factors have been -- traditional

23  factors have been considered in the drawing of maps in the

24  past.  I don't -- I don't think that there's any argument

25  that, you know, keeping incumbents or honoring census tracks.

1  I mean, there are other things considered other than those

2  things.  So that's why I'm asking whether or not if -- if the

3  Court decides to not adopt any of the maps that are before --

4  if I decide not to adopt any of the maps that are before me

5  and have to draw a map, where does that consideration come in,

6  the keeping incumbents in their districts?

7            **MR. SPOONER:**  Well, that's --

8            **THE COURT:**  Or does it?  Is it something I should

9  even consider?

10            **MR. SPOONER:**  This, I think, was referenced by

11  Dr. Kimball as being an issue is because I think if you take

12  the least change approach and try to move the boundaries, I

13  mean, there's some good suggestions made by the parties with

14  the maps that you have that it can likely be done this time

15  without having to change -- put anyone in or out.

16            They went through this ten years ago and *Stenger* was

17  pretty clear that if the map was good -- if the previous -- if

18  the current map's good, then that means that the new map would

19  be good if it's pretty close to it.  And it honors those

20  boundaries.  And I think he would say that a traditional

21  factor would be to honor the boundaries.  I think that it was

22  clear that the least change method was a -- Dr. Kimball even

23  mentioned it one time -- as being a traditional factor.  But

24  the line is -- you know, from all these cases, the line that's

25  drawn is pretty clear that a Court is held to that stricter

1   standard and can't really go very far beyond anything that's

2   not proven to be a traditional or historic factor.

3              And even though we talked about census blocks, that

4   is not anywhere in the Charter and it's not anywhere in any of

5   the cases.  So it's more of a suggestion than it is a

6   traditional factor as the term is.

7              And I think Jane's going to talk more about the

8   communities of interest and how those impact the case.  But

9   having heard the evidence and sitting through the case, I

10  think that my best argument is that Republican Version Map 1

11  has the least changes and the least political considerations

12  in it while recognizing that there is probably some degree of

13  political consideration in every map.  But we had no evidence

14  in terms of -- any real significant evidence in terms of those

15  leans that the Republican version map created.

16             And what we did see is a little confusing and it's

17  minimal.  And we're not going to be changing -- you know, by

18  following Republican Version Map 1, we're not going to be

19  giving any incumbent or any political party any real

20  difference.  I mean, we're talking about a half percent to a

21  percent change in a difference, and I know on the ones that

22  are closer to 50 percent.

23             But I still don't see how that factor would apply

24  because in today's election world, it's not -- it's not the

25  same.  It's just -- you know, you've got independents in there

1    and you've got a lot more polarization.

2            So, by keeping it close -- plus the issue of this --

3    how the census was affected by the COVID that they talked

4    about, which may have -- may have affected the numbers.  It

5    makes more sense to try to keep it as close as possible to

6    where it is now.  I think that we heard evidence about

7    Meacham Park and U. City.  But I don't think that really has

8    any impact on anything.

9            And with U. City, if it was good ten years ago, the

10   neighborhoods have changed and there's no evidence in terms of

11   how the make-ups of the neighborhoods have changed.  So to use

12   the term of the Delmar divide like we have 40 years ago isn't

13   the same and the Business Journal just ran an article

14   two days -- three days ago, how the Delmar divide no longer

15   exists in the housing market.

16           So it's just -- I think I'll just go back, and just

17   in summary, Judge, it goes to the same as the Court's standard

18   would have to go with the least change approach following

19   what's in the County Charter, and while the recommendations

20   that were made in *Fletcher* and made in *Corbett* and made in

21   *Stenger* by the judges, that these issues really need to be

22   worked out by the citizens is -- still stands.  And if the

23   citizens want to change it to -- change the Charter to include

24   additional factors or to include any factors to better ensure

25   that maps can be reached, then they need to do that.  It's a

1   legislative issue, not a judicial issue.

2           So I would ask that based on the case law, based on

3   the evidence, that the Court either adopt Republican Version 1

4   or the Proposed Compromise Map, or that if the Court is to

5   draw a map, that the Court would take consideration of those

6   two maps in determining if -- if -- to make a map that would

7   be compliant with the Charter.  Thank you, Judge.

8           **THE COURT:**  All right.  Thank you.

9           Ms. Dueker?

10          **MS. DUEKER:**  Thank you.  To one of your questions,

11  Your Honor, this would have been a lot easier had the expert

12  just drawed the map -- had drawn the map.

13          **THE COURT:**  That'd be my wish, but --

14          **MS. DUEKER:**  Yeah.  So, you know, because you're

15  right.  I mean, it does raise some significant issues.

16          The bottom line is the population hasn't changed

17  that much.  I mean, that's just reality.  And so the idea that

18  we're going to overhaul the redistricting process in St. Louis

19  County is not warranted by the small amount of change that's

20  occurred in this population.

