**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN BOWMAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| BECKY ARPS, et al., | ) | |
| | ) | |
| Consolidated Plaintiffs, | ) | Case No. 4:21-CV-1406 NAB |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT L. CHAMBERS, et al., | ) | |
| | ) | |
| Defendants. | | |

**MEMORANDUM AND ORDER**

This matter is pending before the undersigned pursuant to 28 U.S.C. § 636(c). Plaintiffs and Consolidated Plaintiffs bring suit against Defendant members of the St. Louis County Board of Election Commissioners of St. Louis County, Missouri seeking judicial reapportionment of the St. Louis County Council Districts following the failure of the St. Louis County Council Reapportionment Commission to file a reapportionment plan.

I.      **BACKGROUND**

Each set of plaintiffs in this case filed separate lawsuits on November 30, 2021, less than two days after the Reapportionment Commission's deadline to adopt and file a reapportionment plan.

Plaintiffs John Bowman, Karen Cloyd, Glenn Koenen, Susan Meredith, Tommie Pierson, Jr., Dana Sandweiss, and Brian Wingbermuehle (collectively "the Bowman Plaintiffs") are registered voters in St. Louis County, one from each of the seven County Council Districts. The Bowman Plaintiffs were the seven Democratic members of the 2021 St. Louis County Council

Bipartisan Reapportionment Commission ("Reapportionment Commission").

Consolidated Plaintiffs[1] Becky Arps, Rene Artman, Adam Bohn, Rita Heard Days, Edward Engler, Tim Fitch, Mark Harder, Lisa Kaliski, Amy Poelker, June Schmidt, Kelly Stavros, Ernie Trakas, and Richard Wolfe (collectively "the Arps Plaintiffs") are thirteen registered voters of St. Louis County, including three Republican members of the Reapportionment Commission (Plaintiffs Arps, Bohn, and Poelker). The Arps Plaintiffs also include four incumbent members of the St. Louis County Council: Plaintiff Days represents District One; Plaintiff Fitch represents District Three; Plaintiff Trakas represents District Six; and Plaintiff Harder represents District Seven. Plaintiff Days is the current Chair of the St. Louis County Council and a Democrat. Plaintiffs Fitch, Trakas, and Harder are Republicans. The terms of Plaintiffs Days, Fitch, and Harder will expire in January of 2023, and they plan to run for reelection in the 2022 election.

Defendants Robert Chambers, Patricia Yaeger, Marsha E. Haeffner, and Florence Hill are the members of the Board of Election Commissioners of St. Louis County. Plaintiffs brought this action against Defendants in their official capacity as members of the Board and as the officials in charge of elections in St. Louis County. While Defendants will have the duty of implementing the district lines as determined by the Court, Defendants have no authority to draw the lines themselves.

The Bowman Plaintiffs and the Arps Plaintiffs seek, *inter alia,* to have the Court (1) declare that the current Council District boundaries are in violation of the requirements of the United States Constitution and the Missouri Constitution; and (2) reapportion the Council Districts such that St. Louis County is divided into seven districts that are composed of contiguous territory as compact

---

[1] Nine of the Arps Plaintiffs were named in the initial complaint. The Arps Plaintiffs First Amended Complaint filed on December 10, 2021 added Plaintiffs Days, Engler, Poelker, and Schmidt to the lawsuit. The First Amended Complaint also added a claim against John Doe Defendants for conspiracy to interfere with Plaintiffs' constitutional rights by interfering with the duties of the Reapportionment Commission to adopt a new map.

and nearly equal in population as possible. The parties requested an expedited schedule, a bench trial, and for the Court to issue a decision before the first day for filing a Declaration of Candidacy for the 2022 election to the St. Louis County Council. Pursuant to applicable law, the time period for filing a Declaration of Candidacy begins on February 22, 2022 and ends on March 29, 2022. Potential County Council candidates intending to run for office will need to know the district boundaries prior to filing their Declarations of Candidacy.

On the motion of the Arps Plaintiffs, these cases were consolidated on December 14, 2021. On the motion of the Bowman Plaintiffs, the John Doe Defendants named in the Arps Plaintiffs' First Amended Complaint were severed and the conspiracy claim against them was dismissed without prejudice on January 25, 2022. The undersigned held a bench trial on February 1, 2022. The Bowman Plaintiffs presented two witnesses. First, their retained expert Dr. David Kimball testified regarding the existing County Council District Map and the plans proposed by the Bowman Plaintiffs and the Arps Plaintiffs. Second, Plaintiff Brian Wingbermuehle testified very briefly. Counsel for the Arps Plaintiffs cross-examined both witnesses, and counsel for Plaintiff Rita Heard Days separately cross-examined Dr. Kimball. The parties also submitted a Joint Stipulation of Uncontested Facts. The Bowman Plaintiffs and the Arps Plaintiffs jointly submitted the testimony of eight of the plaintiffs by way of deposition designations.[2] Defendants have consistently remained neutral regarding the Bowman Plaintiffs and Arps Plaintiffs' respective proposed district plans, and presented no evidence at trial.

---

[2] The Court reviewed the deposition designations of Plaintiffs Becky Arps, John Bowman, Rita Heard Days, Timothy Fitch, Susan Meredith, and Dana Sandweiss. The Court reviewed the deposition transcripts of Plaintiffs Adam Bohn and Brian Wingbermuehle in their entirety.

## II.     FACTS ELICITED AT TRIAL

### St. Louis County Council & The County Charter

The St. Louis County Charter sets forth the procedure by which St. Louis County Council Districts are reapportioned following a decennial census. Pursuant to § 2.020 of the County Charter, St. Louis County is divided into seven County Council Districts. Pursuant to § 2.035 of the County Charter, on or about May 28, 2021, County Executive Dr. Sam Page appointed fourteen persons, seven Democrats and seven Republicans, to the St. Louis County Bipartisan Reapportionment Commission. Section 2.035 of the County Charter states:

> The commission shall reapportion the council districts by dividing the population of the county by the number of council districts established by this charter so that the population of each district shall, as near as possible, equal that figure and so that each district shall be composed of contiguous territory as compact as may be. Not later than six months after the population of St. Louis County is reported to the president of the United States after each decennial census or six months after the appointment of the commission by the county executive, whichever is later, the commission shall file with the county clerk and with the office or officer charged with conducting elections in the county a final statement of the numbers and the boundaries of the districts together with a map of the districts. The final statement must receive the affirmative vote of a majority plus one of all the members. . . .