21          And, you know, I say at the outset on behalf of my

22  client that whenever you talk about municipal boundaries,

23  you're talking about the First because they are impacted the

24  most.  And so, you know, you could understand why people in

25  the First would be reticent about overhauls that talk about,

1    you know, municipalities.  My client has 40 municipalities are

2    either in all or part of her district.  So you can see where

3    that might make people -- make her and her district very

4    concerned.  And that's one of the reasons why I believe the

5    Supreme Court has been very clear that if you're going to

6    deviate from population equity, that there has to be a very

7    strong historical policy to do this.

8          So not only do we not have any history, no Court in

9    Missouri has ever recognized communities of interest or

10   municipal boundaries.  And it's not even been utilized in

11   Missouri yet.  So even though it's mandated by the

12   Constitution, we're going through that process right now.  So

13   to in any way argue that this is historical is really -- it's

14   just not -- it's a non-starter.  It's not historical.

15         So I think -- and here's another issue.  I mean,

16   Dr. Kimball is one of the smartest people I've ever known, and

17   it was, obviously, one of the reasons that I've hired him.

18   But I think, frankly, he was sort of asked to sort of slather

19   over a political map -- rather than draw a map, he was asked

20   to slather over a political gerrymandering map and asked to

21   come up with, you know, a new way of doing things.

22         You know what, that's aspirational.  But I also

23   think -- and I'm not saying I disagree with his policies.  The

24   problem is there's no legislative delegation from the people

25   or anywhere else to give the Court the ability to jump into a

1   roving Commission on communities of interest.

2          Now, now we want to call it just municipal, but all

3   along, this is about community of interests and, you know,

4   that is just too broad.  You can't even call that a

5   legislative delegation because it means everything, and

6   therefore, it means nothing.

7          And so I think -- so then in order to avoid that

8   inescapable conclusion that this is so completely amorphous as

9   to -- not -- give you any guidance at all, you know, the

10  voters never asked for this.  And I believe that Dr. Kimball

11  believes everything he's saying about the policies.  However,

12  you know, you can't say on one hand that the voters get to

13  choose the representatives and on the other hand you have to

14  tell them that they have to live with community interests over

15  their objection.  Sadly, this is not a way to run a railroad,

16  to have you do it.  The Courts have been very clear the four

17  times they've been asked to do this.  But the voters

18  reaffirmed what they wanted.  And that's -- and it's their

19  call.

20         And so, while aspirational, there's just no

21  evidentiary or legal basis to do this.  I think if this Court

22  were asked to do communities of interest, I think there would

23  be a huge separation of powers problem because I think you

24  would be legislating.

25         And as to municipal boundaries, we've been there,

1    done that, and I think it's dangerous.  I think it can be used

2    as a roving Commission.  I think this is not the first time,

3    but the second time that's happened.  We went into all that on

4    my motion *in limine*, so I won't bore you with it again.  But I

5    think -- I don't know how plaintiffs who claim that municipal

6    boundaries are so important, but yet they carve out one

7    subdivision for one councilperson, Chesterfield, one

8    subdivision in Chesterfield, and for Councilwoman Dunaway and

9    the rest of Chesterfield is in Councilman Harder's district.

10   I don't know how you say you're respecting municipal

11   boundaries and you do that.

12           So, you know, I do think this leaves you with a very

13   difficult decision because of the two incumbents.  And, you

14   know, it's not in the Charter.  And I don't think anyone has

15   ever recognized it as a separate factor.  However, I do agree

16   that people have choices in their incumbents.  They're

17   incumbents for a reason.  And so at least that has some voter

18   and -- you know, it has a tie to the voter.

19           What they're asking you to do, there's no data

20   whatsoever that the voters want this.  They may like their

21   municipalities.  I can probably even go with that.  But the

22   idea that because they like their municipalities, they somehow

23   they want to draw their County Council districts based on

24   that, there's no historical and there's certainly no current

25   evidence of that.  And as nice as a policy as it may be, and

1    as how much I might agree with it, I just don't think you have

2    the power to do it.

3            Let's see.  I mean, again, *Abrams* and *Johnson* is the

4    case that I would point you to on the issue of it's a pretty

5    high standard of proof in order to overcome, you know, adding

6    factors when you're deviating from equity of population and

7    that case is pretty clear.  Judge Perry thought it was very

8    clear.  And so I don't envy your task.  But, frankly, I don't

9    think this should have been in court anyway.  I think these

10   people were close enough and they should have come -- you

11   know, that's both -- it's political.  And I think people have

12   gotten used to just coming here and getting it done.

13           But I don't think the fact that you have seven

14   Democrats and seven Republicans who are never going to agree,

15   that doesn't mean that the Court can enter into a legislative

16   free-for-all and add a free-falling definition.

17           Let's see.  And -- yeah, that's what I just said.

18   So, anyway, since there is no really deviation in policy or

19   population, there's no need to consider any other factors.