Pursuant to the County Charter, the terms of the Commission members expired at 12:01 a.m. on November 29, 2021. The Commission neither adopted a reapportionment plan nor filed a final statement of reapportionment of the districts as required by the Charter. The parties assert the Charter makes no provision for extending the term of the Commission or accomplishing reapportionment by other means, and so, judicial intervention is necessary.

Pursuant to Article II, Section 2.035 of the St. Louis County Charter, St. Louis County must be divided into seven Council Districts meeting the requirements that the population of each district shall, as near as possible, be equal population, and that each district shall be composed of contiguous territory as compact as may be. The Districts may not be in violation of the Constitution

of the United States and Missouri, or the Voting Rights Act, 52 U.S.C. §§ 10101 *et seq.*

During its existence, the Commission was presented with several reapportionment plans. Some were presented by the Democratic Commission members, others by the Republican Commission members. One plan referred to by the Republican Commissioners as the "Proposed Compromise Map" was created during a meeting where a subset of both Democratic and Republican Commissioners were present and contributing ideas, but there is dispute as to whether the Proposed Compromise Map was truly agreed upon by the Democratic Commissioners at the meeting. The Commission as a whole did not vote on the Proposed Compromise Map.

The existing County Council Districts were determined ten years ago by the Honorable Terry I. Adelman in a case styled *Stenger v. Kellett,* Cause No. 4:11-cv-2230-TIA (E.D.Mo. February 23, 2012). Dr. David C. Kimball, the expert who testified in this case, was also the only retained expert in *Stenger.* In *Stenger,* Dr. Kimball created the only plan presented to the Court, and Judge Adelman adopted Dr. Kimball's plan.

### The 2020 Decennial Census

According to the 2020 U.S. Decennial Census, the total population in St. Louis County is 1,004,125. The population of St. Louis County per the 2020 Census reflects that St. Louis County is not equally apportioned among the seven County Council Districts. For the Districts to be equally apportioned, each District would have an "ideal" population of 143,446.[3] The parties stipulated that each of the seven existing Districts deviate from the ideal population as follows:

---

[3] The "ideal" population is calculated by taking the total population of St. Louis County (1,004,125) and dividing it by the number of County Council Districts (7), resulting in an ideal population of 143,446 per District.

| District No. | 2020 Population | Deviation from Ideal Population | Percentage Deviation |
|---|---|---|---|
| 1 | 127,640 | -15,806 | -11.02% |
| 2 | 145,224 | +1,778 | +1.24% |
| 3 | 148,797 | +5,351 | +3.73% |
| 4 | 139,770 | -3,676 | -2.56% |
| 5 | 149,235 | +5,789 | +4.04% |
| 6 | 145,746 | +2,300 | +1.60% |
| 7 | 147,713 | +4,267 | +2.97% |

As is reflected in the data above, the maximum deviation from the least populated to the most populated existing districts is 21,595, or 15.05%. The average deviation among the Districts from the ideal population is 5,567, or 3.88%. The parties agree that these deviations violate the principle of one person, one vote.

The Census data reflects that the two districts that lost population over the last ten years are the First and Fourth Districts, the two districts in the northeast corner of the County. The data also reflects that the population of St. Louis County shifted to the south.

Uncontested expert testimony revealed that there is typically error in census data. There are several practical considerations that explain the potential for error. The Census Bureau can miss people and can double count people. In Missouri, item nonresponse rates were higher in the 2020 Census than in the 2010 Census for age and race questions. The Census Bureau faced additional challenges collecting data for the 2020 Census due to the coronavirus pandemic. The Census was conducted in 2020, and the plans presented in this case were created more than one year later. People have moved and have passed away since the Census data was collected. In light of all of these considerations, the populations generated from the Census do not reflect the exact populations today.

**The Parties' Proposed Plans**

The parties presented three proposed reapportionment plans for the Court's consideration.

6

The Bowman Plaintiffs presented one plan, the "Democrat Map v.3."[4] The Arps Plaintiffs presented two plans. Their preferred plan is the "Republican Map v.1."[5] Alternatively, the Arps Plaintiffs seek adoption of the "Proposed Compromise Map."[6]

The three proposed plans were presented at trial via the testimony and report of Dr. David C. Kimball, the Bowman Plaintiffs' retained expert. Dr. Kimball is a Professor of Political Science at the University of Missouri – St. Louis. His areas of specialty are voting and elections in the United States. Dr. Kimball obtained a bachelor's degree in political science and applied math from Brown University and a master's degree and Ph.D in political science from Ohio State University. He has written books and articles about American politics and elections, and serves on the editorial board of *Election Law Journal.* Dr. Kimball was the retained expert hired by the Democratic plaintiffs in *Stenger v. Kellett*, where he helped draw the redistricting plan that was adopted by Judge Adelman in *Stenger* ten years ago. Dr. Kimball has served as an expert in other election and redistricting cases, including four federal lawsuits and *Pearson, et al. v. Koster, et al.,* a 2012 Cole County case involving the redistricting of Missouri congressional districts. No party objected to Dr. Kimball's expertise in voting behavior, elections, and redistricting in the United States.