20   That was *Abrams* again.

21           So I would ask Your Honor to -- you know, I think

22   everything related to the new factors needs to go.  Now, where

23   that leaves you, you know, that's -- that's not as easy a

24   consideration.  But I think the most important one is, one,

25   you have to stick with what the voters wanted, the County

1   voters.  Not what they wanted for their state, but what they

2   wanted for their County Council districts.

3            And the population hasn't changed that much, I would

4   venture.  I think I believe the changes in this redistricting

5   were less than the changes in the previous redistricting.  So

6   overhauling it, I think, is something that's completely

7   unwarranted, so I ask that you not consider any factor outside

8   the Charter as it's been done in the past.  Thank you.

9            **THE COURT:**  Okay.  Thank you.

10           Mr. Greiman, do you have something more?

11           **MR. GREIMAN:**  Thank you, Your Honor.

12           Just very briefly, three things.  Number one, I

13  think some of the things that have been said about

14  Judge Perry's decision in *Corbett v. Sullivan* are not

15  accurate.  Judge Perry said, and I quote, and this is on

16  page 202 F. Supp. 2d 974.  Her plan does not consider the

17  history of St. Louis County or its traditional communities of

18  interest because the parties did not present sufficient

19  evidence from which I could apply those considerations.

20           She didn't say those considerations are improper.

21  She didn't say it's not proper to take those into account when

22  a Court is drawing a district.  She said she didn't consider

23  them because there wasn't sufficient evidence.  There is

24  sufficient evidence here.  There's a wealth of a record from

25  Dr. Kimball.

1          Secondly, I would ask the Court to take a careful

2   look at the Bowman Plaintiffs' Exhibit 13 which compares

3   Republican Version 1 and the Proposed Compromise Map.  It will

4   show there ain't a whole lot of difference there.  It ain't

5   much of a compromise.  And, you know, Ms. Dueker's point is we

6   shouldn't, you know, follow political subdivision lines.

7          You know, really, the difference there between the

8   Third District is, you know, why is there that difference?

9   You know, why do those lines diverge?  It's because, you know,

10  one follows municipal, you know, boundaries, and the other

11  cherry-picks Democratic precincts and Republican precincts

12  and, you know, puts them on one side of the line or the other

13  for political advantage.  That is not a better way to draw a

14  map than honoring a political subdivision lines.

15         Finally, Your Honor, I would ask the Court to listen

16  to Dr. Kimball.  Dr. Kimball knows of where he speaks.  He

17  gave very well qualified and convincing testimony and I would

18  ask the Court to listen to Dr. Kimball.  Thank you,

19  Your Honor.

20         Just one housekeeping matter.  So in connection with

21  our agreement on the deposition designations, we have put

22  together notebooks for the Court.

23         **THE COURT:**  Okay.

24         **MR. GREIMAN:**  I have one for your law clerk and one

25  for the Court.  The other parties have been given one.  They

1    all contain designations, but I would just, you know, repeat

2    the agreement we made.  The Court should not just look at the

3    designations on Mr. Bohn and Mr. Wingbermuehle, but the Court,

4    we're asking, look at the entire transcripts on those.

5              **THE COURT:**  All right.

6              **MR. GREIMAN:**  That's all I have, Your Honor, unless

7    the Court has questions.

8              **THE COURT:**  I don't have any additional questions.

9    Since I have not seen the depositions, obviously, I have not

10   received all of the evidence in the case.  I've received the

11   depositions, but I haven't had an opportunity to review them.

12             So at this point, I am not certain how we will go,

13   but I will tell you that I am -- the Court is considering

14   drawing its own map.  But I will make that decision after at

15   least reviewing the depositions and taking -- this is actually

16   my first opportunity to really see the maps that have been put

17   into evidence so I can see the differences.

18             And I'm assuming that, in some of the deposition

19   testimony, there may be some additional information about the

20   impact of the municipal boundaries and what effect they have

21   on the various districts.  I don't know.  But I will consider

22   all of that.

23             Is there anything from the defendant?  I don't want

24   to forget the defendant.  Is there anything that you want to

25   add at this time?

1          **MR. SLUYS:**  No, Your Honor.

2          **THE COURT:**  All right.  If we do, we will be in

3     touch regarding any issues with map and using the County's

4     software.  So we'll just need the information for who it is we

5     contact.

6          So is there anything else?  All right.  I want to

7     thank all counsel.  While I know you're very spirited, I was

8     actually seriously at one point -- and this is off the record

9     now.

10         **(Off the record)**

11         **THE COURT:**  But thank you all for getting this done

12    in a timely manner.  Obviously, we need to get this resolved

13    quickly and that is our charge to do that as quickly as

14    possible.  And I'm glad we were able to get it done because

15    there apparently is a storm coming and we all want to get

16    home.  So thank you all.  That concludes this proceeding.

17         **(Court adjourned at 3:06 p.m.)**

18

19

20

21

22

23

24

25

<u>CERTIFICATE</u>

I, Carla M. Klaustermeier, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 204 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 10th day of February, 2022.


/s/ Carla M. Klaustermeier
Carla M. Klaustermeier, RMR, CCR, CSR, CRR
Official Court Reporter