Dr. Kimball testified that he analyzed each of the three proposed reapportionment plans to determine whether they complied with the four factors required by the County Charter: equal population, contiguity, compactness, and compliance with the Voting Rights Act. The factual evidence presented on these four factors will be discussed in connection with the conclusions of law, *infra.*

---

[4] All three maps have been referred to with different names at different places in the record. Democrat Map v.3 has also been referred to in the record as "the Bowman Map" or "the Proposed Map submitted by Brian Wingbermuehle – 11/22/21."
[5] Republican Map v.1 has also been referred to as "Proposed Map Submitted by Adam Bohn – 11/8/2021."
[6] The Proposed Compromise Map has also been referred to as "Proposed Map Submitted by Adam Bohn – 11/21/21" or the "Compromise Map" or the "Republican Alternative Map."

Dr. Kimball testified that he considered certain factors beyond equal population, compactness, contiguity, and the Voting Rights Act. One such consideration is the preservation of census blocks. Dr. Kimball testified this is an important consideration because a census block is the smallest geographic unit of census population data available. If a district boundary line was drawn to split a census block, there would be uncertainty as to how many residents of the census block live on one side of the district boundary or the other. The uncertainty would make it difficult to calculate the total population within the districts containing only part of a census block. Each of the three proposed plans avoided splitting census blocks or precinct boundaries, and each plan accomplished this goal.

Dr. Kimball further testified that another consideration in redistricting is the approach. A common method is the least change approach, which involves starting with the existing district boundaries and making adjustments to those boundaries to draw the new districts. The Arps Plaintiffs contend that the Republican Map v.1 was the plan that used the least change approach. However, as Dr. Kimball observed, it appears that each of the three proposals follows a least change approach in that they started with the existing County Council Districts and made adjustments to those boundaries to create new plans, as opposed to starting from scratch without regard for the existing boundaries.  No evidence was presented to suggest that any of the three plans used a different approach.

The most disputed factor considered by Dr. Kimball is the preservation of municipal boundaries. In creating Democrat Map v.3, the Bowman Plaintiffs sought to create districts that keep municipalities together in the same district. This was not a goal for either plan proposed by the Arps Plaintiffs. Dr. Kimball testified preservation of municipal boundaries or keeping local political subdivisions together is a valid and traditional factor for redistricting. Missouri and more

than forty other states have similar requirements for respecting local political subdivisions in their state legislative redistricting criteria. Dr. Kimball testified that the general principle supported by this criterion is making the lines of accountability clearer between constituents and their representatives. When an entire municipality is within a single council district, it is easier for a constituent to know who their representative is, and they are more likely to contact their representative with any issues and otherwise become engaged in civic participation. Municipal governments also collaborate with St. Louis County on certain services and initiatives, which suggests representative benefits of locating a municipality within a single council district.

St. Louis County currently has 88 municipalities. A significant portion of St. Louis County is unincorporated, and 320,000 residents of unincorporated St. Louis County have neither formed their own municipal governments, nor been annexed into another town's local government. Each of the three proposals split some municipal boundaries, with Democrat Map v.3 splitting the fewest municipalities. Democrat Map v.3 only split 10 municipalities, while Republican Map v.1 and the Proposed Compromise Map split 23 and 18 municipalities, respectively. Dr. Kimball opines that all three plans comply with the requirements of equal population, compactness, contiguity, and the Voting Rights Act, but that the Court should adopt the Democrat Map v.3 because it does a materially better job of respecting municipal boundaries than the other two proposals.

Additional facts will be referred to in connection with the conclusions of law, *infra*.

III. **CONCLUSIONS OF LAW**

The Bowman Plaintiffs and the Arps Plaintiffs have challenged the constitutionality of the current St. Louis County Council Districts pursuant to 42 U.S.C. §§ 1983 and 1988, alleging that the changes in population reflected in the 2020 Decennial Census resulted in violation of their rights under the Fourteenth Amendment to the United States Constitution and under Article I, § 2

of the Missouri Constitution.

The Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1343(a)(3) and (4) and 42 U.S.C. § 1988. Plaintiffs' claims arose in St. Louis County, where Plaintiffs reside and are registered to vote. Defendants also reside in St. Louis County. St. Louis County lies within the Eastern District of Missouri, and therefore venue is proper pursuant to 28 U.S.C. § 1391(b). An actual justiciable controversy exists among the parties so that the Court may declare the rights and other legal relations of the parties under 28 U.S.C. § 2201, and may grant other or further relief under 28 U.S.C. § 2202.

Defendants are properly named in this matter in that the Board of Election Commissioners is responsible for conducting elections in St. Louis County, and its actions will violate voters' constitutional rights if it administers elections in districts that are found to be unconstitutional.

The Equal Protection Clause of the Fourteenth Amendment requires that legislative districts be of nearly equal population, so that each person's vote may be given equal weight in the election of representatives "without regard to race, sex, economic status . . . ." *Reynolds v. Sims,* 377 U.S. 533, 561 (1964).

Based on the 2020 Census, the total deviation of the current Districts from the ideal is 15.05%, which exceeds the deviation permissible under the Fourteenth Amendment. It is undisputed that the current apportionment of the Districts does not allow for equal weight to be given to the vote of each qualified resident of St. Louis County. Thus, the current apportionment and existing Council Districts impair the rights of citizens to vote by violating the principle of "one person, one vote." *See Reynolds,* 377 at 558; *see also* Mo. Const. Art. I, § 2. If the 2022 Council elections are held using the existing Districts, which are based on the 2010 Census, the Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment to the Constitution of the

United States, and to equal rights and opportunity under the law pursuant to Article I, Section 2 of the Missouri Constitution, will be violated.

Accordingly, the Court is now "left with the unwelcome obligation of performing in the legislature's stead, while lacking the political authoritativeness that the legislature can bring to the task." *Connor v. Finch*, 431 U.S. 407, 415, 97 S. Ct. 1828, 1834, 52 L. Ed. 2d 465 (1977). This marks the fifth decade in which St. Louis County has failed to adopt *any* plan to reapportion its council districts.  In 1982, Judge Cahill reapportioned the county districts; in 1992 Judge Hamilton reapportioned them; in 2002, Judge Perry reapportioned the districts; and in 2012, Judge Adelman had the unenviable task of reapportionment.  Judge Perry's admonition during this process twenty years ago bears repeating:

> [T]he plan adopted here and which will remain in effect for the next ten years will mark three decades in which the voters of St. Louis County will have their County Council district lines established by federal judge, rather than by the political process established by the Charter.
> With such a pattern, I must conclude that, for some reason I cannot begin to understand, the voters in St. Louis County prefer to have this important governmental task performed by an unelected federal judge who should not be making political decisions. If this is not their preference, they should certainly establish a new system for deciding the issue before the next census comes around.

*Corbett v. Sullivan*, No. 4:01-CV-2006 CDP, 202 F. Supp. 2d 972, 975 (E.D. Mo. 2002); *see also Stenger v. Kellett*, No. 4:11-CV-2230 TIA, 2012 WL 601017, at *8 (E.D. Mo. Feb. 23, 2012) (quoting *Corbett*).

The Court is now left to consider whether adoption of one of the three proposed plans is appropriate, or if the Court should draw its own plan. In reapportioning the St. Louis County Council Districts, a district court must achieve: "(1) equality of population among districts; (2) geographic compactness; and (3) protection of minority voting rights. *Fletcher v. Golder*, 959 F.2d 106, 109 (8th Cir. 1992); *see also Stenger*, 2012 WL 601017, at *9; *Corbett*, 202 F. Supp. 2d at

980 (quoting *Fletcher* requirements).

The Bowman Plaintiffs and the Arps Plaintiffs agree that all three proposed plans comply with the basic requirements of the United States and Missouri Constitutions, the Voting Rights Act, and the County Charter. The Bowman Plaintiffs contend that their proposal, Democrat Map v.3, should be adopted by the Court because it meets all of the criteria above and does a better job of respecting municipal boundary lines than the Arps Plaintiffs' proposals. The Arps Plaintiffs contend that Democrat Map v.3 is a product of political considerations, and that the Bowman Plaintiffs' desire to respect municipal boundaries is a pretext for achieving political benefit. They further assert that Republican Map v.1 and the Proposed Compromise Map meet the required criteria and are free from political considerations, such that the Republican Map v.1 should be adopted, or alternatively, the Proposed Compromise Map should be adopted. The Court will address each argument in turn, while determining whether the proposed plans comply with applicable law.

### Equal Population

A redistricting plan must adhere to the constitutional guarantee of one person, one vote. *See supra.* "Court-ordered districts are held to higher standards of population equality than legislative ones. A court-ordered plan should 'ordinarily achieve the goal of population equality with little more than *de minimis* variation.'" *Abrams v. Johnson*, 521 U.S. 74, 98, 117 S. Ct. 1925, 1939, 138 L. Ed. 2d 285 (1997); quoting *Chapman v. Meier,* 420 U.S. 1, 26–27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975).

The undersigned finds that each of the three proposed plans easily meets the equal population standard. From the ideal population of 143,446 persons per District, the maximum population deviation for the plans is 904 people, or .630%, under Democrat Map v.3; 496 people,

or .346%, under Republican Map v.1; and 616 people, or .429%, under the Proposed Compromise Map. Each plan has a maximum population deviation below 1%, which is the standard for local redistricting. Further, as Dr. Kimball explained, the differences between the proposed plans in terms of equal population is negligible, especially given the uncertainty and potential for error in the census data.

### Contiguity and Compactness

Pursuant to Article II, Section 2.035 of the County Charter, the Council Districts must be "composed of contiguous territories as compact as may be."

To be contiguous, a district should have no blocks that are disconnected from all other blocks within the same district. In other words, one could walk from one part of the boundary within a district to another and remain in the district without crossing into a different district. Each of the three proposed plans produced contiguous districts, meeting the contiguity requirement.

To determine compactness, Dr. Kimball analyzed the three proposals using the population polygon measure of compactness. The population polygon measure examines the shape of a district and the location of where people live in and around the district. To perform this analysis, Dr. Kimball used mapping software[7] to draw the minimum polygon around each district. Then, he computed the ratio of the population inside the district to the population in the polygon that surrounds the district. He likened the process to "stretching a rubber band around the boundaries of a district and then comparing the population within the district of the population that is within that rubber band area." The score for the population polygon measure ranges from zero (the worst score) to one (a perfect score, or a perfectly compact district).

The average score for the Democrat Map v.3 districts is .86. The average score for the

---

[7] Dr. Kimball used the ArcGIS Pro computer software redistricting program. Arc GIS is also the software used by St. Louis County.

Republican Map v.1 is .90, and the average score for the Proposed Compromise Map is also .90. The standard deviations for each of the three plans are as follows: .079 for the Democrat Map v.3; .063 for the Republican Map v.1; and .05 for the Proposed Compromise Map. For comparison, the average compactness of the existing Districts is .91 with a standard deviation of .049. Dr. Kimball opined that each of the three proposed plans are similarly compact, and the differences between the plans in terms of compactness are insignificant.

All three plans are less compact than the existing districts adopted by Judge Adelman in 2012. The Democrat Map v.3's marginally lower compactness score of .86 seems to be a result of the plan's goal of keeping municipal boundaries together, despite many municipalities' non-compact boundaries. For example, Democrat Map v.3's First District scored .82, and the Second District scored .71, the lowest score of any district in any of the three proposals. In the Republican Map v.1, the two lowest scoring districts are the Third District with a score of .76, and the Fourth District with a much higher score of .88. Similarly, the Proposed Compromise Map's lowest scoring districts are the Third District with a score of .80 and the Fourth District with a score of .88. The Arps Plaintiffs' lower scoring Third Districts seem to be the result of protecting the incumbent District Three councilman, discussed *infra.*

Although each plan has a lower score than the existing Districts' average population polygon score of .91, the proposals come quite close, and Dr. Kimball found these differences to be statistically insignificant, given the potential for error in the Census data that was used to conduct the analysis. The undersigned concludes from the evidence that the Proposed Compromise Map is the better plan in terms of compactness because it has the highest average compactness and the lowest standard deviation. However, each proposal creates districts with high compactness scores, and the differences between the proposed plans in terms of compactness are insignificant.

**Voting Rights Act**

The redistricting plan must comply with the Voting Rights Act of 1965. 52 U.S.C. § 10301

*et seq.* Section 2 of the Voting Rights Act states in pertinent part:

> No voting qualification or prerequisite to voting or standard, practice, or procedure
> shall be imposed or applied by any State or political subdivision in a manner which
> results in a denial or abridgement of the right of any citizen of the United States to
> vote on account of race or color. . . .

52 U.S.C. § 10301(a). The Supreme Court has long held that the scope of Section 2's prohibition

encompasses the alleged dilution of minority votes. *See, e.g., Brnovich v. Democratic Nat'l

Comm.*, 141 S. Ct. 2321, 2332–33 & 2333 n.5 (2021) (collecting cases).

In order to establish a claim under the Voting Rights Act, the Supreme Court identified

three preconditions for a vote-dilution claim under Section 2: (1) the minority group is sufficiently

large and geographically compact to constitute a majority in a properly drawn single-member

district; (2) minority group is politically cohesive; and (3) that racial bloc voting typically frustrates

the election of the minority group's preferred candidate. *Thornburg v. Gingles,* 478 U.S. 30, 50-

51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). If the preconditions are satisfied, a court next performs

a totality-of-the-circumstances analysis to decide whether it is shown that the political processes

leading to nomination or election are not equally open to participation by the protected class "in

that its members have less opportunity than other members of the electorate to participate in the

political process and to elect representatives of their choice."[8] 52 U.S.C. § 10301(b). The Voting

---

[8] According to the Senate Judiciary Committee report that accompanied the 1982 amendments to the Voting Rights
Act and was relied on by the Supreme Court in *Gingles* and its progeny, typical factors that may be used to show a
Section 2 violation include: 1) The extent of any history of official discrimination in the state or political subdivision
that touched the right of the members of the minority group to register, to vote, or otherwise participate in the
democratic process; 2) The extent to which voting in the elections of the state or political subdivision is racially
polarized; 3) The extent to which the state or political subdivision has used unusually large election districts, majority
vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the
opportunity for discrimination against the minority group; 4) If there is a candidate slating process, whether the
members of the minority group have been denied access to that process; 5) The extent to which members of the
minority group in the state or political subdivision bear the effects of discrimination in such areas as education,

Rights Act specifically declines to establish "a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.* However, "[t]he extent to which members of a protected class have been elected to office . . . is one circumstance which may be considered" in determining whether a violation has occurred. *Id.*

Dr. Kimball analyzed the districts in each plan for racial make up and determined that each plan complied with the Voting Rights Act. According to the 2020 Census, the black population of St. Louis County is 24.6%, while the white population is 63.0%. The racial composition[9] of each plan is as follows:

| Dist. No. | Current Districts | | Proposed Compromise Map | | Republican Map v.1 | | Democratic Map v.3 | |
|---|---|---|---|---|---|---|---|---|
| | Black | White | Black | White | Black | White | Black | White |
| 1 | 74.7% | 17.4% | 69.4% | 21.5% | 69.5% | 21.6% | 64.9% | 24.4% |
| 2 | 23.5% | 56.8% | 22.0% | 58.2% | 22.0% | 58.1% | 19.7% | 61.2% |
| 3 | 3.3% | 84.2% | 2.4% | 84.7% | 3.2% | 84.0% | 2.9% | 85.7% |
| 4 | 66.6% | 26.7% | 66.2% | 26.9% | 66.0% | 27.1% | 65.4% | 27.6% |
| 5 | 7.6% | 79.5% | 6.4% | 81.1% | 5.7% | 81.7% | 13.7% | 73.5% |
| 6 | 2.8% | 86.8% | 2.8% | 86.9% | 2.8% | 86.9% | 2.8% | 86.9% |
| 7 | 2.7% | 81.2% | 2.7% | 81.5% | 2.7% | 81.5% | 2.7% | 81.3% |
| County | 24.6% | 63.0% | 24.6% | 63.0% | 24.6% | 63.0% | 24.6% | 63.0% |

Like the existing County Council Districts, each proposed plan creates two districts with a majority black population. Dr. Kimball opined that at a minimum, Districts One and Four needed

---

employment and health, which hinder their ability to participate effectively in the political process; 6) Whether political campaigns have been characterized by overt or subtle racial appeals; and 7) The extent to which members of the minority group have been elected to public office in the jurisdiction. S. Rep. No. 97-417, at 28–29 (1982).

[9] No evidence was presented regarding the apportionment of non-black minority populations in St. Louis County. Those populations are not accounted for in the table.

30% to 40% of the voting age population to be comprised of black residents. In each of the three plans, District One and District Four are each comprised of more than 60% black residents. Dr. Kimball found each plan's two majority-minority districts sufficient to protect the voting rights of black residents in those districts.

In previous decades, a district needed at least a 65% minority population in order to maintain a majority-minority district. However, more recent election trends reflect the 65% rule is no longer required. For example, in the three elections analyzed by Dr. Kimball wherein a black candidate ran against a white incumbent, the black candidate won the majority of votes in St. Louis County.[10] Dr. Kimball testified that these local election results and other elections over the past 15 years show that there is a shift away from racially polarized voting in St. Louis County. In fact, Dr. Kimball opined that if the percentage of black populations were much higher than the 64.9% to 69.5% in the proposed plans, there is a risk of "packing" the districts by including too high a share of the black voters in one area and diminishing the ability of black voters in the neighboring districts to elect the candidates of their choice. Under these circumstances, the undersigned finds that one could not establish the third *Gingles* factor—that racial bloc voting typically frustrates the election of the minority group's preferred candidate—for any of the three proposals. I conclude that each of the three plans is in compliance with the Voting Rights Act.

**Traditional Factors**

When drawing district lines by judicial order, courts are held to a more stringent standard than legislatively adopted apportionments. *Connor v. Finch*, 431 U.S. 407, 419, 97 S. Ct. 1828, 1836, 52 L. Ed. 2d 465 (1977). "[A] court, as a general rule, should be guided by the legislative

---

[10] Dr. Kimball reviewed the St. Louis County election results for the 2020 elections of Alissia Canady for Lieutenant Governor of Missouri; Yinka Faleti for Missouri Secretary of State; and the 2018 election of Wesley Bell for St. Louis County Prosecutor. In each election against a white incumbent, the black candidate received 59.2%, 55.9%, and 56.6% of the total votes in St. Louis County, respectively.

policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." *Abrams,* 521 U.S. at 79.

Here, the Bowman Plaintiffs ask the Court to consider preservation of municipal boundaries in addition to compliance with the County Charter and the Voting Rights Act. The Arps Plaintiffs insist that the Court should only consider the Charter requirements and the Voting Rights Act, because judicial redistricting is held to a higher standard than legislative redistricting, and the Charter does not call for preservation of municipal boundaries. In determining what non-Charter factors to consider, the undersigned looked to the guidance of prior cases in which the St. Louis County Council Districts were judicially reapportioned.

### *Census Blocks*

Although it is not a consideration in the Charter, each of the three proposals avoided splitting census blocks or precinct boundaries. Keeping census blocks together has historically been a consideration in drawing or adopting the St. Louis County Council Districts, perhaps out of necessity given the population data available. *See Fletcher v. Golder*, No. 91-2314C(7), 1992 WL 105910, at *8 (E.D. Mo. Feb. 24, 1992), *aff'd,* 959 F.2d 106 (8th Cir. 1992) (the court "finds the goal of following existing [Voter Tabulation District] lines legitimate and necessary" because "[w]hile splitting VTDs might serve the goal of compactness, the Court lacks the population data to allow it to do so."); *Corbett*, 202 F. Supp. 2d at 990 (in drawing its own reapportionment plan, the court noted that some district borders are uneven "as this cannot be avoided when dealing with census blocks").

### *Least Change Approach*

Additionally, it appears that each plan used the "least change" approach. This method was used to reapportion the districts ten years ago, and the undersigned finds it to be a legitimate factor to consider in reapportioning the districts here. *See Stenger,* 2012 WL 601017, at *3 ("The 'least

change' method is advantageous because it maintains the continuity in representation for each district and is by far the simplest way to reapportion the county council districts.").

***Preservation of Municipal Boundaries***

The preservation of municipal boundaries is the greatest dispute among the Bowman Plaintiffs and the Arps Plaintiffs. The Bowman Plaintiffs urge the Court to consider the "long-recognized" redistricting principle of respecting municipal boundaries. In support, they point to Dr. Kimball's testimony regarding the benefits of keeping municipalities together, as well as cases wherein courts allowed legislatures to deviate from perfect population equality to accommodate respecting municipal boundaries, political subdivisions, or communities of interest. They also emphasize that the Missouri Constitution's 2018 amendments include keeping communities and political subdivisions together in the state legislative districting criteria.[11]

The Arps Plaintiffs argue that the Court cannot take municipal boundaries into consideration, and that the Democratic effort to respect municipal boundaries is a pretext for moving Plaintiff Fitch outside of District 3 and/or to force the Court to establish boundaries rather than allowing the Reapportionment Commission to agree on a plan pursuant to the County Charter.

Despite the longstanding recognition of preserving municipal boundaries as a legitimate redistricting factor[12] and the Missouri Constitution's requirement of preserving political

---

[11] Under the amended provision, state legislative districts are to (1) be drawn with as nearly equal population as practicable; (2) comply with applicable federal law, including the Voting Rights Act; (3) be composed of contiguous territory as compact as may be; and (4) to the extent consistent with the first three requirements, *communities shall be preserved*. "Districts shall satisfy this requirement if *district lines follow political subdivision lines to the extent possible*…" Mo. Const. art. III, § 3(b) (emphasis added).

[12] The Supreme Court has repeatedly recognized preserving municipal boundaries, or keeping political subdivisions together, as a traditional redistricting principle. *See, e.g., Evenwel v. Abbott*, 578 U.S. 54, 59–60, 136 S. Ct. 1120, 1124, 194 L. Ed. 2d 291 (2016) ("when drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness."); *Bush v. Vera*, 517 U.S. 952, 959, 116 S. Ct. 1941, 1952, 135 L. Ed. 2d 248 (1996) (recognizing natural geographical boundaries and conformity to political subdivisions as traditional redistricting principles); *Miller v. Johnson*, 515 U.S. 900, 919, 115 S. Ct. 2475, 2489, 132 L. Ed. 2d 762 (1995) (recognizing "respect for political subdivisions" as a traditional districting principle).

subdivisions in state legislative district reapportionment, the County Charter does not require consideration of municipal boundaries in reapportioning St. Louis County Council Districts. Nor has any court reapportioning the St. Louis County Council Districts taken municipal boundaries into consideration. *See, e.g., Corbett*, 202 F. Supp. 2d at 987 ("Respecting municipalities has never been a consistently applied legislative factor in the redistricting process in St. Louis County.") Accordingly, the undersigned finds that preserving municipal boundaries is not required in reapportioning the districts, nor is it a reason in this case to sacrifice the other considerations mandated by the Charter—namely, compactness.

As the Democrat Map v.3 illustrates, preservation of municipal boundaries impacts the ability to create a plan that is as compact as possible. In fact, Democrat Map v.3 was unable to preserve all municipal boundaries, as 10 municipalities are spilt among two or sometimes three council districts in the proposed plan. For comparison, the existing plan splits 22 municipalities into multiple County Council Districts. Indeed, it is difficult to create seven districts that are equal in population and compact that also follow municipal boundaries, especially in an area with as many municipalities as are located in St. Louis County. Because Democrat Map v.3 sacrifices compactness for a redistricting principle not required by the Charter and not historically recognized in reapportioning the St. Louis County Council Districts, the undersigned declines to adopt this plan.

### *Protection of Incumbents & Other Political Considerations*

Both sets of Plaintiffs avoid taking a position on whether the protection of incumbents is an appropriate consideration for the Court.[13] Nevertheless, one of the main differences between

---

[13] I suspect they have different reasons for avoiding the issue. The Arps Plaintiffs argue that factors outside of the Charter should not be considered, but they also propose plans with the intent to protect District Three's Republican

the plans is whether District Three will encompass Arps Plaintiff Fitch's current residence.

The evidence presented at trial by way of Dr. Kimball and deposition designations is that Plaintiff Fitch is the incumbent in District Three. When he began his term, Plaintiff Fitch lived in Fenton, in the more southern portion of District Three. In October 2020, Plaintiff Fitch sold his home and moved to a rental residence in Creve Coeur. Plaintiff Fitch's new residence is on the edge of the existing District Three, less than a quarter mile from the northern boundary and less than a mile from the western boundary.

Dr. Kimball testified, and it is clear from observing the proposed plans, that in both the Republican Map v.1 and the Proposed Compromise Map, there is an "appendage" or "head" on the northwestern portion of District Three. This appendage makes the district less compact than if the northern boundary of District Three were flatter across the northern border, and gives District Three the lowest compactness score in both plans.[14] The evidence supports that the Arps Plaintiffs' proposed plans are created with the appendage on the northern border of District Three in order to keep Plaintiff Fitch in the district. Arps Plaintiffs testified that a Republican goal in reapportionment was to protect Plaintiff Fitch.[15]

In contrast, Democrat Map v.3 supported by the Bowman Plaintiffs creates a much flatter northern boundary for District Three, and it moves the entire northern boundary further south.[16] Moving the District Three border south is consistent with the 2020 Census data reflecting that St. Louis County's population as a whole has shifted south. However, the Bowman Plaintiffs'

---

incumbent. On the other hand, the Bowman Plaintiffs seek to prevent splitting of municipal boundaries, but are willing to split a municipality where it protects District Two's Democratic incumbent.

[14] District Three scored .76 in Republican Map v.1, and .80 in Proposed Compromise Map. In comparison, the next least compact district in both plans scored a .88.

[15] Arps Plaintiff Adam Bohn testified that both Plaintiff Fitch and Plaintiff Artman expressed the desire that Mr. Fitch not be drawn out of District Three. Plaintiff Becky Arps testified she was told by Plaintiff Artman "to keep Tim Fitch in his district." Plaintiff Artman is the chair of the St. Louis County Republican Central Committee.

[16] The "flattened" boundary allowed the Democrat Map v.3 District Three to score a .88 in compactness.

flattened northern boundary does not serve their stated goal of keeping municipalities together, as it splits three municipalities between Districts Two and Three (Creve Coeur, Frontenac, and Town and Country, which splits among three districts). At least one Bowman Plaintiff testified that a consideration for the Democrats was not to move boundary lines just to accommodate Plaintiff Fitch.[17]

The Arps Plaintiffs argue that the Bowman Plaintiffs drew their proposed plan with the specific intention to draw Plaintiff Fitch out of his district such that he will be unable to run for reelection in District Three in 2022 from his current residence. They further argue that this injects political considerations into the Bowman proposal, suggesting the desire to respect municipal boundaries was pretext for political considerations.[18] The Arps Plaintiffs also argue that Republican Map v.1 and the Proposed Compromise Map are "free from political considerations." The Bowman Plaintiffs argue that preservation of municipal boundaries is not pretext and gives Democrats no partisan advantage. They also argue that "evidence of partisan political motivation is irrelevant and need not be considered." *See Fletcher,* 959 F.2d at 109 (affirming the district court's ruling *in limine* to exclude evidence of political motivations); *but see Corbett*, 202 F. Supp. 2d at 988 (finding political motivation relevant "because it shows that one of the Republicans' arguments for favoring their plan is false").

It is disingenuous for the Arps Plaintiffs to argue that their proposed plans are free from political considerations. Redistricting is an inherently political process. All three proposals

---

[17] Bowman Plaintiff Dana Sandweiss testified that the reasons boundary lines were moved between a prior plan and Democrat Map v.3 was to keep communities of interest and municipalities together, and because "we didn't want to draw a map just to draw a commissioner [sic] into a current district."

[18] Some evidence also suggested that despite wanting to preserve municipal boundaries, the Bowman Plaintiffs intentionally split Chesterfield in order to accommodate Councilwoman Kelli Dunaway, who resides in Chesterfield and currently represents District Two. Chesterfield is split between Districts Two and Seven in the Democrat Map v.3. However, Chesterfield is already split between three districts in the existing Council Districts. Additionally, both Republican Map v.1 and the Proposed Compromise Map split Chesterfield between Districts Two, Three, and Seven.

22

presented to the Court were created by members of the Reapportionment Commission before the expiration of the Commission and before this lawsuit was initiated. At that point, the Commissioners were subject to a less stringent standard than the Court must adhere to now. The Commissioners could and likely did consider other traditional and political factors in their attempt to create a plan that would comply with the Charter and receive the votes of the majority plus one of the Commissioners. The evidence, and common sense, make clear that all of the proposals involved political motivations, including protection of incumbents.

Although incumbency protection can be a legitimate factor in districting, "not all of its forms are in the interests of the constituents." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 403, 126 S. Ct. 2594, 2601, 165 L. Ed. 2d 609 (2006); citing *Karcher v. Daggett,* 462 U.S. 725, 740, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). "If the justification for incumbency protection is to keep the constituency intact so the officeholder is accountable for promises made or broken, then the protection seems to accord with concern for the voters." *Id.* at 441. If, on the other hand, incumbency protection means drawing lines around citizens who oppose an incumbent, the change is to benefit the incumbent, not the voters. *Id.*

Dr. Kimball's testimony that the voters should choose their representatives and not the other way around is consistent with Supreme Court discussion regarding the issue of protecting incumbents. He testified that boundaries should not be "dramatically redraw[n]" in order to draw an incumbent out of his or her district into another district. In that scenario, the result is that two incumbents are forced to run against each other, which tends to run against the principle of voters choosing their representatives. *See also Bush v. Vera*, 517 U.S. 952, 964, 116 S. Ct. 1941, 1954, 135 L. Ed. 2d 248 (1996) (internal citations omitted) ("And we have recognized incumbency protection, at least in the limited form of 'avoiding contests between incumbents,' as a legitimate

state goal."). However, Dr. Kimball testified that redrawing boundaries in order to accommodate an incumbent who recently moved to the border of his district is also "somewhat problematic" with the principle of voters choosing their representatives, and there is no easy solution to the issue. Under the circumstances, drawing the Third District to encompass Mr. Fitch's current address and drawing the Third District in a way that keeps him out of the very district he represents are both political considerations.

More importantly, protection of incumbents is not a historical factor considered by previous courts in adopting or drawing a plan for the council districts. *See Fletcher v. Golder*, No. 91-2314C(7), 1992 WL 105910, at *9 (E.D. Mo. Feb. 24, 1992), *aff'd,* 959 F.2d 106 (8th Cir. 1992) (declining to consider evidence concerning the protection of incumbents); *Corbett v. Sullivan*, 202 F. Supp. 2d 972, 989-90 (E.D. Mo. 2002) (despite the parties' urging to consider not pairing incumbents and protecting incumbents, the court drew a plan without regard for incumbents); *Stenger v. Kellett*, No. 4:11CV2230 TIA, 2012 WL 601017, at *4 (E.D. Mo. Feb. 23, 2012) (adopting a plan that used the "least change" approach "not to protect the incumbent, but to allow the voters to decide whether they desired to keep the same representative or reject him or her by electing someone else."). The undisputed facts show that the Republican Commissioners drew their plans with the specific intention of accommodating Plaintiff Fitch's new residence less than a quarter of a mile from the border of the existing Third District. Because the Republican Map v.1 and the Proposed Compromise Map sacrifice compactness for a redistricting principle not required by the Charter and not historically recognized in reapportioning the St. Louis County Council Districts, the undersigned declines to adopt either plan.

## The Court-Drawn Plan

The goals of preserving municipal boundaries and protection of incumbents have proven

to have positive effects on democracy. If the Reapportionment Commission or the parties had agreed on a plan that supported both goals, perhaps we would not be here. In any event, the Court is not bound by these goals. The Court is bound by the County Charter and the Voting Rights Act. Applying this framework, the undersigned has drawn a reapportionment plan that will be implemented in St. Louis County. A graphical depiction of the plan is attached as Exhibit A. A summary of the population, size, and racial composition of the districts is attached as Exhibit B. The population of the districts range from 143,406 to 143,484, a total deviation of seventy-eight people and an average deviation of twenty-four people. These deviations are lower than the deviations in the plans proposed by the parties and are not statistically significant. The districts are statistically of equal population.

The districts are also compact and contiguous. I suspect that the districts could have been marginally more compact if I started from scratch in drawing the districts. However, that would not be consistent with the least change approach utilized by Dr. Kimball and adopted by Judge Adelman in *Stenger*. While the districts probably would have been more compact, this approach also is likely to significantly change the shape of and geographic regions in each district.

My goal was to create districts of equal population by making minimal changes to the existing districts, census block by census block. I began with the current district boundaries. In making adjustments to the existing boundaries, I recognized that Districts Four and One, two of the northernmost districts, lost significant population and to equalize the population would require taking population from the surrounding districts—Two and Five. After Districts Four and One had gained sufficient population, I moved on to Districts Seven and Six, the districts furthest west and south, and adjusted the population to achieve equal population there. Then, I attempted to logically adjust the boundaries of Districts Two, Three, and Five. This is where I gained a better

understanding of the challenges faced by the Commission. Oftentimes once I was satisfied with the population of one or two districts and believed those districts to be "final," I found that the impact on a surrounding district was so severe that all of the districts needed further adjustments. Keeping census blocks together also impeded the process, as the census blocks greatly vary in shape and size, affecting the compactness of the districts. While some boundaries smoothly run along a street or highway, others are more uneven due to the census blocks and the changes required to achieve equal population.

My initial approach did not take into account the racial composition of the districts. After the reapportionment was underway, I realized that the concentration of the black population in northern St. Louis County resulted in District One easily maintaining a black population of more than 70%. In light of Dr. Kimball's testimony regarding the risk of racially "packing" the First and Fourth Districts, I made additional changes to the boundaries to lower the black population of District One to below 70%. Of course, that required further trial and error adjustments to simultaneously achieve a lower black population in District One and maintain equal population in the surrounding districts. District One now has a black population of 69.66%, and District Four has a black population of 67.68%.[19] I believe that these districts do not violate the Voting Rights Act in any way.

The Court will provide all counsel of record with the shapefiles for the Court-adopted plan via email.

Accordingly,

**IT IS HEREBY ORDERED** that the current St. Louis County, Missouri Council Districts are declared in violation of the Fourteenth Amendment to the United States Constitution and

---

[19] In terms of voting age population specifically, the black voting age populations of District One and District Four are 67.15% and 64.19% of their total populations, respectively.

Article I, Section 2 of the Constitution of Missouri.

**IT IS FURTHER ORDERED** that the apportionment plan adopted by the Court in this memorandum and attached hereto as Exhibit A is declared to meet all federal and state constitutional requirements.

**IT IS FURTHER ORDERED** that said plan of reapportionment will govern the election of members of the St. Louis County, Missouri County Council beginning with the 2022 election and continuing thereafter until St. Louis County, Missouri Council Districts are reapportioned in accordance with applicable law.

**IT IS FURTHER ORDERED** that Defendants in the performance of their duties and functions be governed by and comply with the court-adopted plan of apportionment.

NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of February, 2022.